Kenta Tsuda (Alaska Bar No. 1605046) (admission pending)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ktsuda@earthjustice.org
    ejorgensen@earthjustice.org

Peter Heisler (Alaska Bar No. 1602005) (admission pending)
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7104
E: pheisler@earthjustice.org

*Attorneys for Plaintiffs Chilkat Indian Village of Klukwan et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CHILKAT INDIAN VILLAGE OF KLUKWAN; <br> SOUTHEAST ALASKA CONSERVATION COUNCIL; <br> LYNN CANAL CONSERVATION; and <br> RIVERS WITHOUT BORDERS, a project of TIDES <br> CENTER, <br><br>     *Plaintiffs*, <br><br>     v. <br><br> BUREAU OF LAND MANAGEMENT; BRIAN STEED, in <br> his official capacity as Acting Director of the Bureau of Land <br> Management; KAREN MOURITSEN, in her official <br> capacity as Acting Alaska State Director of the Bureau of <br> Land Management; and DENNIS TEITZEL, in his official <br> capacity as Field Manager of the Bureau of Land <br> Management Glennallen Field Office, <br><br>     *Defendants*. | Case No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
(5 U.S.C. §§ 701-706; 42 U.S.C. § 4332)

# INTRODUCTION

1.      This action challenges Defendants' approvals advancing a hardrock mine exploration project within the Chilkat River watershed northwest of Haines, Alaska. Defendants' actions violate the National Environmental Policy Act and the Administrative Procedure Act.

2.      The Chilkat watershed and its natural values are central to the livelihoods and culture of many who fish, hunt, and otherwise enjoy its natural beauty and wildlife. The watershed's wild stocks of salmon have been, and continue to be, essential to the way of life of the Tlingit people who have resided there for millennia, and are important to commercial and recreational users in the region as well. The salmon also support a globally unique convergence of thousands of bald eagles that return each fall to an area of the watershed protected by the State of Alaska as the Alaska Chilkat Bald Eagle Preserve.

3.      Today, some lands in the Chilkat watershed are managed by the United States Department of the Interior's Bureau of Land Management (BLM). These lands are currently open to mining.

4.      Congress has mandated that, in overseeing mining operations on these lands, BLM must consider the environmental impacts of its decisions. Under the National Environmental Policy Act, BLM must evaluate not only an action's direct impacts, but also its cumulative effects and the effects of future connected stages of a project. The agency's evaluation must be timely, in order meaningfully to inform the agency's decision making while the agency retains full discretion to preclude impacts.

5.      Plaintiffs initiate this action because Defendants have violated Congress's mandate by approving exploration plan proposals for the Palmer mining project (Palmer Project)

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                                 1

in the Chilkat watershed without considering the potential impacts of full mine development while it still has full discretion to ensure protection of the unique values of the region.

6.      In August 2016, BLM approved a proposal by Vancouver-based mining company Constantine Metal Resources Limited, through its subsidiary Constantine North Incorporated (collectively "Constantine Metals" or "the Company"), involving five years of exploration activities on the Company's claims in the Chilkat watershed.  In connection with this decision, members of the public, including Plaintiffs, urged the agency to consider impacts that development of a future mine could have on the environment and downstream communities. Development of a mine at the Palmer Project is likely to cause substantial environmental impacts, including by generating a form of environmental pollution known as acid-mine drainage, which would pose severe threats to the watershed and those who rely upon it, and could even result in catastrophic impacts from events like tailings-dam failures.  Notwithstanding these risks, BLM refused to consider the impacts of potential mine development, and concluded that the Palmer Project will have no significant impact on the environment.

7.      In September 2017, BLM approved a road extension proposed by Constantine Metals connecting the Company's activities on federal lands to exploration activities on adjacent land owned by a state corporation.  Again, notwithstanding requests by members of the public, including Plaintiffs, the agency refused to consider potential development impacts.

8.      Today, BLM retains the unconstrained discretion to protect the pristine, ecologically important areas encompassing the Palmer Project, including by a withdrawal of these federal lands from mining.  But the agency is likely to lose this full discretion before its next decision point on the Palmer Project.  Constantine Metals may soon reach the point of "discovery," that is, the point at which it has gathered sufficient information to demonstrate it

has found a commercially valuable deposit. If there is a discovery, rights would vest in the Company by operation of law, and, under federal law, BLM's ability to protect project area lands, including by withdrawal, would be substantially constrained or lost. BLM insists it would consider development impacts later. But if analysis is not undertaken now, it would not be timely: intervening events would have already limited BLM's authority to prevent development impacts before the agency has even considered them.

9. Defendants have violated the National Environmental Policy Act and the Administrative Procedure Act by approving Constantine Metals' exploration plan, and its subsequent road extension proposal, causing Plaintiffs irreparable harm. Plaintiffs ask the Court to remedy this harm by requiring BLM to meet its obligations under the National Environmental Policy Act to consider the impacts of its approval decisions, including the impacts of future mine development on the Chilkat watershed and the people who depend on it, and by staying BLM's approvals pending that evaluation.

## JURISDICTION & VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

11. This Court can grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 (the Declaratory Judgment Act) and 5 U.S.C. §§ 701-706 (the Administrative Procedure Act).

12. An actual, justiciable controversy now exists between Plaintiffs and Defendants.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e). Defendants BLM, Karen Mouritsen, and Dennis Teitzel reside in this judicial district: BLM's Glennallen Field Office, which has authority over the Haines Borough, including the Palmer Project area, and is charged with reviewing submissions associated with the Palmer Project, is headquartered in the

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                          3
Case 3:17-cv-00253-TMB    Document 1    Filed 12/04/17    Page 4 of 25

District of Alaska. This civil action is brought against officers of the United States acting in their official capacities, and a substantial part of the events or omissions giving rise to the claims in this case occurred in the District of Alaska.

## PLAINTIFFS

14.     Plaintiff Chilkat Indian Village of Klukwan ("Klukwan" or "the Village") is a federally recognized Indian tribe whose traditional territory includes the entirety of the Palmer Project area. Klukwan is situated along the Chilkat River. Villagers' ancestors settled the Chilkat River valley thousands of years ago because of its abundant resources. Today, Villagers continue to practice traditional subsistence fishing, hunting, mushroom-, and berry-gathering in the Chilkat watershed, including in the Palmer Project area, the lands surrounding it, and the waters immediately downstream. These practices are important to the Village and its members not only economically, but also for the maintenance and enrichment of the Village's traditional values and cultural life. Tourism in the Chilkat River region is also economically important to the Village. The Chilkat watershed and its resources are culturally and economically crucial to the Village's way of life.

15.     Plaintiff Southeast Alaska Conservation Council (SEACC) is a conservation organization that has been working on mining and clean water issues in Southeast Alaska since 1970. SEACC members include commercial and sport fishers, tourist outfit operators, and tribal members. Members of SEACC regularly use and enjoy the public lands and waters of Alaska, including the lands within the Palmer Project area and the waters immediately downstream of it, to pursue a variety of interests, including the harvest of salmon and other natural resources for customary and traditional uses (subsistence), recreational and commercial purposes, and the aesthetic enjoyment of forest, alpine, and riparian resources. Promoting clean water and strong

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                          4
Case 3:17-cv-00253-TMB     Document 1     Filed 12/04/17     Page 5 of 25

water-quality standards is an essential component of SEACC's goal to protect Southeast Alaska's natural resources, including its public lands, and SEACC members' use of those lands and waters.

16.     Plaintiff Lynn Canal Conservation (LCC) is a grassroots conservation organization based in Haines, Alaska, with around 200 members.  Founded in 1972, LCC has a long-term commitment to the health of fish and wildlife populations and to regulations that promote clean water and stream protection for watersheds important to commercial, sport, and subsistence salmon fisheries.  LCC has been commenting on and actively involved with mining, road building, and other resource-development issues in the northern Lynn Canal region for 45 years.  LCC members regularly use public lands and waters, including the lands within and surrounding the Palmer Project area and the waters immediately downstream of it, for recreational and commercial purposes, including the harvest of salmon, and the aesthetic enjoyment of forest, alpine, and riparian resources.  LCC is committed to the belief that protecting fish habitat is an essential part of a healthy economic future for the Lynn Canal region and Southeast Alaska.

17.     Plaintiff Rivers Without Borders (RWB), a project of Tides Center, is a United States and Canadian nonprofit conservation organization raising awareness of the outstanding ecological, cultural, and economic values of the Alaska–British Columbia transboundary watersheds, including those of the Chilkat and Klehini Rivers, and encouraging ecosystem-based planning and stewardship toward safeguarding those values.  RWB has supporters in Haines, Alaska, who use the Palmer Project area and the Chilkat watershed for their salmon and other values, and a history of engagement in management issues related to the Chilkat watershed, including the Alaska Chilkat Bald Eagle Preserve.

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                                  5

18.    Plaintiffs' members live, raise their families, work, hunt, fish, hike, view wildlife, and otherwise recreate in and conduct educational, cultural, subsistence, and other activities in, around, and downstream of the Palmer Project area.  Plaintiffs' members seek to continue to use the Palmer Project area for these and other purposes.  Defendants' unlawful approvals of the exploration plan and road extension will directly and irreparably injure these interests.

19.    Activities authorized under the exploration plan and road extension—including the transportation of personnel, supplies, equipment, and waste; infrastructure construction; and exploration drilling—have adversely affected and will continue detrimentally to affect Plaintiffs' members' uses of the Palmer Project area and its immediate vicinity.  Plaintiffs' members' use of the Palmer Project area has been and will be curtailed or prevented by exploration activities, including the use of heavy machinery involved in exploration activities, by exploration infrastructure, and by drilling activity.  The sights and sounds of exploration activities at the Palmer Project area limit Plaintiffs' members' use of these public lands for various purposes, including hunting, angling, hiking, nature and wildlife viewing, bird watching, foraging, and the enjoyment of natural beauty.  Industrial noises caused by exploration activities also may displace terrestrial, avian, and aquatic species, limiting Plaintiffs' members' use of the Palmer Project area and its vicinity, in connection with activities such as hunting, angling, wildlife viewing, and bird watching.  Surface disturbances caused by exploration activities, including drilling, the construction of a road and laydown areas, as well as the disposal of wastes from road building, will change the physical appearance of the Glacier Creek valley, and potentially its water quality, and reclamation is unlikely to restore the area completely after operations have terminated. These changes may displace terrestrial, avian, and aquatic species that inhabit the area or adversely affect their habitats.  Such changes would detrimentally affect Plaintiffs' members' use

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                    6
Case 3:17-cv-00253-TMB    Document 1    Filed 12/04/17    Page 7 of 25

of the Palmer Project area, including for hunting, angling, hiking, nature and wildlife viewing, bird watching, and the enjoyment of natural beauty. Ultimately, Plaintiffs' members would be adversely affected by full-scale development of a mine, including through effectively permanent industrial impacts at the mine site and potential water-quality impacts, with potential impacts to salmon and other values throughout the Chilkat region.

20.     Defendants' failures to assess the full range of environmental impacts of the exploration plan and road extension have irreparably injured, and continue to injure, the interests of Plaintiffs and their members. The relief requested in this lawsuit would redress these injuries by compelling Defendants to undertake the environmental review mandated by Congress under the National Environmental Policy Act.

## DEFENDANTS

21.     Defendant BLM is a bureau within the U.S. Department of the Interior. BLM manages the federal public lands upon which the Palmer Project is situated. BLM is responsible for complying with and enforcing mining laws, including the General Mining Law of 1872 and the Federal Land Policy and Management Act on federal lands under its management. BLM evaluates and approves or disapproves mining plans for lands under its management and is responsible for complying with the National Environmental Policy Act and the Administrative Procedure Act.

22.     Defendant Brian Steed is the Acting Director of BLM. He is sued in his official capacity.

23.     Defendant Karen Mouritsen is the Acting Alaska State Director of BLM. She is sued in her official capacity.

24.     Defendant Dennis Teitzel is the Field Manager of the Glennallen Field Office of

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                                              7
Case 3:17-cv-00253-TMB     Document 1     Filed 12/04/17     Page 8 of 25

BLM, the office that oversees the management of the Palmer Project area lands.  He is sued in his official capacity.

## STATUTORY FRAMEWORK

### I.      The General Mining Law of 1872

25.      Hardrock mining on federal lands is governed by the General Mining Law of 1872 ("the General Mining Law").  30 U.S.C. §§ 21-54.  Under the General Mining Law, unless otherwise withdrawn or closed, mineral deposits on federal lands are open to exploration.  A federal agency's approval of exploration activities creates no entitlement to development and therefore can be revoked by the government.

26.      The discovery of a valuable mineral deposit creates a vested property right associated with the land, specifically a claimant's right to exploit the subsurface minerals, subject to regulatory standards.  Under the courts' prudent-person marketability test, discovery and the associated vesting of property rights require a showing of prospective profitability or a reasonable prospect of success in developing a valuable mine, given market conditions and relevant operating costs.

### II.     The Federal Land Policy and Management Act

27.      The Federal Land Policy and Management Act (FLPMA) governs BLM's management of public lands.  43 U.S.C. §§ 1701-87.  One of Congress's goals in enacting FLPMA was to ensure that the public lands are managed in accordance with policies that "protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife . . . and that will provide for outdoor recreation and human occupancy and use[.]"

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                                                    8
Case 3:17-cv-00253-TMB     Document 1     Filed 12/04/17     Page 9 of 25

*Id.* § 1701(a)(8).

28.     Under FLPMA, BLM may protect public lands by withdrawing them from the operation of laws that would ordinarily allow entry, such as the General Mining Law. Land withdrawals under FLPMA, however, are subject to valid existing rights, including the property right that vests with discovery of a valuable mineral deposit. On lands withdrawn from appropriation under the General Mining Law, BLM will not approve development activities unless the agency determines that a valuable deposit had been discovered before the withdrawal, and that the claim remains valid.

29.     In the absence of a withdrawal, FLPMA requires that the agency "take any action necessary to prevent unnecessary or undue degradation of the lands." *Id.* § 1732(b). BLM's authority to prevent unnecessary or undue degradation of the lands it manages is defined by regulation and is not as broad as the protections conferred by a withdrawal.

30.     BLM implements FLPMA in connection with mining on BLM-managed lands through regulations it has promulgated. Under these regulations, where exploration will cause more than negligible disturbance, the prospector must submit a plan of operations for approval by BLM. BLM will then determine whether to approve the plan as submitted; approve the plan subject to changes or conditions; or disapprove or withhold approval of the plan because it is incomplete, it proposes operations in an area segregated or withdrawn from the operation of the General Mining Law, or it proposes operations that would result in unnecessary or undue degradation of public lands.

## III.     The National Environmental Policy Act

31.     The National Environmental Policy Act (NEPA) is the United States' basic national charter for protection of the environment. It requires federal agencies to take a hard

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                                     9
Case 3:17-cv-00253-TMB     Document 1     Filed 12/04/17     Page 10 of 25

look at environmental consequences before approving actions involving public resources. 42 U.S.C. §§ 4331-47. The Council on Environmental Quality has promulgated regulations implementing NEPA that are binding on federal agencies.

32. Under NEPA and its implementing regulations, an agency considering a major federal action must determine whether the action might significantly affect the quality of the human environment. Where, based on a preliminary environmental assessment (EA), the agency finds that the action has no potential significant impact, it must explain its finding in a document called a finding of no significant impact (FONSI).

33. Where, however, the agency determines that there may be a significant impact, it must prepare an environmental impact statement (EIS). This document must provide a full and fair discussion of significant environmental impacts and inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse effects.

34. In assessing potential environmental impacts, the agency's analysis must be sufficiently broad and timely.

35. In order for analysis to be accurate and informative, the agency must consider the full range of potential impacts associated with the action. An EA must be comprehensive, analyzing not only the action's potential direct effects, but also potential cumulative effects (*i.e.*, those which could result from the incremental impact of the action when added to those of other past, present, and reasonably foreseeable future actions). The agency also must consider the effects of connected actions, such as potential actions that are linked to the action being approved.

36. Congress further directed that the agency's analysis occur in time to inform both agency and private decision making. The environmental information must be available to

officials, interested private parties, and the public before the agency makes its decision. Agencies must integrate the NEPA process with other planning at the earliest possible time to ensure that their decisions take environmental values into account.

37.     NEPA analysis, including where necessary preparation of an EIS, must precede an irreversible or irretrievable commitment of resources that could predetermine the agency's decision making with respect to the proposed action. Where potential impacts are significant, the agency must conduct analysis early enough to influence the decision-making process. Analysis cannot justify decisions already made. Accordingly, the agency must assess future impacts before it could lose the discretion to prevent such impacts.

38.     In the context of mining operations on federal lands, BLM must consider the effects of mine development at the exploration stage. This is because BLM's discretion to prevent these impacts could be limited if it waits: under the General Mining Law, a property right vests upon discovery of a valuable mineral deposit, and under FLPMA, the agency's ability to protect fully the values of the Chilkat watershed, including its discretion to withdraw lands, is constrained or lost in the face of a vested property interest. The agency must consider the potential effects of development at the exploration stage, before its discretion to prevent development impacts is constrained in this way.

## STATEMENT OF FACTS

### I.     The Palmer Project Area

39.     In 2006, Constantine Metals began exploring the Palmer Project area, a parcel of BLM-managed federal lands 34 miles northwest of Haines, in order to determine potential for development of a hardrock mine.

40.     The Palmer Project area lies within a steep glacial valley in the headwaters of

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                          11
Case 3:17-cv-00253-TMB     Document 1     Filed 12/04/17     Page 12 of 25

Glacier, Sarah, Little Jarvis, and Jarvis Creeks. These four creeks flow into the Klehini River, which itself flows into the Chilkat River. Within the Palmer Project area, Glacier Creek flows through a narrow floodplain bordered by steep mountains, widening before it joins the Klehini River. Glacier Creek provides habitat for fish species such as coho salmon, cutthroat trout, and Dolly Varden. The Klehini River is inhabited by all five species of Pacific salmon, as well as cutthroat trout and Dolly Varden.

41. The Chilkat River takes its name from the Tlingit "Jilkaat Heeni," meaning "storage container for salmon." The Chilkat watershed is ranked as one of the highest-value watersheds for salmon habitat in Southeast Alaska. The Chilkat River is inhabited by all five species of Pacific salmon, steelhead, cutthroat trout, Dolly Varden, eulachon, Pacific lamprey, and whitefish.

42. The Chilkat watershed includes riparian forests and overlapping coastal and interior ecosystems that provide some of the richest wildlife habitat and the highest mammalian species diversity in Southeast Alaska. The Palmer Project area and the watershed downstream of it are habitats for numerous terrestrial, avian, and aquatic species. The Palmer Project area itself includes habitat for terrestrial species such as mountain goats, moose, black and brown bears, wolverines, Alexander Archipelago wolves, and American marten. Numerous avian species may also use the Palmer Project area for breeding, as a migration stopover, or as year-round habitat.

43. Immediately downstream of the Palmer Project area, the Alaska Chilkat Bald Eagle Preserve ("the Preserve") sits at the confluence of Klehini, Tsirku, and Chilkat Rivers. The State of Alaska created the Preserve in 1982 to protect and perpetuate the Chilkat bald eagles and their essential habitats in recognition of their statewide, nationally, and internationally significant values in perpetuity. It also designated the area at the confluence of the rivers as

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                          12
Case 3:17-cv-00253-TMB    Document 1    Filed 12/04/17    Page 13 of 25

critical habitat for the eagles. Here, an unusual glacial gravel deposit, accumulated over millennia, allows warm waters stored within the area's alluvial fan to flow from under the channel beds, resulting in an expanse of water that does not freeze in winter. Coho and chum salmon run in these waters exceptionally late in the year, bringing thousands of bald eagles to this area of the Preserve in late October and November for a last salmon feeding before the onset of winter. Eagles arrive from the U.S. Pacific Northwest, Canada, and Interior Alaska for the largest bald eagle concentration in the world.

44.     From the Preserve, the Chilkat River flows to the ocean at the Chilkat Inlet.

45.     The Palmer Project area and the watershed downstream of it are of significant socioeconomic and cultural importance to the people of Southeast Alaska.

46.     The Palmer Project area lies in the traditional territory of the Chilkat Tlingit people, who have lived in the Chilkat watershed for thousands of years. Historically, Klukwan ("eternal village" in the Tlingit language) thrived on the watershed's abundant salmon. Today, Klukwan continues to rely on the salmon and other natural resources of the Chilkat watershed. Subsistence harvests, particularly of salmon from the Chilkat and Klehini Rivers, are the lifeblood of the Village. Villagers rely on all five species of Pacific salmon, steelhead, Dolly Varden, and eulachon. For eulachon, a species used for traditional and cultural practices, the Chilkat is the most consistently fished river in Southeast Alaska. Impacts to resources of the watershed are impacts to livelihoods in Klukwan. The watershed is also important for cultural reasons: Klukwan is a traditional Tlingit community for which the cultivation of traditional practices, including traditional harvest practices, the clan and moiety systems, and the Tlingit language are central. The community's and individuals' relationships with place, particularly the traditional territories of the Chilkat watershed, are central to many of these cultural practices.

47.     The Chilkat watershed is also vitally important to the fish populations that sustain the regional commercial fishery.  The salmon populations returning to and spawning in this drainage are harvested by commercial fishers in Lynn Canal and in other net and troll fisheries of northern Southeast Alaska.  The jobs, businesses, and economic activity supported by these harvests are important to the economy of the Haines region, as well as to Southeast Alaska generally.

48.     The watershed is enjoyed by sport anglers from Southeast Alaska and farther afield.  For example, the Chilkat River drainage was used by over 1,600 sport anglers for over 5,300 angler days in 2015 alone.

49.     The Preserve also draws visitors to the Chilkat watershed.  The tourist presence supports the local economy, allowing Klukwan to extend the visitor season into early winter and generate additional revenue.  With tourism in mind, and with congressional support, the Village has planned a Bald Eagle Observatory to provide a viewing lobby with picture windows and spotting scopes allowing visitors to take in a view of the sky, Chilkat Mountain peaks, the Chilkat River, and the many eagles that gather in this location.

50.     Many other people also visit the area.  They hunt, fish, view wildlife, watch birds, hike, ski, explore, and study the different forest, alpine, and riverine landscapes of the watershed, and otherwise use and enjoy the natural beauty and values of the Chilkat watershed.

## II.     Hardrock Mining at the Palmer Project Area

51.     Hardrock mining at the Palmer Project could have significant detrimental effects on the environment.

52.     Hardrock mining refers to the multi-stage process of extracting minerals from a body of metal-bearing rock, known as ore.  The first stage is exploration: the process of seeking

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                              14
Case 3:17-cv-00253-TMB     Document 1     Filed 12/04/17     Page 15 of 25

an ore body and then evaluating whether it can be mined profitably.

53.     Exploration begins with preliminary searches to find mineral-bearing rocks on the surface of the exploration area. Exploration projects can proceed to intermediate and then advanced exploration, during which subsurface sampling provides a more detailed assessment of what minerals may be present in an area. At these stages, drilling machinery is used to extract a series of "cores," cylindrical sections of the subsurface rock, which are analyzed for valuable metals. If through these activities a valuable deposit is discovered, the likely next stage in the project is development: the process of physically accessing the ore body, breaking and extracting ore, separating concentrated minerals from the ore, and disposing of waste byproducts, together with construction of the infrastructure necessary for these activities.

54.     Exploration activities displace users from the Palmer Project area and its vicinity. Activities including construction, exploration drilling, and transportation of materials, personnel, equipment, and wastes into, around, and out of the Palmer Project area, displace users by occupying physical spaces with infrastructure and equipment. The activities generate loud noises that can displace and disturb terrestrial wildlife, birds, and aquatic life, which users hunt, fish, or view. Activities can create safety concerns related to the use of heavy machinery, materials, and vehicles.

55.     The potential harms arising at the development stage are greater in intensity, scope, and duration. The operating life of a hardrock mine can span decades. During and leading up to this time, displacement from the Palmer Project area would be even more extensive and severe than during exploration: development would likely involve the construction of more and larger infrastructure such as tunnels or mine pits, processing and treatment plants, and waste storage facilities; the extraction and movement of larger magnitudes of materials, including vast

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                          15
Case 3:17-cv-00253-TMB     Document 1     Filed 12/04/17     Page 16 of 25

quantities of ore and waste rock; and a significant increase in transportation of supplies, fuel, equipment, and personnel. Development can have lasting changes on the physical landscape: mine pits or tunnels, as well as waste impoundments, often become permanent features of the land and require ongoing monitoring and maintenance activities that result in long-term disturbance.

56. Moreover, development impacts are not confined to the mine site, but threaten the downstream environment, particularly via pollution by mining wastes. Constantine Metals has indicated that the Palmer Project area contains a volcanic-associated sulfide deposit. Volcanic-associated sulfide deposits are among the deposit types most likely to generate a form of pollution known as acid-mine drainage. Acid-mine drainage refers to pollution resulting from oxidation when sulfide rock is exposed to air and water. Mining activities in sulfide rock increase the exposed surface area of the rock, and with it the rate of oxidation and generation of acidity. Extraction and ore milling (the process of grinding ore into fine pieces to extract metals) could generate millions, even billions, of tons of waste rock with a vast net surface area, from which acids and metals could leach.

57. If the Palmer Project area is developed, acid could be transferred to contact waters, *i.e.*, waters exposed to mining wastes. Acidity of contact waters can be strong, similar in pH to vinegar or lemon juice. The highest levels of acidity ever measured in the environment were in contact waters from a copper-zinc mine in the United States; the contact waters from this mine were more acidic than battery acid. When exposed to acidic waters, rock in the Palmer Project area could release metals such as aluminum, cadmium, copper, and zinc.

58. The Company could use water-treatment methods to neutralize acidity and precipitate dissolved metals from contact waters before these waters are released to the Palmer

Project area's surrounding environment. However, these methods frequently fail. The likelihood of failure is significant because mine wastes can persist and generate acid-mine drainage over a very long time horizon.

59. Waste impoundment failures could also pose risks to the environment around the Palmer Project area and beyond. Development at the Palmer Project area could involve constructing a dam to impound the slurry of granular waste rock, knowns as "tailings," that results from mining. This method of waste disposal, known as wet closure, is particularly common where a project is undertaken in areas involving steep gradients, such as the glacial valleys of the Palmer Project area. A tailings dam in the Palmer Project area would have to withstand the lateral force from potentially huge quantities of tailings and contact waters. Failures of tailings dams do occur: over the century or so during which they have been used, tailings dams have failed at a rate of around two major incidents per year. Serious dam failures are increasing as a proportion of total failures, with 49 percent of serious failures occurring since 1990. Where a dam fails, contaminated water and tailings can be released in large quantities. Recent examples of such disasters include failures of tailings dams at British Columbia's Mount Polley Mine in 2014 and Brazil's Fundão tailings facility in 2015.

60. The risk of tailings-dam failure at the Palmer Project area could be heightened by the possibility of seismic activity, because ground shaking, as well as earthquake-triggered landslides and avalanches, can compromise tailings dams. The Palmer Project area lies within the Fairweather-Queen Charlotte fault region, close to the Denali, Chilkat River, and Chugach-St. Elias Faults. The Palmer Project area experiences frequent and at times strong seismic activity. According to BLM, a nearby earthquake could cause extensive damage at the Palmer Project area, but the probability of destructive earthquakes is unknown because regional

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                              17
Case 3:17-cv-00253-TMB   Document 1   Filed 12/04/17   Page 18 of 25

tectonics have not been studied in detail.

61.     Rather than employing wet closure, tailings at the Palmer Project area could be dry stacked, *i.e.*, dewatered and compacted, then stored, usually in piles.  This approach also poses risks to the environment:  like other mine wastes, dry tailings can continue to oxidize and generate acidic and metals-loaded contact waters, which must be impounded and treated to avoid environmental harm.  Moreover, the tailings themselves can be released directly to the environment as fugitive dust from piles, during transport, or upon structural failure (*e.g.*, during seismic activity or a landslide).

62.     A pollution event upstream of Klukwan and the spawning and rearing reaches of the Klehini and Chilkat watersheds could harm the area and its ecological values.  The Palmer Project area experiences considerable and consistent rainfall and, in the spring and summer, snowmelt.  Waters from the Palmer Project area drain via surface flow or seepage as groundwater into Glacier Creek at the valley's trough, then flow into the salmon-spawning waters of the Klehini and Chilkat Rivers.  These waterbodies serve as migratory pathways for salmon, trout, and eulachon, including populations that sustain the subsistence harvests of Klukwan, the commercial fisheries of Lynn Canal, and the raptors of the Preserve.

63.     Pollution of downstream waters by acidic or metals-loaded contact waters, or by tailings, could harm aquatic organisms.  A spike in dissolved metals could have population-level effects on fish in the Chilkat watershed.

64.     Effects on both the natural values of the area and its people would follow.  For example, the eagles returning to the Preserve could struggle if late-season salmon runs were adversely affected.  Other wildlife reliant on salmon, trout, and eulachon—birds and mammals— could experience follow-on population declines.  In turn, people in or drawn to this corner of

Southeast Alaska might no longer be able to enjoy these values.

65.     Population-level effects on salmon runs could harm the commercial fisheries of Lynn Canal and Southeast Alaska more broadly, in turn affecting many local jobs and businesses that commercial fishing supports.

66.     In Klukwan, adverse effects on the Chilkat watershed's salmon, trout, and eulachon could interfere with Villagers' traditional way of life.  Such effects could compromise the economic viability of the Village.

## III.     The Palmer Project Exploration Plan

67.     On May 22, 2015, Constantine Metals submitted a Plan of Operations ("the Exploration Plan") proposing expanded exploration activities.  The Exploration Plan included infrastructure for helicopter-supported exploration drilling, drill pads, and construction of a road starting in the Glacier Creek valley, crossing Glacier Creek and climbing the south wall of the valley with switchbacks to an equipment laydown area.  The proposed infrastructure could allow road access to drill sites on the face of the south wall, provide a staging area for helicopter- and ground-supported exploration activities, and facilitate transport of personnel, equipment, fuel, and supplies.  Constantine Metals proposed around five years of exploration using this infrastructure.

68.     Given the level of surface disturbance contemplated, pursuant to agency regulations, Constantine Metals sought BLM's approval for the Exploration Plan.

## IV.     Defining the Scope of Analysis at the Palmer Project

69.     On November 30, 2015, BLM's Glennallen Field Office announced preparation of an EA for the Exploration Plan.  The agency gave notice of a review period regarding the scope of the environmental assessment and stated that it would accept public comment.

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                                      19

70.     Members of the public submitted comments on the scope of BLM's review. Plaintiffs commented that BLM's analysis should encompass not only direct effects of the proposed action, but also connected and cumulative impacts beyond the Exploration Plan's five-year horizon, including development impacts.

## V.     The Palmer Project Exploration Plan Draft EA

71.     On April 25, 2016, BLM issued a draft EA for the Exploration Plan ("the Draft EA").

72.     The Draft EA restricted consideration of mining-related cumulative impacts to ongoing, noticed exploration activities (with a time horizon ending in 2019). The effects of later stages in the mining process were not considered. The Draft EA found no potentially significant impacts—direct, connected, or cumulative—to water quality, wildlife, or fisheries from the proposed Exploration Plan.

73.     Regarding Klukwan, the Draft EA stated that effects on community characteristics and culture as related to subsistence would be minimal.

74.     BLM opened a 30-day public review and comment period on the Draft EA.

75.     Members of the public submitted comments on the Draft EA. Again, comments from Plaintiff groups addressed the scope of review, pointing out that the agency should have considered connected and cumulative impacts beyond the time horizon of the Exploration Plan, including the effects of development.

## VI.     BLM's FONSI and Approval of the Palmer Project Exploration Plan

76.     On August 18, 2016, BLM issued a Decision Record approving the Exploration Plan, a final EA, and a FONSI.

77.     In reaching its approval decision, BLM did not change the scope of its analysis

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                                                                          20

from the Draft EA. Regarding the exclusion of development impacts, BLM stated: Exploration must be conducted before the prospect can lead to an economical discovery. It also stated: The proponent is still in the exploration phase; therefore, it is not a reasonably foreseeable future action to consider mining in this analysis.

78.     In its decision the agency stated: BLM administers the surface use of the public lands but cannot prevent the claimant or their operators from exploring or developing their mineral resources. It also stated: Development of mineral resources within an active unpatented mining claim was a non-discretionary action on behalf of BLM's decision process.

79.     Following approval of the Exploration Plan, Constantine Metals began road construction and drilling operations. According to the Company, the Palmer Project had entered the advanced stage of exploration.

## VII.     The Road Extension Proposal

80.     On January 3, 2017, Constantine Metals submitted to BLM a request for approval of a modification to the road design included in the Exploration Plan and approved in the final EA ("the Road Extension"). The proposed modification entailed an 800-foot extension of the previously-approved road for the purpose of providing access to immediately adjoining state-corporation lands under lease to Constantine Metals.

81.     On April 28, 2017, BLM gave public notice of Constantine Metals' modification request, and opened a review period, accepting public comment on the proposed Road Extension and associated environmental analysis.

82.     Members of the public submitted comments. Plaintiffs commented that BLM should reject the request due to insufficient information. Alternatively, they requested full environmental analysis of the proposed Road Extension encompassing all direct, connected, and cumulative impacts. The comments focused on the need to assess the environmental risks to the

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*

downstream watershed posed at the development stage, including from potential acid-mine drainage and tailings-dam failure. They described and included numerous sources documenting the scientific consensus that acid-mine drainage is a potential consequence of hardrock mining at a deposit like the Palmer Project's; that tailings-dam failure could follow from development, a possibility heightened by potential seismic activity; and that acid-mine drainage could be harmful to fish populations in waters downstream.

## VIII.  BLM's Approval of the Road Extension

83.      On September 21, 2017, BLM issued a Decision Record approving the Road Extension, along with an associated EA and a FONSI.

84.      In the EA, BLM asserted that very few exploration projects actually make it to the point that a mine can be developed, and that the Palmer Project has a greater chance of not becoming a mine than that it does of becoming a mine. The agency stated that it would not consider development impacts until after the Company had completed exploration and had produced a thorough valuation of the deposit's resources—essentially, until after the Company had made a discovery.

## CLAIM FOR RELIEF

85.      Plaintiffs incorporate each and every allegation set forth in the Complaint by reference.

86.      Under NEPA, an agency must consider potential environmental impacts before proceeding with a major federal action, to determine whether it could have significant effects on the environment and therefore necessitate the preparation of a detailed environmental impact statement before a decision is taken. In determining whether a proposed action may have potentially significant impacts, the agency must consider not only the action's direct impacts, but

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.
22

also the cumulative impacts of both the proposed action and reasonably foreseeable future actions, as well as the effects of connected actions. The agency's consideration must be timely, in order meaningfully to inform the agency's decision making while the agency retains full discretion to prevent potential impacts.

87. BLM's approvals of the Exploration Plan and Road Extension are final, major federal agency actions. BLM acknowledged in both the Exploration Plan FONSI and the Road Extension EA that it did not consider impacts of mine development in connection with either of these agency actions, and it did not analyze whether such impacts were potentially significant.

88. The impacts from development of a mineral deposit at the Palmer Project are impacts from actions connected to, and are cumulative to the impacts of, BLM's approvals of the Exploration Plan and Road Extension. Consideration of such impacts at a later time would not be timely, because BLM is likely to lose its full discretion to prevent these potential impacts before its next decision point on the Palmer Project.

89. Defendants' decisions to approve the Exploration Plan and Road Extension without an adequate analysis of potential impacts associated with these actions, including potential impacts from mine development, were arbitrary, capricious, and not in accordance with law, in violation of NEPA, 42 U.S.C. § 4332(2)(C), and the Administrative Procedure Act, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

1. Enter a declaratory judgment that Defendants' decisions to approve the Exploration Plan and Road Extension were arbitrary, capricious, and not in accordance with law;

2. Enter appropriate injunctive relief to ensure that Defendants comply with NEPA

and to prevent irreparable harm to Plaintiffs, their members, and the environment until such

compliance occurs, including by halting exploration activities permitted by approval of the

Exploration Plan and Road Extension at the Palmer Project until Defendants have completed an

environmental review that considers the potential impacts of mine development and have

reassessed the potential for significant impacts based on this review;

     3.     Award Plaintiffs the costs of this action, including reasonable attorneys' fees

pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

     4.     Grant such other relief as this Court deems just and proper.


Respectfully submitted this 4th day of December, 2017.

*s/ Kenta Tsuda*
Kenta Tsuda (Alaska Bar No. 1605046)
(admission pending)
EARTHJUSTICE

*s/ Peter Heisler*
Peter Heisler (Alaska Bar No. 1602005)
(admission pending)
EARTHJUSTICE

*s/ Eric P. Jorgensen*
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

*Attorneys for Plaintiffs Chilkat Indian Village of Klukwan, Southeast Alaska Conservation Council, Lynn Canal Conservation, and Rivers Without Borders, a project of Tides Center*

COMPLAINT
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No.                                   24