Kenta Tsuda (Alaska Bar No. 1605046)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ktsuda@earthjustice.org
   ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Chilkat Indian Village of Klukwan et al.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| CHILKAT INDIAN VILLAGE OF KLUKWAN *et al*., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BUREAU OF LAND MANAGEMENT *et al*., | ) | Case No. 3:17-cv-00253-TMB |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CONSTANTINE NORTH, INC. *et al.*, | ) | |
| | ) | |
| *Intervenor-Defendants.* | ) | |
| | ) | |

**PLAINTIFFS' PRINCIPAL BRIEF ON SUMMARY JUDGMENT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56
AND DISTRICT OF ALASKA LOCAL RULE 16.3**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

I.    MINING POSES RISKS TO THE PALMER PROJECT AREA AND THE
      DOWNSTREAM ENVIRONMENT .............................................................. 3

      A.    The Palmer Project is Situated in the Ecologically and Socially Important
            Chilkat River Watershed. ....................................................................... 3

      B.    Hard-Rock Mining at the Palmer Project Area Could Have Significant
            Detrimental Effects on the Chilkat River Watershed. ........................... 7

II.   BLM REFUSED TO CONSIDER DEVELOPMENT IMPACTS WHEN
      AUTHORIZING EXPLORATION ACTIVITIES AT THE PALMER PROJECT ......... 12

      A.    BLM Approved the Exploration Plan Without Considering Development
            Impacts. ............................................................................................. 12

      B.    BLM Approved the Road Extension Proposal Without Considering
            Development Impacts. ......................................................................... 15

ARGUMENT ...................................................................................................... 16

I.    PLAINTIFFS HAVE ARTICLE III STANDING. ........................................... 16

II.   STANDARD OF REVIEW ........................................................................ 17

III.  BLM'S REFUSAL TO CONSIDER POTENTIAL IMPACTS OF FUTURE
      MINE DEVELOPMENT VIOLATES NEPA. ................................................ 18

      A.    BLM was Required to Consider Development Impacts as Connected and
            Cumulative Impacts Associated with the Plan Approval and Road
            Extension Decisions. ........................................................................... 19

            1.    Potential development effects are impacts from an action
                  connected to the Plan Approval and Road Extension decisions. ....... 20

            2.    Potential development effects are cumulative impacts associated
                  with the Plan Approval and Road Extension decisions. ................... 22

PLAINTIFFS' PRINCIPAL BRIEF
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No. 3:17-cv-00253-TMB                                                                 i

Case 3:17-cv-00253-TMB    Document 43    Filed 06/01/18    Page 2 of 52

B. NEPA Timeliness Requirements Mandate that BLM Consider Development Impacts in Connection with the Plan Approval and Road Extension Decisions.................................................................25

    1. BLM postponed analysis of development impacts until a point too late for meaningful consideration. ............................................25

    2. The record demonstrates a reasonable discussion of development impacts was possible..................................................................31

IV. THE APPROPRIATE REMEDY IS VACATUR, OR, ALTERNATIVELY, AN ORDER ENJOINING ACTIVITIES PENDING BLM'S COMPLIANCE WITH THE LAW ON REMAND..................................................................34

A. Plaintiffs Request that the Court Vacate the Plan Approval and Road Extension Decisions...................................................................34

B. Alternatively, Plaintiffs Request that the Court Remand the Plan Approval and Road Extension Decisions to BLM, and Enjoin Activities Under These Decisions, Pending BLM's Compliance with Its NEPA Obligations. ........35

    1. Plaintiffs would suffer irreparable injury from continuation of activities under the Plan Approval and Road Extension decisions............36

    2. Remedies available at law are inadequate to compensate for Plaintiffs' injury. ..................................................................37

    3. The balance of hardships supports issuance of an injunction. ...................37

    4. An injunction serves the public interest....................................................38

CONCLUSION...............................................................................................39

PLAINTIFFS' PRINCIPAL BRIEF
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No. 3:17-cv-00253-TMB             ii

Case 3:17-cv-00253-TMB    Document 43    Filed 06/01/18    Page 3 of 52

# TABLE OF AUTHORITIES

## CASES

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ....................................................................36, 38

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987).................................................................................36, 37

*Andrus v. Sierra Club*,
  442 U.S. 347 (1979).................................................................................20, 25

*Bob Marshall All. v. Hodel*,
  852 F.2d 1223 (9th Cir. 1988) .........................................................................27

*Cal. Cmty. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) ...........................................................................34

*City of Davis v. Coleman*,
  521 F.2d 661 (9th Cir. 1975) ...............................................................19, 22, 23

*Cole v. Ralph*,
  252 U.S. 286 (1920)..........................................................................................29

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) .............................................................26, 27, 31

*Ecological Rights Found. v. Pac. Lumber Co.*,
  230 F.3d 1141 (9th Cir. 2000) .........................................................................17

*Freeman v. Dep't of the Interior*,
  650 F. App'x 6 (D.C. Cir. 2016)........................................................................29

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*,
  528 U.S. 167 (2000)..........................................................................................16

*Humane Soc'y of U.S. v. Locke*,
  626 F.3d 1040 (9th Cir. 2010) .........................................................................34

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
  305 F.3d 957 (9th Cir. 2002) ...........................................................................17

*Jones v. Nat'l Marine Fisheries Serv.*,
  741 F.3d 989 (9th Cir. 2013) ...........................................................................22

PLAINTIFFS' PRINCIPAL BRIEF
*Chilkat Indian Village of Klukwan et al. v. BLM et al.*,
Case No. 3:17-cv-00253-TMB                                                                    ii

Case 3:17-cv-00253-TMB    Document 43    Filed 06/01/18    Page 4 of 52

*Kern v. Bureau of Land Mgmt.*,
   284 F.3d 1062 (9th Cir. 2002) ......................................................22, 23, 26, 31, 33

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
   387 F.3d 989 (9th Cir. 2004) ......................................................................17, 22

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
   634 F.2d 1197 (9th Cir. 1980) .............................................................................38

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................17

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ............................................................................................35

*Mont. Envtl. Info. Ctr. v. Office of Surface Mining*,
   274 F. Supp. 3d 1074 (D. Mont. 2017) .........................................................22, 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..............................................................................................17

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
   668 F.3d 1067 (9th Cir. 2011) ......................................................................23, 32, 33

*Nat'l Mining Ass'n v. Zinke*,
   877 F.3d 845 (9th Cir. 2017) ...............................................................................30

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   886 F.3d 803 (9th Cir. 2018) .........................................................................35, 36

*Native Ecosystems Council v. Dombeck*,
   304 F.3d 886 (9th Cir. 2002) ...............................................................................32

*Pit River Tribe v. U.S. Forest Serv.*,
   469 F.3d 768 (9th Cir. 2006) ...............................................................................27

*Reoforce, Inc. v. United States*,
   119 Fed. Cl. 1 (2013) ..........................................................................................29

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ............................................................................................26

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*,
   449 F.3d 1016 (9th Cir. 2006) .............................................................................17

*Save the Yaak Comm. v. Block*,
   840 F.2d 714 (9th Cir. 1988) ......................................................................19, 20, 25, 26

PLAINTIFFS' PRINCIPAL BRIEF
*Chilkat Indian Village of Klukwan et al. v. BLM et al.*,
Case No. 3:17-cv-00253-TMB                                                                              iii

Case 3:17-cv-00253-TMB    Document 43    Filed 06/01/18    Page 5 of 52

*Te-Moak Tribe of W. Shoshone of Nev. v. Dep't of the Interior*,
608 F.3d 592 (9th Cir. 2010) ..................................................................23, 31, 33

*Thomas v. Peterson*,
753 F.2d 754 (9th Cir. 1985) .........................................................20, 21, 22, 24, 26

*Tribal Vill. of Akutan v. Hodel*,
869 F.2d 1185 (9th Cir. 1988) ...................................................................32, 33

*United States v. Shumway*,
199 F.3d 1093 (9th Cir. 1999) ...........................................................................29

*Vane Minerals (US), LLC v. United States*,
116 Fed. Cl. 48 (2014) ......................................................................................29

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978)............................................................................................26

*Vill. of False Pass v. Clark*,
733 F.2d 605 (9th Cir. 1984) .............................................................................32

*W. Oil & Gas Ass'n v. EPA*,
633 F.2d 803 (9th Cir. 1980) .............................................................................34

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008).........................................................................................36, 37

## FEDERAL STATUTES

5 U.S.C. § 706....................................................................................................17, 34

30 U.S.C. § 22............................................................................................................28

42 U.S.C. §§ 4331-47...............................................................................................19

42 U.S.C. § 4332.................................................................................................19, 26

43 U.S.C. § 1701.......................................................................................................29

43 U.S.C. § 1702.......................................................................................................28

43 U.S.C. § 1714.......................................................................................................28

43 U.S.C. § 1732.......................................................................................................28

PLAINTIFFS' PRINCIPAL BRIEF
*Chilkat Indian Village of Klukwan et al. v. BLM et al.*,
Case No. 3:17-cv-00253-TMB                                                                    iv

Case 3:17-cv-00253-TMB     Document 43     Filed 06/01/18     Page 6 of 52

# ALASKA STATUTES

AS 41.21.610 ..........................................................................................................5

# REGULATIONS

40 C.F.R. § 1501.2 ...............................................................................................25

40 C.F.R. § 1502.1 ...............................................................................................19

40 C.F.R. § 1502.22 .................................................................................22, 23, 26

40 C.F.R. § 1508.7 ...............................................................................................22

40 C.F.R. § 1508.8 ...............................................................................................22

40 C.F.R. § 1508.9 ...............................................................................................19

40 C.F.R. § 1508.25 .............................................................................................20

40 C.F.R. § 1508.27 .............................................................................................19

43 C.F.R. § 3809.5 ...............................................................................................28

43 C.F.R. § 3809.11 .............................................................................................28

43 C.F.R. § 3809.411 ...........................................................................................28

43 C.F.R. § 3809.420 ...........................................................................................28

PLAINTIFFS' PRINCIPAL BRIEF
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No. 3:17-cv-00253-TMB                                                                    v

Case 3:17-cv-00253-TMB     Document 43     Filed 06/01/18     Page 7 of 52

## INTRODUCTION

This action challenges two decisions by the Department of the Interior's Bureau of Land Management (BLM) approving mineral exploration activities in the Chilkat River watershed north of Klukwan, Alaska. In issuing these decisions, the agency refused to consider potential impacts from development of a future mine, even though its decisions authorized exploration activities that may generate private rights to develop a mine. These rights could constrain BLM's ability to ensure necessary protection for the region. It was unlawful for BLM to approve exploration activities while entirely uninformed as to potential future impacts of mine development.

The Chilkat River watershed and its natural environment are central to the livelihoods and culture of people who fish, hunt, or otherwise use or enjoy the area and its natural values. The watershed's stocks of salmon have been, and continue to be, essential to the way of life of the Tlingit people who have resided at Klukwan for millennia. The salmon are also important to commercial and recreational users in the region. The fish additionally support a globally unique convergence of thousands of bald eagles that return each fall to an area of the watershed protected by the State of Alaska as the Alaska Chilkat Bald Eagle Preserve ("the Preserve").

Today, some lands in the Chilkat River watershed are managed by BLM. These lands are currently open to mining. In 2016 and again in 2017, BLM approved exploration operations proposed by Constantine North Incorporated (collectively with its parent, Constantine Metal Resources, "Constantine Metals" or "the Company") as part of the Palmer Project ("Palmer Project" or "the Project"), authorizing a multi-year program of exploration drilling and associated construction activities. Constantine Metals is currently conducting exploration activities pursuant to these approvals, with a view to the next stage in what BLM calls "the life

cycle" of the Project: mine development. The Project involves a volcanic massive sulfide deposit, a variety of metals-bearing rock that, when developed, often yields a form of water pollution known as acid mine drainage. Acid mine drainage has degraded numerous watersheds and fisheries downstream of hard-rock mines. In the Chilkat River watershed, such pollution would endanger the environment downstream of the Palmer Project, threatening cultural, economic, and natural values.

Although the two decisions at issue in this case concern mineral exploration, they have serious implications for future mine development at the Palmer Project. By authorizing further exploration, BLM likely compromised its ability to foreclose later harms from mining. Once informed about the potential impacts of development, the agency may find, as it has found in other such essential lands, that the only way adequately to protect the watershed is to withdraw the lands from operation of the mining laws and thereby preclude mining. However, the actions at issue in this case could be the last decision points during which BLM retains the full discretion it now has to protect the area by means of a withdrawal. This is because Constantine Metals may soon reach "discovery," the point at which the Company is able to demonstrate a commercially valuable deposit. At discovery, private rights vest in the Company by operation of law, limiting BLM's ability to protect the area by withdrawal.

Under the National Environmental Policy Act (NEPA), federal agencies are required to take a "hard look" at environmental impacts associated with their proposed actions, including the cumulative effects of reasonably foreseeable actions and the effects of future connected stages of a project. The agency's hard look must occur as early as possible, and, at the latest, before the point of no return at which the agency loses its full discretion to preclude the environmental impacts in question.

Here, BLM's actions were unlawful because the agency refused entirely to consider development impacts, although they are the sort of connected and cumulative impacts that NEPA requires BLM to consider at this stage, before it is too late. Members of the public, including Plaintiffs, called for BLM to consider the potential impacts of future mine development before the agency committed to advancing the Palmer Project under the mining regime. Instead, BLM postponed any consideration of development to after the "feasibility study phase," that is, after discovery, by which point BLM's ability to protect the values of this sensitive region would be compromised.

At this stage, information about potential development of a mine is incomplete, and the agency will have some latitude, in light of available information, to determine the level of detail and specificity of an analysis of development impacts. But BLM does not have the option to ignore such impacts entirely, as it did here. BLM's failure to take a hard look at development impacts—indeed any look at all—violates NEPA. Plaintiffs therefore request that the Court declare BLM's decisions unlawful and vacate them, or, alternatively, remand these decisions to BLM for the agency to meet its obligations under the Act, and enjoin all activities under the decisions, pending such compliance.

## STATEMENT OF FACTS

I.  MINING POSES RISKS TO THE PALMER PROJECT AREA AND THE DOWNSTREAM ENVIRONMENT.

   A.   <u>The Palmer Project is Situated in the Ecologically and Socially Important Chilkat River Watershed.</u>

The Palmer Project area lies within a steep glacial valley in the headwaters of four creeks that flow into the Klehini River, which then flows into the Chilkat River. Ex. 11 at 72 (Doc. 36-8 at 72). Waters in this area are rich in aquatic life. Within the Palmer Project area, Glacier

Creek provides habitat for fish species such as coho salmon, cutthroat trout, and Dolly Varden. *Id.* at 96-97 (Doc. 36-8 at 96-97). The Klehini River—taking its name from the Tlingit for "Mother's Water"—is inhabited by all five species of Pacific salmon, as well as cutthroat trout and Dolly Varden. *Id.* at 102-03 (Doc. 36-8 at 102-03); Ex. 34 at 4-5, ¶ 7. The Chilkat River, which takes its name from the Tlingit *Jilkaat Heeni*, meaning "storage container for salmon," is inhabited by all five species of Pacific salmon, steelhead and cutthroat trout, Dolly Varden, eulachon, Pacific lamprey, and whitefish. Ex. 11 at 101 (Doc. 36-8 at 101); Ex. 15 at 2 (Doc. 37-2 at 69); Ex. 19 at 1 (Doc. 37-2 at 132).

The following BLM maps, reproduced from the record, show the location of the Palmer Project area relative to Klukwan, the Preserve, and surface waters, including anadromous fish streams (larger versions of these maps can be found in the administrative record).



Ex. 11 at 95, Fig. 3-4 (Doc. 36-8 at 95, Fig. 3-4) (indicating the locations of Klukwan, the Preserve, and anadromous fish streams).



*Id.* at 73, Fig. 3-1 (Doc. 36-8 at 73, Fig. 3-1) (indicating the location of the Palmer Project area).

The Palmer Project area and the watershed downstream of it also provide habitat for mountain goats, moose, black and brown bears, wolverines, Alexander Archipelago wolves, and American marten, among other mammals. Ex. 11 at 129-34 (Doc. 36-8 at 129-34). Numerous avian species may also use the Palmer Project area for breeding, as a migration stopover, or as year-round habitat. *Id.* at 134-36 (Doc. 36-8 at 134-36).

Nearby, downstream of the Palmer Project area, the Preserve sits at the confluence of Klehini, Tsirku, and Chilkat Rivers. *Id.* at 100-01, 135 (Doc. 36-8 at 100-01, 135). The State of Alaska created the Preserve to "protect and perpetuate the Chilkat bald eagles and their essential habitats . . . in recognition of their statewide, nationally, and internationally significant values in perpetuity." AS 41.21.610(a); Ex. 11 at 101 (Doc. 36-8 at 101). The State also designated the area at the confluence of these rivers as critical habitat for the eagles. Ex. 11 at 101 (Doc. 36-8

PLAINTIFFS' PRINCIPAL BRIEF
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No. 3:17-cv-00253-TMB                                    5
Case 3:17-cv-00253-TMB     Document 43     Filed 06/01/18     Page 12 of 52

at 101).  Here, an unusual gravel deposit, accumulated by glaciers over millennia, allows warm waters stored within the area's alluvial fan to flow from under the channel beds, resulting in an expanse of water that does not freeze in winter.  Ex. 29 at 6 (Doc. 38-2 at 80); Ex. 11 at 101 (Doc. 36-8 at 101).  Coho and chum salmon run in these waters exceptionally late in the year, bringing thousands of bald eagles to this area of the Preserve in late October and November for a last salmon feeding before the onset of winter.  Ex. 29 at 8-9 (Doc. 38-2 at 82-83); Ex. 11 at 101, 135 (Doc. 36-8 at 101, 135).  Eagles arrive from the U.S. Pacific Northwest, Canada, and Interior Alaska, drawing together the largest bald eagle concentration in the world.  Ex. 29 at 8-9 (Doc. 38-2 at 82-83); Ex. 11 at 101 (Doc. 36-8 at 101).  From the Preserve, the Chilkat River flows to the ocean at the Chilkat Inlet.  Ex. 11 at 100 (Doc. 36-8 at 100).

The Palmer Project area and the watershed downstream of it are of significant socioeconomic and cultural importance to the people of Southeast Alaska.  The Palmer Project area lies in the traditional territory of the Chilkat Tlingit people, who have lived in the Chilkat River watershed for thousands of years.  Ex. 15 at 1-2 (Doc. 37-2 at 68-69); Ex. 34 at 4, ¶ 6. Historically, the Village of Klukwan (from *Tlakw Aan*, or "eternal village" in the Tlingit language) thrived on the watershed's abundant salmon and other resources.  Ex. 15 at 1-2 (Doc. 37-2 at 68-69); Ex. 34 at 2, 4, ¶¶ 3, 6.  Today, residents of Klukwan continue to rely on the salmon and other natural resources of the Chilkat River watershed.  Subsistence harvests, particularly of salmon from the Chilkat and Klehini Rivers, are the lifeblood of the Village. Ex. 15 at 1-2 (Doc. 37-2 at 68-69).  Villagers rely on all five species of Pacific salmon, steelhead trout, and Dolly Varden.  *Id.* at 2 (Doc. 37-2 at 69).  Compared to other rivers in Southeast Alaska, the Chilkat is the most consistently fished river for eulachon, a species harvested for food and for traditional and cultural uses.  Ex. 20 at 10-11 (Doc. 37-2 at 163-64).  The watershed

is also important for cultural reasons: Klukwan is a traditional Tlingit community for which the cultivation of traditional practices, including harvest practices, is central. Ex. 34 at 4, ¶ 6; *id.* at 1, ¶ 2; Ex. 11 at 154 (Doc. 36-8 at 154); *id.* at 158 (Doc. 36-8 at 158). Impacts to resources of the watershed are impacts to livelihoods and culture in Klukwan. Ex. 34 at 4-6, ¶¶ 7, 9; Ex. 9 at 6 (Doc. 36-7 at 11); Ex. 15 at 1-2 (Doc. 37-2 at 1-2).

The Chilkat River watershed is also important to regional commercial and sport fisheries. The salmon returning to spawn in this drainage are harvested in the commercial fisheries of Southeast Alaska. Ex. 11 at 101-02, 104, 105 (Doc. 36-8 at 101-02, 104, 105). The watershed is enjoyed by sport anglers from Southeast Alaska and farther afield. *Id.* at 102 (Doc. 36-8 at 102). For example, the Chilkat River drainage was used by over 1,600 sport anglers for over 5,300 angler days in 2015 alone. Ex. 17 at 2 (Doc. 37-2 at 97). The Preserve also draws visitors, whose presence supports the local economy, allowing Klukwan to extend the visitor season into early winter and thus generate additional revenue. Ex. 15 at 2 (Doc. 37-2 at 69). Impacts to the resources of the watershed are impacts to these interests as well.

> B. <u>Hard-Rock Mining at the Palmer Project Area Could Have Significant Detrimental Effects on the Chilkat River Watershed.</u>

Mining activity proceeds in a multi-stage process or "life cycle" that begins with exploration, which is the process of seeking a mineral deposit and then evaluating whether it can be mined profitably. *See* Ex. 32 at 10 (Doc. 38-4 at 125) ("Exploration is only one phase of a specific and well-defined process that the mining industry follows to advance projects from prospecting to mining."); *id.* at 11 (Doc. 38-4 at 126) (describing exploration within the "life cycle of a mine"). Exploration begins with preliminary searches to find ore (mineral-bearing rock) and can proceed to intermediate and then advanced stages, during which subsurface

sampling provides a more detailed assessment of what minerals may be present in an area. Ex. 49 at 1-2; Ex. 43 at 1-2.[1]  Although many projects that enter the preliminary or "grassroots" stages of exploration may not ultimately become mines, "[a]s an exploration project advances the confidence of the geological resources progresses." Ex. 32 at 11-12 (Doc. 38-4 at 126-27). When a company identifies a valuable deposit, it can proceed to "the next step in the Life Cycle of a Mine:" development,[2] the process of physically accessing the ore, breaking and extracting it, separating concentrated minerals from the ore, and disposing of waste byproducts, as well as the construction of the infrastructure necessary for these activities.  *Id.* at 12 (Doc. 38-4 at 127); *see also id*. at 10-11, Fig. 1.5.1 (Doc. 38-4 at 125-26).

Exploration activities preclude other uses of the project area and its vicinity by occupying physical spaces with infrastructure and equipment, generating disturbances that may displace users and wildlife, and creating safety concerns related to the use of heavy machinery, materials, and vehicles.  Ex. 5 at 1 (Doc. 36-1 at 85); Ex. 11 at 62-63 (Doc. 36-8 at 62-63); *see infra* pp. 16, 36-37.  Potential harms arising at the development stage are even greater in intensity, scope, and duration.  Development involves disturbances that can have lasting changes on the physical landscape.  Ex. 27 at 32 (Doc. 37-8 at 109) (finding that the average surface disturbance of a

---

[1] Regarding Exhibits 43-51, Plaintiffs have conferred with the Federal Defendants and agree that these documents are part of the administrative record in this case.  The documents do not yet appear in the administrative record that has been filed with the Court, and so the Federal Defendants have agreed to file these documents as supplements to the record.  Until then, Plaintiffs are citing to these documents as exhibits.  For the convenience of the Court, Plaintiffs will file a corrected brief with updated citations to the administrative record sources once the supplements have been filed.

[2] Plaintiffs use the term "development" throughout the brief to refer to extraction, processing, and the construction activities undertaken to facilitate extraction and processing.  At places in the record, the agency uses the term "development" to refer only to the construction activities establishing mine infrastructure, and refer to extraction and processing as distinct steps.  *See* Ex. 32 at 11-12 (Doc. 38-4 at 126-27).

major mine is 1,901 acres). Moreover, development impacts are not confined to the mine site, but threaten the downstream environment, particularly via pollution from mining wastes. Here, Constantine Metals has indicated that the Palmer Project area contains a volcanic-associated massive sulfide deposit. Ex. 24 at 17 (Doc. 37-5 at 23). Such deposits "are among the most likely of all deposit types to have associated environmental problems, particularly acid mine drainage." Ex. 48 at 2. Acid mine drainage is a form of pollution generated when sulfide rock is exposed to air and water: oxidation of the rock turns waters acidic, and these acidic waters dissolve heavy metals from the rock into the water. Ex. 26 at 4-7 (Doc. 37-8 at 11-14). The result is a toxic cocktail of acidic water loaded with heavy metals. *Id.* Mining activities are especially prone to generate this form of pollution, because extraction and ore milling (the process of grinding ore into fine particles to draw out metals) vastly increase the surface area of rock, which accelerates oxidation and expedites the rates at which acidity and dissolved metals are released. *Id.* at 6 (Doc. 37-8 at 13).

If the Palmer Project area is developed, acid and heavy metals could be transferred to waters exposed to mining wastes, known as contact waters. Acidity of contact waters can be strong. In fact, the highest levels of acidity ever measured in the environment—more acidic than battery acid—were in contact waters from a copper-zinc mine in the United States. Ex. 50 at 1. A mining operation can attempt to use water-treatment methods to neutralize acidity and precipitate dissolved metals out of contact waters before they are released into the environment. Ex. 27 at 33 (Doc. 37-9 at 32). However, these methods frequently do not operate as predicted. *Id.* at 22 (Doc. 37-8 at 92). The likelihood of failure is significant, not least because mining wastes can persist and generate acid mine drainage for decades or more. Ex. 26 at 7 (Doc. 37-8 at 14).

Waste impoundment failures also pose risks to the environment of the Palmer Project area and beyond. Development at the Palmer Project area could require a dam to impound the slurry of granular waste rock, known as "tailings," that results from ore processing. A tailings dam in the Palmer Project area would have to withstand the lateral force from tailings and contact waters. Ex. 23 at 2 (Doc. 37-3 at 101). Tailings dam failures occur regularly, at an average rate of around once every eight months globally. Ex. 22 at 4 (Doc. 37-3 at 69). Serious dam failures are increasing as a proportion of total failures, with 49 percent of serious failures occurring since 1990. Ex. 21 at 1 & n.3 (Doc. 37-2 at 197). Where a dam fails, contact waters and tailings can be released in large quantities. Recent examples of such disasters include the failures of tailings dams at British Columbia's Mount Polley Mine in 2014 and Brazil's Fundão tailings facility in 2015. Ex. 28 at 1-3 (Doc. 38-2 at 66-68); Ex. 16 at 7 (Doc. 37-2 at 85). The risks are exacerbated by the possibility of seismic activity, which can compromise tailings dams. Ex. 11 at 150 (Doc. 36-8 at 150). The Palmer Project area lies within the Fairweather-Queen Charlotte fault region, and is close to the Denali, Chilkat River, and Chugach-St. Elias faults. *Id.* at 149 (Doc. 36-8 at 149). The region experiences frequent and at times strong seismic activity. *Id.* According to BLM, a nearby earthquake could cause extensive damage at the Palmer Project area; the probability of destructive earthquakes is unknown because regional tectonics have not been studied in detail. *Id.*

Other methods of tailings disposal, such as dry stacking, *i.e.*, dewatering and compacting tailings, and then storing them in piles, also pose risks to the environment. Ex. 25 at 10 (Doc. 37-7 at 124). Dry tailings can continue to generate toxic contact waters, which must be impounded and treated to avoid environmental harm. *Id.*

A pollution event at a future mine upstream of Klukwan, the Preserve, and the fish-

inhabited reaches of the Chilkat River watershed could harm the area's ecological values. The Palmer Project area experiences considerable precipitation. Ex. 11 at 79 (Doc. 36-8 at 79); *id.* at 150 (Doc. 36-8 at 150). Waters from the Palmer Project area drain into Glacier Creek at the valley's trough, then flow into waterbodies that sustain the subsistence harvests of Klukwan, the commercial fisheries of Southeast Alaska, and the bald eagles of the Preserve. Ex. 16 at 10-11 (Doc. 37-2 at 88-89). Pollution of downstream waters by acidic, metals-loaded contact waters or by tailings could harm aquatic organisms. *Id.* at 7 (Doc. 37-2 at 85); Ex. 26 at 4, 8-9 (Doc. 37-8 at 11, 15-16). Numerous studies have found that acid mine drainage is highly toxic and even lethal to fish species, including salmon. Ex. 16 at 9-11 (Doc. 37-2 at 87-89 & nn.36-47) (describing scientific literature and citing studies); *see also, e.g.*, Ex. 51 (describing toxic effects of dissolved copper from acid mine drainage on salmon); Ex. 18 (Doc. 37-2 at 119-31) (documenting toxic effects of acid mine drainage on salmon downstream of a sulfide mine in British Columbia); Ex. 33 (Doc. 38-3 at 8-35) (describing acid mine drainage risks to salmon from development of sulfide deposits). Adverse effects on both the natural values of the area and its people could follow. For example, in Klukwan, adverse effects on the Chilkat River watershed's salmon, trout, and eulachon could harm Villagers' traditional way of life, and potentially compromise the economic viability of the Village. Ex. 16 at 10-11 (Doc. 37-2 at 88-89); Ex. 15 at 4-11 (Doc. 37-2 at 71-78). The eagles returning to the Preserve could struggle if late-season salmon runs were adversely affected. Ex. 16 at 7-9, 11 (Doc. 37-2 at 85-87, 89); Ex. 15 at 10 (Doc. 37-2 at 77). Other wildlife reliant on salmon, trout, and eulachon—birds and mammals—could experience follow-on harms. Ex. 16 at 10 (Doc. 37-2 at 88); Ex. 15 at 10-11 (Doc. 37-2 at 77-78). In turn, people in this corner of Southeast Alaska and others who visit it from the around the globe might no longer be able to enjoy these values. Ex. 16 at 10-11 (Doc.

II.   BLM REFUSED TO CONSIDER DEVELOPMENT IMPACTS WHEN
      AUTHORIZING EXPLORATION ACTIVITIES AT THE PALMER PROJECT.

      A.   BLM Approved the Exploration Plan Without Considering Development Impacts.

Constantine Metals has been conducting exploration activities on the Palmer Project

lands since 1998 when, under the name Rubicon Metals, it began sighting surface minerals in the

Glacier Creek valley.  Green Decl., Doc. 11 at 2, ¶¶ 4, 5.  Since 2006, the Company has been

exploring under its current name.  *Id.* at 2, ¶ 6.  The Company's exploration activities have

intensified over its years in the area.  In 2015, operations advanced to the point at which surface

disturbances required BLM approval.  Ex. 1 at 1 (Doc. 35-9 at 1).

On May 22, 2015, Constantine Metals submitted a Plan of Operations ("the Exploration

Plan") to BLM, proposing expanded exploration activities.  *Id.*; Ex. 2 at 1 (Doc. 35-9 at 3).  The

Exploration Plan proposed infrastructure for helicopter-supported exploration drilling, drill pads,

and construction of a road starting in the Glacier Creek valley, crossing Glacier Creek, and

climbing the south wall of the valley with switchbacks to an equipment laydown area.  Ex. 2 at

14, Tbl. 1-1 (Doc. 35-9 at 18, Tbl. 1-1); *id.* at 46 (Doc. 35-9 at 48).  The proposed infrastructure

would facilitate road access to drill sites on the face of the south wall, provide a staging area for

helicopter- and ground-supported exploration activities, and facilitate transport of personnel,

equipment, fuel, and supplies.  *Id.* at 12 (Doc. 35-9 at 14).  Constantine Metals proposed around

five years of exploration using this infrastructure, after which point it "anticipated that emphasis

w[ould] shift from exploration to engineering & development."  *Id.* at 77 (Doc. 35-9 at 79); *id.* at

68 (Doc. 35-9 at 70).  Given the level of contemplated surface disturbance, pursuant to agency

regulations, Constantine Metals sought BLM's approval of the Exploration Plan.  Ex. 1 at 1

(Doc. 35-9 at 1).

On November 30, 2015, BLM's Glennallen Field Office announced preparation of an environmental assessment for the Exploration Plan. Ex. 3 (Doc. 35-11 at 145-47); Compl., Doc. 1 at 20, ¶ 69; Answer, Doc. 22 at 21, ¶ 69; Intervenor-Defendants Constantine North Inc. *et al.*'s Proposed Answer ("Proposed Answer"), Doc. 14 at 8, ¶ 69. The agency gave notice of a review period regarding the scope of the environmental assessment and stated that it would accept public comment. Ex. 3 (Doc. 35-11 at 145-47).

Members of the public, including Plaintiffs, submitted comments on the scope of BLM's review, urging that BLM's analysis should encompass not only direct effects of the proposed exploration activities, but also associated impacts beyond the Exploration Plan's immediate horizon, including potential development impacts. Ex. 45 at 1-2, 4-5; Ex. 4 at 2 (Doc. 35-12 at 100); Ex. 47 at 1; Ex. 6 at 7, Tbl. 1 (Doc. 36-2 at 88) (Letter No. 122); *id.* at 6 (Doc. 36-2 at 87) (Letter No. 72); *id.* at 6, Tbl. 1, 8, Tbl. 2 (Doc. 36-2 at 87, 98) (Letter No. 76); *id.* at 7, Tbl. 1, 8-9, Tbl. 2, 11, Tbl. 7 (Doc. 36-2 at 88, 98-99, 110) (Letter Nos. 123, 125, & 127); *id.* at 10 (Doc. 36-2 at 101) (Letter No. 78).

On April 25, 2016, BLM issued a draft environmental assessment in connection with the Exploration Plan. Ex. 7 at 1 (Doc. 36-6 at 1).[3] In the draft environmental assessment, BLM restricted its review to the impacts of exploration activities; BLM refused to consider the effects of later stages in the mining process. Looking only at exploration activities, BLM found no potentially significant impacts to water quality, wildlife, or fish from the proposed Exploration

---

[3] The copy of the Plan Approval draft environmental assessment that the agency has filed as part of the administrative record, cited in and attached to this brief as Exhibit 7 (Doc. 36-8), was annotated with comments. Plaintiffs have conferred with the Federal Defendants and have agreed that Defendants will file a clean copy of the draft environmental assessment as a supplement to the record. When they have done so, for the convenience of the Court, Plaintiffs will file a corrected brief with updated citations.

Plan. *Id.* at 10 (Doc. 36-6 at 81); *id*. at 12 (Doc. 36-6 at 112); *id*. at 13 (Doc. 36-6 at 143). Again considering only exploration activities, the agency characterized potential effects on the community of Klukwan and its culture as "minimal." *Id.* at 15-16 (Doc. 36-6 at 157-58).

BLM opened a 30-day public review and comment period on the draft environmental assessment. Ex. 11 at 27 (Doc. 36-8 at 27). Members of the public, including Plaintiffs, submitted comments on the draft, again addressing the scope of review and pointing out that the agency should have considered impacts beyond the immediate horizon of the Exploration Plan, including the effects of development. Ex. 8 at 1 (Doc. 36-7 at 5); Ex. 9 at 1, 5 (Doc. 36-7 at 6, 10); Ex. 46 at 2.

On August 18, 2016, BLM issued a Decision Record approving the Exploration Plan ("the Plan Approval"), together with a final environmental assessment and a finding of no significant impact. Ex. 13 (Doc. 36-9 at 5-11); Ex. 11 (Doc. 36-8 at 1-214); Ex. 12 (Doc. 36-9 at 1-4). In reaching its approval decision, BLM refused to consider development. BLM stated that "[e]xploration must be conducted . . . before the prospect can lead to an economical discovery." Ex. 13 at 5 (Doc. 36-9 at 9). It also stated that "[t]he proponent is still in the exploration phase; therefore, it is not a reasonably foreseeable future action to consider mining in this analysis." *Id.* BLM asserted that it lacked the ability to "prevent the claimant or their operators from exploring or developing their mineral resources." *Id*. at 4 (Doc. 36-9 at 8). According to the agency, "[d]evelopment of mineral resources within an active unpatented mining claim was a non-discretionary action on behalf of BLM's decision process." *Id.*

Following BLM's Plan Approval decision, Constantine Metals began road construction and drilling operations under the Exploration Plan. Compl., Doc. 1 at 22, ¶ 79; Answer, Doc. 22 at 23-24, ¶ 79; Proposed Answer, Doc. 14 at 9, ¶ 79.

B.    BLM Approved the Road Extension Proposal Without Considering Development Impacts.

On January 3, 2017, Constantine Metals submitted to BLM a request for approval of a modification to the road design included and approved in the Exploration Plan.  Compl., Doc. 1 at 21, ¶ 80; Answer, Doc. 21 at 24, ¶ 80; Proposed Answer, Doc. 14 at 9, ¶ 80.  The proposed modification entailed an 800-foot extension of the previously approved road, intended to provide access to immediately adjoining state-corporation lands under lease to Constantine Metals.  Ex. 14 at 1 (Doc. 37-1 at 28).

On April 28, 2017, BLM gave public notice of Constantine Metals' modification request, and opened a review period, accepting public comment on the proposed road extension and associated environmental analysis.  Ex. 30 at 3 (Doc. 38-4 at 110).  Plaintiffs commented that BLM should reject the request due to insufficient information.  Ex. 16 at 3 (Doc. 37-2 at 81); Ex. 15 at 3 (Doc. 37-2 at 70).  Alternatively, they stated that environmental analysis of the proposed road extension should encompass direct, connected, and cumulative impacts.  Ex. 16 at 3-12 (Doc. 37-2 at 81-90); Ex. 15 at 3-11 (Doc. 37-2 at 70-78).  Once again, the comments focused on the need to assess the environmental risks to the downstream watershed from a future development stage, including from potential acid mine drainage and tailings dam failure.  Ex. 16 at 4-12 (Doc. 37-2 at 83-90); Ex. 15 at 4-11 (Doc. 37-2 at 72-78).  They described and included numerous sources documenting the scientific consensus that acid mine drainage is a likely consequence of hard-rock mining at a deposit like the Palmer Project's; that tailings dam failure could follow from development, a possibility heightened by potential seismic activity; and that pollution from the Project could be harmful to fish populations in waters downstream.  Ex. 16 at 5-7 (Doc. 37-2 at 83-85); Ex. 15 at 5-9 (Doc. 37-2 at 72-76).

On September 21, 2017, BLM issued a Decision Record approving the modification

request ("the Road Extension"), along with an associated environmental assessment and a finding of no significant impact. Ex. 30 (Doc. 38-4 at 108-11); Ex. 32 (Doc. 38-4 at 116-46); Ex. 31 at 1 (Doc. 38-4 at 112-15). Again, BLM entirely refused to consider development impacts. In the environmental assessment, BLM asserted that "very few exploration projects actually make it to the point that a mine can be developed," and that the Palmer Project "has a greater chance of not becoming a mine than that it does of becoming a mine." Ex. 32 at 12 (Doc. 38-4 at 127). The agency stated that it would not consider development impacts until after the Project had reached the "feasibility study phase," after the Company had produced a thorough valuation of the deposit's resources. *Id.* at 13 (Doc. 38-4 at 128).

## ARGUMENT

### I.    PLAINTIFFS HAVE ARTICLE III STANDING.

Plaintiffs have standing to bring this case because their members have standing in their own right, the interests at stake are germane to Plaintiffs' organizational purposes, and the lawsuit does not require the participation of individual members. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 181 (2000). Plaintiffs' members use the areas at and near the Palmer Project area for various purposes, including hunting, fishing, subsistence practices, and recreation. *See* Ex. 35 at ¶ 4; Ex. 36 at ¶ 10; Ex. 37 at ¶ 5; Ex. 38 at ¶¶ 9, 10; Ex. 39 at ¶¶ 10-18; Ex. 40 at ¶ 12; Ex. 41 at ¶¶ 8-17; Ex. 42 at ¶¶ 6-9. Exploration activities authorized under the Plan Approval and Road Extension decisions have harmed, currently harm, and will harm Plaintiffs' members' abilities to engage in these activities. Ex. 34 at ¶ 10; Ex. 35 at ¶ 8; Ex. 36 at ¶ 11; Ex. 37 at ¶ 12; Ex. 38 at ¶ 11; Ex. 39 at ¶¶ 20-24; Ex. 40 at ¶¶ 21-22; Ex. 41 at ¶ 18; Ex. 42 at ¶¶ 6, 8-9, 15-16. BLM's unlawful circumvention of its procedural NEPA obligations have also harmed Plaintiffs' abilities to pursue their educational and informational

missions.  Ex. 35 at ¶ 9; Ex. 36 at ¶ 11; Ex. 37 at ¶ 13.  The harm and threat of harm to their

members' aesthetic, economic, cultural, recreational, subsistence, and other interests in and

around the Palmer Project area, as well as to Plaintiffs' educational and informational interests in

a lawful public administrative process, represent a concrete injury in fact, fairly traceable to the

actions challenged in this litigation and redressable by the relief they seek.  *See Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Ecological Rights Found. v. Pac. Lumber*

*Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).

II.     STANDARD OF REVIEW

        Review of an agency's compliance with NEPA is governed by the Administrative

Procedure Act, which requires courts to set aside agency actions, findings, and conclusions that

are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C. § 706(2)(A); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989,

992 (9th Cir. 2004).  An agency's decision is typically arbitrary if it has "entirely failed to

consider an important aspect of the problem."  *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305

F.3d 957, 973 (9th Cir. 2002) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*

*Co.*, 463 U.S. 29, 43 (1983)).  In reviewing the adequacy of a NEPA document, courts apply a

"rule of reason" to ensure that the agency has taken a "hard look" at the potential environmental

consequences of the proposed action.  *Klamath-Siskiyou*, 387 F.3d at 992-93.  Because the scope

of NEPA analysis is predominantly a legal question, the agency's determination is subject to a

reasonableness standard.  *See San Luis Obispo Mothers for Peace v. Nuclear Regulatory*

*Comm'n*, 449 F.3d 1016, 1028 (9th Cir. 2006).

III. BLM'S REFUSAL TO CONSIDER POTENTIAL IMPACTS OF FUTURE MINE DEVELOPMENT VIOLATES NEPA.

NEPA requires that federal agencies take a hard look at an action's potential environmental consequences in advance of committing to that proposed action. The hard look must address not only an action's potential direct consequences, but also the potential effects of connected actions and cumulative impacts of the action and reasonably foreseeable future actions. The hard look also has timing requirements. In general, it must be undertaken as soon as a reasonable discussion of impacts is possible. At the latest, it must precede a go/no-go point at which the agency's ability to make a choice is limited by a commitment of resources.

Here, BLM refused to consider the potential effects of future development at the Palmer Project, even though these are connected and cumulative impacts associated with exploration. BLM's assurances that development impacts would be considered at a later stage are unacceptable under NEPA timeliness requirements. BLM intends to consider development only after the Project has reached the "feasibility study phase"—that is, when the Company has completed sufficient exploration to decide whether it can establish a profitable mine. This is too late. BLM's Plan Approval and Road Extension decisions affect not only exploration activities, but also future mine development. Given information regarding potential threats associated with development, BLM may conclude that a land withdrawal is the only effective means to protect the region. But the Plan Approval and Road Extension decisions may lead to the establishment of private rights that would constrain the agency's ability to make a land withdrawal. By postponing its analysis of development impacts, BLM has likely compromised its ability to make a fully informed decision about withdrawal, rendering its hard look too late. Moreover, as a practical matter, it was not too early to analyze development impacts either. There already is sufficient available information for a reasonable assessment of development impacts from a mine

at this site.  More detailed information might emerge later, but this truism is not an acceptable justification for postponement.

A. BLM was Required to Consider Development Impacts as Connected and Cumulative Impacts Associated with the Plan Approval and Road Extension Decisions.

NEPA requires federal agencies to take a hard look at the environmental consequences of a proposed action before reaching a decision.  42 U.S.C. §§ 4331-47.  If, based on a preliminary environmental assessment, the agency finds that the action has no potential significant impact, it must explain so in a finding of no significant impact.  40 C.F.R. § 1508.9.  If, however, the agency determines that there may be a significant impact, it must prepare an environmental impact statement, providing a full and fair discussion of significant environmental impacts and reasonable alternatives that would avoid or minimize adverse effects.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.1.  In assessing potential environmental impacts, the agency's analysis must be sufficiently broad, allowing the agency "to the fullest extent possible" to reach a decision "tak[ing] into proper account a complete analysis of the project's environmental impact."  *City of Davis v. Coleman*, 521 F.2d 661, 673 (9th Cir. 1975).  An environmental assessment must analyze not only the action's potential direct effects, but also the effects of connected actions, such as potential future actions linked to the proposed action.  *Save the Yaak Comm. v. Block*, 840 F.2d 714, 720 (9th Cir. 1988).  The environmental assessment must also consider potential cumulative effects, meaning those impacts which could result from the incremental impact of the proposed action when added to those of other past, present, and reasonably foreseeable future actions.  *Id*. at 720 (citing 40 C.F.R. § 1508.27); *id*. at 722.

Here, potential effects of future mine development at the Palmer Project area were both connected and cumulative impacts associated with BLM's Plan Approval and Road Extension

decisions.

          1.     *Potential development effects are impacts from an action connected to the Plan Approval and Road Extension decisions.*

Under binding NEPA implementing regulations,[4] where a follow-on action cannot proceed unless the proposed action is undertaken, the proposed and follow-on actions are connected. 40 C.F.R. § 1508.25(a)(1)(ii).

To evaluate the relationship between a proposed and a follow-on action, the Ninth Circuit asks whether the proposed action has utility independent of the follow-on action. Where a proposed action's justification derives from the possibility of the follow-on action, the former lacks independent utility, and the actions are connected. *Save the Yaak Comm.*, 840 F.2d at 720 (holding that because future timber sales were the benefits justifying the proposed road construction project, the actions were connected); *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985), *abrogated in part on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 141 (2010). For example, in *Thomas v. Peterson*, the Ninth Circuit considered the relationship between the proposed authorization of a logging road, and follow-on timber sales. *Thomas*, 753 F.2d at 757. The Court observed that the "cost-benefit analysis of the road considered the timber to be the benefit of the road;" in other words, without follow-on timber sales, construction of the road would not be justified. *Id.* at 758-59. The Court held that the proposed road lacked utility independent of the follow-on timber sales, and, accordingly, that the actions were connected. *Id.* at 759. The Ninth Circuit therefore held that the agency was required to consider the impacts of follow-on timber sales when analyzing the road's impacts. *Id.* at 759-60.

---

[4] The Council on Environmental Quality's NEPA implementing regulations are mandatory regulations applicable to all federal agencies. *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979).

Here, the Plan Approval and Road Extension decisions lack a justification independent of the possibility of future mine development. BLM's actions authorize exploration activities. Exploration is not always successful—in some situations exploration may fail to reveal a profitable mineral deposit, and so development will not follow. *See* Ex. 32 at 13 (Doc. 38-4 at 128). Development thus remains a possible, though not certain, outcome. Nonetheless, the possibility of development accounts for the positive value in exploration's cost-benefit analysis. Constantine Metals is not conducting exploration for its own sake. The possibility of development is the rationale and impetus for exploration. It is with operation of a mine that "companies start to see a return on their investment" and "make some money." Ex. 44 at 2. In the words of the Company's chief executive, Constantine Metals is pursuing precisely "enough exploration at the Palmer Project to determine whether and how a mine might be developed." Green Decl., Doc. 11 at 3, ¶ 15. The Company's Exploration Plan thus anticipates a progression from exploration to development. Ex. 2 at 68 (Doc. 35-9 at 70) ("After Year 5, assuming continued positive results, it is anticipated that emphasis will shift from exploration to engineering & development."). This is also how the agency understands the situation: as BLM states in the environmental assessment accompanying the Plan Approval, "Constantine is exploring the Palmer base and precious metals deposit . . . with the goal of identifying a mineral resource that is economically feasible to develop." Ex. 11 at 36 (Doc. 36-8 at 36). Without the possibility of development, exploration would be an irrational waste of time and resources. The Plan Approval and Road Extension decisions lack utility independent of potential future development of the Palmer Project deposit. Therefore, BLM was required to consider the effects of future development at the Palmer Project as the impacts of a connected action. *See Thomas*, 753 F.2d at 758-59.

2. *Potential development effects are cumulative impacts associated with the Plan Approval and Road Extension decisions.*

At the threshold stage, to determine whether it must prepare an environmental impact statement, an agency must consider cumulative impacts associated with its proposed action. 40 C.F.R. § 1508.8; *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1076 (9th Cir. 2002). Cumulative impacts are those that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. The agency must discuss not only the combined effects of such actions, but also their type and degree. *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 994-97 (9th Cir. 2004).

A future action need not be certain to be reasonably foreseeable. NEPA implementing regulations require an agency to consider the cumulative impacts of future actions that are reasonably foreseeable, even if these future actions and/or their potential impacts are uncertain. 40 C.F.R. § 1502.22(b)(4); *City of Davis v. Coleman*, 521 F.2d 661, 675 (9th Cir. 1975); *Mont. Envtl. Info. Ctr. v. Office of Surface Mining*, 274 F. Supp. 3d 1074, 1091-93 (D. Mont. 2017).

That a future action is reasonably foreseeable can be inferred from circumstantial facts, such as agency or third-party decision making that takes the occurrence of the future action into account. *Thomas*, 753 F.2d at 760 ("[I]f the [timber] sales are sufficiently certain to justify construction of the road, then they are sufficiently certain for their environmental impacts to be analyzed along with those of the road."). While general plans for a large and geographically undefined area may be too speculative to warrant NEPA consideration, courts have held that anticipated development of a specified area is reasonably foreseeable. *Compare Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 1000-01 (9th Cir. 2013) (holding that a company's "general plans for expanded mining" over a 50-mile coastline with "no information as to . . . location . . . or even how many projects" would be pursued, did not render future actions

reasonably foreseeable), *with N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1079 (9th Cir. 2011) (holding that anticipated coal-bed methane well development occurring over the following 20 years in specified counties was reasonably foreseeable, and that analysis of these development impacts were required as cumulative impacts associated with a proposed rail-line approval).

Plaintiffs' burden to demonstrate that the agency failed to conduct a sufficient cumulative impact analysis "is not an onerous one." *Te-Moak Tribe of W. Shoshone of Nev. v. Dep't of the Interior*, 608 F.3d 592, 605 (9th Cir. 2010). Courts only require that Plaintiffs show a potential for cumulative impact that went unconsidered; "[t]o hold otherwise would require the public rather than the agency to ascertain the cumulative effects of a proposed action . . . thwart[ing] one of the twin-aims of NEPA." *Id.* Where an agency fails to consider the cumulative impacts from reasonably foreseeable future actions, the agency's decision is invalid. *See Kern*, 284 F.3d at 1079.

Here, although development is not certain at the Palmer Project, it is reasonably foreseeable. As a mining operation in the later stage of exploration, the Palmer Project's next step would be development. *See* Ex. 32 at 11 (Doc. 38-4 at 126). Progression of the Project is not certain; it even may not be highly probable. *Id.* at 12. But development's reasonable foreseeability and its uncertainty are not mutually exclusive. 40 C.F.R. § 1502.22(b)(4); *Davis*, 521 F.2d at 675; *Mont. Envtl. Info. Ctr.*, 274 F. Supp. 3d at 1091-93.

Facts before the agency indicate the reasonable foreseeability of development at the Palmer Project. Under multiple corporate names, the Company has been exploring the Project area since 1998. Green Decl., Doc. 11 at 2, ¶ 5. Over the decades of exploration, "the confidence of the geological resources progresses." Ex. 32 at 11 (Doc. 38-4 at 126). The

Company itself anticipates that at the conclusion of the approved exploration plan, "assuming continued positive results[,] . . . emphasis will shift from exploration to engineering & development." Ex. 2 at 68 (Doc. 35-9 at 70). If development was sufficiently certain to justify the Company's investments in continued exploration, then it is sufficiently certain to be analyzed along with exploration. *See Thomas*, 753 F.2d at 760 ("[I]f the sales are sufficiently certain to justify construction of the road, then they are sufficiently certain for the environmental impacts to be analyzed along with those of the road.").

Development impacts would affect the same place and the same resources as exploration, and thus would be additive to impacts of exploration activities. The record indicates a high likelihood that, like exploration activities, development would generate water-quality impacts in and downstream of the Project area. Ex. 24 at 17 (Doc. 37-4 at 23) ("The Palmer Exploration Project hosts a volcanogenic massive sulfide ('VMS') deposit"); Ex. 48 at 2 ("Volcanic-associated massive sulfide deposits are among the most likely of all deposit types to have associated environmental problems, particularly acid mine drainage."). Like exploration activities, development infrastructure would cause disturbance and habitat displacement within the Project area. Ex. 27 at 32 (Doc. 37-8 at 109) (finding that the average surface disturbance of a major mine is 1,901 acres); Ex. 11 at 120-34 (Doc. 36-8 at 120-34) (describing the Palmer Project area's overlap with wildlife habitat). Such impacts would be additive to those of the Plan Approval and Road Extension decisions. *Id.* at 80, 108, 110-11 (Doc. 36-8 at 80, 108, 110-11) (surface water impacts); Ex. 32 at 17-18, 21 (Doc. 38-4 at 132-33, 136) (same); Ex. 11 at 122, 123 (Doc. 36-8 at 122, 123) (surface disturbance and habitat displacement); Ex. 32 at 14, 16 (Doc. 38-4 at 129, 131) (same); Ex. 11 at 137-42 (Doc. 36-8 at 137-42) (generation of industrial noise); *see generally* Ex. 16 at 3-4 (Doc. 37-2 at 81-82) (describing the effects of exploration).

Therefore, the potential impacts of development would be cumulative with the impacts of the Plan Approval and Road Extension decisions.

Future development at the Palmer Project is reasonably foreseeable, even though it is not certain. Potential development impacts would be cumulative with those of the Plan Approval and Road Extension decisions. For these reasons, BLM was required to consider development impacts.

B.  NEPA Timeliness Requirements Mandate that BLM Consider Development Impacts in Connection with the Plan Approval and Road Extension Decisions.

Under NEPA, the general rule is that an agency must take a hard look at impacts as soon as possible, in order to ensure that analysis meaningfully informs the agency's choice. At the latest, the hard look must occur before the agency's choice becomes irreversibly limited. Here, BLM's postponement of analysis of development impacts violates the rule. The delay effectively limits a fully informed choice as to how the agency should best protect the Chilkat River watershed. And as a practical matter, the record indicates that a reasonable assessment of development impacts was possible. A hard look at development was therefore mandatory under NEPA timeliness requirements.

1.  *BLM postponed analysis of development impacts until a point too late for meaningful consideration.*

"Proper timing is one of NEPA's central themes." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 718 (9th Cir. 1988). The general rule is that the agency's hard look must take place as early as possible. 40 C.F.R. § 1501.2; *Save the Yaak Comm.*, 840 F.2d at 718 (interpreting Council on Environmental Quality NEPA implementing regulations to require NEPA analysis "at the earliest possible time to ensure that planning and decisions reflect environmental values") (quoting *Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979)). "If it is reasonably possible to

analyze the environmental consequences . . . the agency is required to perform that analysis."
*Kern*, 284 F.3d at 1072.  There may be an initial point before which too little information is available for meaningful consideration; analysis in advance of this point is not required of the agency.  40 C.F.R. § 1502.22; *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978).  But once this point is passed, the hard look is mandatory.  Postponing review can render the resulting analysis less useful, and even too late to inform choices before the agency.

Courts recognize that as an action matures, agency and third-party investments of time and resources can prejudice the agency's choices.  *See Save the Yaak Comm.*, 840 F.2d at 718; *Thomas*, 753 F.2d at 760.  Therefore, an agency must consider the potential environmental impacts of its actions early enough to inform its choices and to avoid impacts being "overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989).

At the very latest, the hard look must occur before the agency reaches a go/no-go point at which an irreversible or irretrievable commitment of resources prejudices the agency's choices.  42 U.S.C. § 4332(2)(C)(v).  Applying this principle, courts have specifically defined the outer bound in situations where an action is one stage within a broader project.  NEPA requires that the agency consider potential impacts from subsequent stages while the agency retains full discretion to preclude harms and before this discretion would narrow.  In *Conner v. Burford*, for example, plaintiffs challenged BLM's decision to issue oil and gas leases without considering the environmental impacts of eventual oil development on these leases.  848 F.2d 1441, 1446, 1448 (9th Cir. 1988).  The agency argued that subsequent activities, including development, would be subject to later NEPA analysis, and that analysis of development at the current leasing stage

would be speculative.  *Id.* at 1450.  The Ninth Circuit rejected the agency's position, holding that NEPA required consideration of later surface disturbance at the leasing stage, because the agency's discretion to preclude later impacts would narrow before its next decision point.  *Id.* at 1450.  While the agency retained full discretion to prevent development impacts with respect to some leases ("no surface occupancy" or "NSO" leases), *id.* at 1448-50, with respect to others ("non-NSO" leases) the agency's discretion would narrow following the decision.  *Id.* at 1451.  Therefore, the Court held that issuance of non-NSO leases entailed a "point of commitment" for NEPA purposes.  *Id.*  The agency could not defer environmental analysis of later development impacts associated with non-NSO leases, because in the intervening time, the agency would lose the ability to preclude these impacts.  *Id.*  The court has applied this holding in similar circumstances where an agency's discretion to prevent later impacts narrows before the agency's subsequent decision point.  *See, e.g.*, *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 782 (9th Cir. 2006); *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1227 (9th Cir. 1988).

Here, BLM's decisions affected more than exploration.  Most immediately, BLM faced the choice of whether to authorize the exploration activities outlined in Constantine Metals' proposals.  The Plan Approval and Road Extension decisions, however, also implicated choices about potential development: whether the natural values of the Palmer Project region can be protected at the development stage by the agency's regulatory authority to mitigate impacts, or rather whether adequate protection requires precluding mining altogether by means of a land withdrawal.  These development choices are affected now because by deciding to approve exploration, BLM authorizes activities that may lead to discovery of a valuable mineral deposit, creating private rights that constrain BLM's authority fully to protect the area through withdrawal once mine development is proposed.

BLM currently manages the Palmer Project area under the federal mining regime, which is defined by two statutes, the General Mining Law of 1872 ("the General Mining Law") and the Federal Land Policy and Management Act (FLPMA). Under the General Mining Law, unless otherwise withdrawn or closed, federal lands are open to exploration for mineral deposits. 30 U.S.C. § 22. BLM also regulates surface use of the land under FLPMA "to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). To this end, the agency has promulgated implementing regulations, under which it manages activities like mining to avoid unnecessary or undue degradation of public lands. 43 C.F.R. §§ 3809.5, 3809.11(a), 3809.411(d). Under the agency's definition of this standard, "unnecessary or undue degradation" does not include harms that are "reasonably incident" to mining operations and otherwise compliant with applicable laws. *Id*. § 3809.5. BLM requires that operators employ "reasonable and customary" mining practices and minimize—but not necessarily prevent—the generation of acid mine drainage and its "uncontrolled migration" to the environment. *Id*. § 3809.420(a)(2) & (b)(11).

In addition, under FLPMA, the Secretary of the Interior is authorized to withdraw lands from entry and thereby preclude mining in order to maintain other public values or reserve the area for other public purposes. 43 U.S.C. §§ 1702(j), 1714(a). The Secretary has delegated the authority to process withdrawals to BLM. *Id.* § 1714(a) (authorizing delegations of withdrawal authority); Dep't of the Interior, 603 Dep't Manual 1, 2 (2005) (delegating authority to BLM).

BLM's option to withdraw can be constrained, however, by the General Mining Law's operation. The agency's withdrawal authority can be narrowed by third-party actions beyond BLM's control once the agency approves exploration activities that lead to a discovery. Specifically, the agency's discretion to protect the Palmer Project area by a land withdrawal

narrows at the point of discovery. Under the General Mining Law, while Constantine Metals is exploring the area for minerals, BLM's approval of activities creates no entitlement to resources associated with the land. *See Cole v. Ralph*, 252 U.S. 286, 294 (1920) ("In advance of discovery an explorer in actual occupation and diligently searching for mineral is treated as a licensee or tenant at will."). But the relationship changes once the Company's exploration work creates "a reasonable prospect of success[] in developing a valuable mine," given market conditions and relevant operating costs. *Freeman v. Dep't of the Interior*, 650 F. App'x 6, 8 (D.C. Cir. 2016). At this point—termed "discovery"—Constantine Metals would acquire an exclusive right of possession and enjoyment to subsurface minerals. *United States v. Shumway*, 199 F.3d 1093, 1100 (9th Cir. 1999); *Cole*, 252 U.S. at 295 ("A location based upon discovery gives an exclusive right of possession and enjoyment . . . property in the fullest sense"); *see also Reoforce, Inc. v. United States*, 119 Fed. Cl. 1, 5 (2013). This vesting of rights occurs by operation of law, triggered by private third-party actions, requiring no additional agency decision. *Shumway*, 199 F.3d at 1100. While BLM may withdraw lands at any time, the substantive effect of a withdrawal changes at discovery because withdrawals are made subject to valid existing rights. 43 U.S.C. § 1701, Note (h). After discovery, Constantine Metals would hold property interests in these lands protected by the Fifth Amendment of the Federal Constitution. *Cole*, 252 U.S. at 295; *Vane Minerals (US), LLC v. United States*, 116 Fed. Cl. 48, 62 (2014). Thus, if BLM were to withdraw the lands after discovery, the Company either would retain the ability to occupy and exploit minerals via mine development, or, if the agency extinguished Constantine Metals' property interests, the Fifth Amendment could obligate the Government to make just compensation.

   This change in BLM's ability to protect lands by withdrawal is critical because, once

PLAINTIFFS' PRINCIPAL BRIEF
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No. 3:17-cv-00253-TMB   29

Case 3:17-cv-00253-TMB   Document 43   Filed 06/01/18   Page 36 of 52

fully informed as to potential development effects, BLM may decide that this is the only effective way to protect the public values of the Chilkat River watershed. BLM has decided in other cases that its ability to mitigate environmental damage under the "undue and unnecessary degradation" standard is not sufficient, and that a withdrawal is thus needed. Where it has found special ecological or other public values, the agency has withdrawn lands from the mining regime. *See, e.g.*, *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 857-60 (9th Cir. 2017) (describing the Secretary of the Interior's withdrawal of federal lands in Northern Arizona from location and entry under the General Mining Law to "protect[] the Grand Canyon watershed from adverse effects of . . . mineral exploration and mining" and to prevent "irreversible" harms to "the sacred and traditional places of tribal peoples"). Under NEPA, BLM must be informed of the potential consequences of its choices before the agency loses the opportunity to make an unconstrained choice as to withdrawal.

Given the constraint discovery can impose on BLM's withdrawal authority, BLM must analyze development impacts before exploration activity may lead to a discovery. BLM's decisions in the instant case are structurally similar to the issuance of non-NSO leases in *Conner*: BLM states that development will be subject to NEPA analysis later, when operations can be considered in more detail, specifically, after the Company had completed exploration and produced a thorough valuation of the deposit—effectively after discovery. Ex. 32 at 13 (Doc. 38-4 at 128); Ex. 13 at 5 (Doc. 36-9 at 9). But like the issuance of non-NSO leases in *Conner*, BLM's decisions at issue in this case approving exploration activities could be the last chance before Constantine Metals would reach the point of discovery. The Plan Approval authorized multiple years of exploration activity from the date of the decision. *See* Ex. 2 at 44 & 77 (Doc. 35-9 at 46 & 79); Ex. 11 at 13 (Doc. 36-8 at 13). During this time, Constantine Metals could

reach the point of discovery. Over the course of two decades exploring the Palmer deposit, "the confidence of the geological resources progresses." *See* Ex. 32 at 11 (Doc. 38-4 at 126). Constantine Metals continues to advance the Project to development and anticipates being able to do so after the exploration approved by the decisions at issue in this case is completed. Ex. 2 at 68 (Doc. 35-9 at 70) ("After Year 5, assuming continued positive results, it is anticipated that emphasis will shift from exploration to engineering & development"). The Plan Approval and Road Extension are thus "points of commitment" for NEPA purposes. *Conner*, 848 F.2d at 1451. NEPA requires consideration of development impacts now, in connection with the Plan Approval and Road Extension decisions.

> 2.  *The record demonstrates a reasonable discussion of development impacts was possible.*

NEPA requires an agency to take the hard look at impacts "as soon as it can reasonably be done." *Kern*, 284 F.3d at 1072. "If it is reasonably possible to analyze the environmental consequences . . . the agency is required to perform that analysis." *Id.* Courts recognize that a timely hard look may be more general than one conducted later with more information available. *Id.* at 1072. Although the exploration stage of a mining project "inherently involves uncertainties," *Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 600, uncertainty does not preclude meaningful consideration of potential future impacts. Thorough discussion of future impacts in the life cycle of a mine is possible even where the outcomes of exploration remain uncertain. *See id.* at 600 (holding that BLM properly "balance[d] . . . uncertainties with its duty under NEPA to analyze possible environmental impacts" when it considered the effects of future exploration drilling, the locations of which remained unknown, and the very occurrence of which was uncertain).

Where actions are reasonably foreseeable, they must be considered even if they have not

yet advanced to become specific proposals.  *See N. Plains Res. Council, Inc. v. Surface Transp.*

*Bd.*, 668 F.3d 1067, 1079 (9th Cir. 2011) (requiring agency to consider effects of coal-bed-

methane well development over the next 20 years as cumulative impacts associated with a coal-

hauling railroad line).  Cumulative impacts must be analyzed at an early stage even where an

agency expects to conduct additional NEPA analysis in connection with a later stage in a project.

*See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 896 n.2 (9th Cir. 2002).  For

example, courts apply such an approach to NEPA review of oil and gas projects under the Outer

Continental Shelf Lands Act (OCSLA): these projects proceed through a staged life cycle—from

five-year lease plan issuance, to lease sales, to exploration, and finally to development and

production.  *Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1187 (9th Cir. 1988).  Courts

acknowledge that "[m]ore accurate information will be available at later stages," but hold that

"the amount and specificity of information necessary to meet NEPA requirements varies at

each . . . stage[]."  *Id.* at 1192.  Early on, analysis of later stages may require "what . . . seem to

be incomplete or speculative data."  *Id.* at 1192; *Vill. of False Pass v. Clark*, 733 F.2d 605, 616

(9th Cir. 1984) (holding that NEPA may require repeat analysis of a project's impacts at

increasing levels of detail with advancing stages in an OCSLA project).  The agency will have

substantial latitude to determine what level of generality or detail is appropriate at a given stage,

but where analysis of potential future impacts is possible, the agency cannot entirely refuse to

look ahead.

      Here, BLM entirely refused to consider development impacts.  BLM explained its refusal

by reference to its current uncertainty and the additional information that would become

available later in the life cycle of the project.  Ex. 32 at 13 (Doc. 38-4 at 128).  But uncertainty

does not preclude meaningful review.  The exploration stage of a mining project "inherently

involves uncertainties . . . if mining companies knew the precise location of mineral deposits before drilling, exploration would not be required." *Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 600. Plaintiffs concede that "[m]ore accurate information will be available at later stages." *Tribal Vill. of Akutan*, 869 F.2d at 1192. For that reason, BLM's analysis now will be more general than that which it can conduct later, with more extensive information. *See Kern*, 284 F.3d at 1072. But "the amount and specificity of information necessary to meet NEPA requirements varies at each stage." *Tribal Vill. of Akutan*, 869 F.2d at 1192. Neither uncertainty as to the specificities of future mine development nor even uncertainty as to whether development will occur obviates BLM's duty to consider these potential impacts. *See N. Plains Res. Council, Inc.*, 668 F.3d at 1079; *Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 600.

Though the agency failed to assess the adequacy of information related to development, the record indicates sufficient available information about potential development impacts to prepare an assessment now. The record indicates that the Palmer Project involves a volcanic-associated massive sulfide deposit, among the deposit types most likely to generate acid mine drainage. *See* Ex. 24 at 17 (Doc. 37-5 at 23); Ex. 16 at 5-6 (Doc. 37-2 at 83-84). The record describes potential impacts of acid mine drainage pollution on downstream environmental, economic, and cultural values. Ex. 16 at 7 (Doc. 37-2 at 85); Ex. 26 at 4, 8-9 (Doc. 37-8 at 11, 15-16); *see supra* pp. 6-7, 10-11. The record also describes the topography and hydrology of the Palmer Project area, Ex. 11 at 72 (Doc. 36-8 at 72), its potential seismicity, *id.* at 149 (Doc. 36-8 at 149), and includes information on downstream values that would suffer from acid mine drainage released from the Project. Ex. 16 at 10-11 (Doc. 37-2 at 88-89). These data already indicate that a reasonably thorough analysis of development impacts is possible.

Notwithstanding that more information may be available later, the record indicates that a

reasonable discussion of development impacts was possible in connection with the Plan Approval and Road Extension decisions. BLM was required to undertake that analysis.

IV.    THE APPROPRIATE REMEDY IS VACATUR, OR, ALTERNATIVELY, AN ORDER ENJOINING ACTIVITIES PENDING BLM'S COMPLIANCE WITH THE LAW ON REMAND.

BLM issued the Plan Approval and Road Extension decisions relying on arbitrary and unlawful NEPA analyses. Accordingly, Plaintiffs request that the Court declare the actions unlawful and vacate these decisions. Alternatively, Plaintiffs request that the Court remand the decisions to BLM with direction to comply with NEPA, and in the meantime enjoin further activities under both agency decisions.

A.    Plaintiffs Request that the Court Vacate the Plan Approval and Road Extension Decisions.

Vacatur is the normal remedy where agency actions are held unlawful. Section 706 of the Administrative Procedure Act provides that the reviewing court "shall . . . set aside" agency action that is arbitrary or not in accordance with law. 5 U.S.C. § 706(2)(A). Departure from the ordinary remedy of vacatur may be warranted in rare circumstances where the remedy would thwart the objective of the statute at issue or trigger disastrous large-scale consequences. *See, e.g.*, *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980) (denying vacatur where the remedy would frustrate the aims of the Clean Air Act, under which plaintiffs sued); *Cal. Cmty. Against Toxics v. EPA*, 688 F.3d 989, 993-94 (9th Cir. 2012) (denying vacatur where remedy would trigger economically disastrous blackouts across California's south coast basin); *Humane Soc'y of U.S. v. Locke,* 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) (stating that remand without vacatur is granted only "in rare circumstances").

Vacatur is the appropriate remedy here. As described above, BLM issued the Plan

Approval and Road Extension decisions in violation of NEPA and the Administrative Procedure Act. In analyses accompanying the Plan Approval and Road Extension decisions, BLM entirely refused to consider development impacts. If BLM seeks to approve exploration activities, it must undertake the requisite public NEPA process and agency analysis, and reach decisions informed by this process. By vacating the unlawful actions, the Court would provide BLM the opportunity to comply with NEPA by considering the full scope of impacts associated with its actions, while preventing irreparable harm to Plaintiffs, their members, and the environment until such compliance occurs. Vacatur would serve the purposes of NEPA, and, therefore, this case does not present extraordinary circumstances to warrant departure from the default remedy of vacatur.

Accordingly, Plaintiffs request that the Court grant the ordinary remedy of vacatur.

B.     <u>Alternatively, Plaintiffs Request that the Court Remand the Plan Approval and Road Extension Decisions to BLM, and Enjoin Activities Under These Decisions, Pending BLM's Compliance with Its NEPA Obligations.</u>

In the alternative, Plaintiffs request that the Court enter an injunction prohibiting activities under the unlawful Plan Approval and Road Extension decisions, and remand them to BLM to remedy its violations of NEPA. A plaintiff seeking a permanent injunction must demonstrate: (1) that it is likely to suffer an irreparable injury in the absence of an injunction; (2) that remedies available at law are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018) (holding that where plaintiffs seek to enjoin activities until defendants comply with law, on the first prong, "plaintiffs must show that they are

likely to suffer irreparable harm" in the absence of an injunction). Plaintiffs demonstrate all four elements in this case.

1. *Plaintiffs would suffer irreparable injury from continuation of activities under the Plan Approval and Road Extension decisions.*

Plaintiffs seeking injunctive relief "must show that they are likely to suffer irreparable harm absent an injunction." *Nat'l Wildlife Fed'n* 886 F.3d at 822 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Environmental injury, by its nature . . . is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Where conduct would harm Plaintiffs' members' ability to view, experience, and utilize an area in its undisturbed state, the Ninth Circuit has held this sufficient for irreparable harm. *Nat'l Wildlife Fed'n*, 886 F.3d at 822 (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

Activities authorized under the Plan Approval and Road Extension decisions impose ongoing irreparable harms on Plaintiffs and their members, with further, more severe harms likely. Exploration activities continue to preclude Plaintiffs' members' uses of the Palmer Project area and surrounding areas. Exploration activities occupy physical spaces with infrastructure and equipment, and generate disturbances in the area, as well as safety concerns related to the use of heavy machinery, materials, and vehicles. *See supra* p. 8. Disturbances have and will continue to displace wildlife, precluding Plaintiffs' members' use of the area for hunting and wildlife viewing. Ex. 38 at ¶ 11; Ex. 42 at ¶ 6. Noise disturbance and safety concerns have reduced accessibility or precluded Plaintiffs' members' subsistence, cultural, aesthetic, and recreational uses of the area. Ex. 39 at ¶¶ 21-22; Ex. 35 at ¶ 8; Ex. 36 at ¶ 11; Ex. 37 at ¶ 12; Ex. 41 at ¶ 18. Likewise, increased traffic volumes associated with activities under the Plan Approval and Road Extension decisions have precluded and are precluding use and

enjoyment of the area and surrounding lands by Plaintiffs' members. Ex. 42 at ¶¶ 8, 15; Ex. 41 at ¶ 18; Ex. 37 at ¶ 12. Additionally, in the absence of an injunction, it is likely that BLM's discretion will narrow before it is able to make an assessment of the potential impacts from mine development at the Palmer Project. *See supra* pp. 27-31. This likely limitation on protection would harm Plaintiffs' and their members' interests in and around the Palmer Project area.

      2.      *Remedies available at law are inadequate to compensate for Plaintiffs' injury.*

"Environmental injury, by its nature, can seldom be adequately remedied by money damages." *Amoco Prod. Co.*, 480 U.S. at 545.

Here, the harms to Plaintiffs' and their members' interests entail environmental injuries that cannot be compensated adequately by remedies at law. Most immediately, the continuation of exploration activities under the Plan Approval and Road Extension decisions precludes or limits Plaintiffs' members' use of the Palmer Project area and surrounding lands for subsistence, cultural, spiritual, aesthetic, recreational, and other uses. *See supra* pp. 36-37. As described above, continuation of these activities also potentially compromises Plaintiffs' and their members' interests in the protection of the Chilkat River watershed through the likely narrowing of the agency's discretion. Remedies at law are inadequate to compensate Plaintiffs' members for harms to their uses of areas in and around the Palmer Project.

      3.      *The balance of hardships supports issuance of an injunction.*

In considering equitable relief, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co.*, 480 U.S. at 542). Where irreparable injury is "sufficiently likely," "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co.*, 480 U.S. at 545.

Here, the balance of hardships favors issuance of an injunction halting exploration activities under the Plan Approval and Road Extension decisions. An injunction would impose no hardships on BLM. The Company may experience, if any, some limited harm associated with a pause in its activities during BLM's completion of NEPA review on remand, assuming BLM concludes that withdrawal is not necessary. However, such potential monetary harm is not normally considered irreparable. *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("It is well established . . . [that] monetary injury is not normally considered irreparable."). In the absence of an injunction, severe harms to the environment and to Plaintiffs' and their members' interests in the Chilkat River watershed are ongoing and sufficiently likely, as described above. *See supra* pp. 36-37; *see also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding that project's prevention of plaintiffs' use and enjoyment of the project area "is hardly a *de minimis* injury"). The balance of hardships favors enjoining activities under BLM's unlawful actions, pending the agency's compliance with NEPA on remand.

4.      *An injunction serves the public interest.*

Courts "recognize[] the public interest in careful consideration of environmental impacts before major federal projects go forward, and . . . that suspending such projects until that consideration occurs comports with the public interest." *All. for the Wild Rockies*, 632 F.3d at 1138 (internal quotation omitted). Here, the public interest is advanced by an injunction halting exploration activities while BLM is required to engage in careful consideration of the impacts associated with the Plan Approval and Road Extension decisions, and to have its review inform those decisions. In these circumstances, "suspending [the] project[] until that consideration occurs comports with the public interest." *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court declare invalid BLM's NEPA analyses accompanying the Plan Approval and Road Extension decisions, and vacate those decisions. Alternatively, Plaintiffs request that the Court declare these decisions unlawful, remand them to BLM with instructions to comply with NEPA and the Administrative Procedure Act, and enjoin further activities under the decisions, pending BLM's compliance.

Respectfully submitted this 1st day of June, 2018.

*s/ Kenta Tsuda*
Kenta Tsuda (Alaska Bar No. 1605046)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

*Attorneys for Plaintiffs Chilkat Indian Village of Klukwan, Southeast Alaska Conservation Council, Lynn Canal Conservation, and Rivers Without Borders, a Project of Tides Center*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2018, a copy of foregoing PLAINTIFFS' PRINCIPAL

BRIEF ON SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL

PROCEDURE 56 AND DISTRICT OF ALASKA LOCAL RULE 16.3, with attachments, was

served electronically on Dean Dunsmore and James F. Clark.

                    *s/ Kenta Tsuda*
                    Kenta Tsuda

# TABLE OF EXHIBITS

| Exhibit No. | Doc. No., Doc. Page Nos. | AR Bates Nos. | Description |
| --- | --- | --- | --- |
| 1 | 35-9 at 1-2 | 0557-58 | D. Green, Constantine North, Inc., Letter to D. Teitzel, Bureau of Land Management (BLM), Re: Constantine North, Inc. Palmer Exploration Project Plan of Operations (May 22, 2015) |
| 2 | 35-9 at 3-113 | 0559-669 | Constantine North, Inc., Palmer Exploration Project, Exploration Plan of Operations (Amended Aug. 27, 2015) |
| 3 | 35-11 at 145-47 | 0857-59 | BLM, Scoping Notice, Constantine Metal Resources Ltd's New Mining Plan of Operations for Continued Exploration, DOI-BLM-AK-A020-2016-0006 (undated) |
| 4 | 35-12 at 99-101 | 0994-96 | Chilkat Indian Village, Comments on the Constantine North, Inc. Palmer Exploration Project Exploration Plan of Operations, May 22, 2015 (Jan. 14, 2016) |
| 5 | 36-1 at 85-86 | 1097-98 | D. Green, Constantine North, Inc., Memo to A. Rabuck & R. Tankersley, BLM, Re: Questions Regarding Gate on Road (Feb. 26, 2016) |
| 6 | 36-2 at 77-149 | 1177-1249 | BLM, Scoping Summary Report In support of the Environmental Assessment, Constantine North, Inc., Palmer Exploration Project (Mar. 2016) (excerpts) |
| 7 | 36-6 at 1-213 | 1513-1725 | BLM, Draft Environmental Assessment, Palmer Exploration Project, Constantine North, Inc., Case File: AA-094088, DOI-BLM-AK-A020-2016-006-EA (Apr. 25, 2016) (excerpts) |
| 8 | 36-7 at 5 | 1730 | Alaska Clean Water Advocacy, Comments Re: Draft Environmental Assessment, Palmer Exploration Project Constantine North, Inc., Case File: AA-094088, DOI-BLM-AK-A020-2016-006-EA (undated) |

PLAINTIFFS' PRINCIPAL BRIEF
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No. 3:17-cv-00253-TMB                                                                 i

Case 3:17-cv-00253-TMB    Document 43    Filed 06/01/18    Page 48 of 52

| 9 | 36-7 at 6-11 | 1731-36 | Chilkat Indian Village, Comments on the Draft Environmental Analysis, DOI-BLM-AK-A020-2016-0006-EA (May 26, 2016) |
|---|---|---|---|
| 10 | 36-7 at 59-64 | 1784-89 | Southeast Alaska Conservation Council (SEACC), Comments on the 2016 Palmer Exploration Draft Environmental Analysis, DOI-BLM-AK-A020-2016-0006-EA (May 26, 2016) |
| 11 | 36-8 at 1-214 | 1904-2117 | BLM, Environmental Assessment, Palmer Exploration Project, Constantine North, Inc., Case File: AA-094088, DOI-BLM-AK-A020-2016-006-EA (Aug. 18, 2016) |
| 12 | 36-9 at 1-4 | 2118-21 | BLM, Palmer Exploration Project, Constantine North, Inc., Mine Plan of Operations, Environmental Assessment, DOI-BLM-AK-A020-2016-006-EA, Case File, AA-094088, Finding of No Significant Impact (Aug. 18, 2016) |
| 13 | 36-9 at 5-11 | 2122-28 | BLM, Palmer Exploration Project, Constantine North, Inc., Mine Plan of Operations, Environmental Assessment, DOI-BLM-AK-A020-2016-006-EA, Case File, AA-094088, Decision Record (Aug. 18, 2016) |
| 14 | 37-1 at 28-29 | 2236-37 | D. Green, Constantine North, Inc., Letter to R. Tankersley, BLM, Re: Palmer Exploration Project, SE Alaska, Amendment to Road Design - Case File AA-094088 (Jan. 3, 2017) |
| 15 | 37-2 at 68-78 | 2324-34 | Chilkat Indian Village, Comments Re: Palmer Exploration Project, SE Alaska Amendment to Road Design – Case File AA-094088 (DOI-BLM-AK-A020-2017-0025-EA) (May 27, 2017) |
| 16 | 37-2 at 79-90 | 2335-46 | SEACC *et al.*, Comments Re: Palmer Exploration Project, SE Alaska Amendment to Road Design – Case File AA-094088 (DOI-BLM-AK-A020-2017-0025-EA) (May 28, 2017) |
| 17 | 37-2 at 96-97 | 2352-53 | Alaska Department of Fish & Game (ADF&G), Alaska Sport Fishing Survey, Survey Area F2 (Haines), 2015 Harvest Estimates (accessed May 26, 2017) |

PLAINTIFFS' PRINCIPAL BRIEF
*Chilkat Indian Village of Klukwan et al. v. BLM et al.*,
Case No. 3:17-cv-00253-TMB                                                                    ii

Case 3:17-cv-00253-TMB     Document 43     Filed 06/01/18     Page 49 of 52

| 18 | 37-2 at 119-31 | 2375-87 | K. L. Barry *et al.*, *Impacts of acid mine drainage on juvenile salmonids in an estuary near Britannia Beach in Howe Sound, British Columbia*, 57 CAN. J. FISH. AQUAT. SCI. 2032 (2000) |
|---|---|---|---|
| 19 | 37-2 at 132 | 2388 | Government of British Columbia, BC Geographical Names, Chilkat River (accessed May 25, 2017) |
| 20 | 37-2 at 135-196 | 2391-452 | M. Brock & P. Coiley-Kenner, *A Compilation of Traditional Knowledge About the Fisheries of Southeast Alaska*, ADF&G Technical Paper No. 332 (Sept. 2009) (excerpts) |
| 21 | 37-2 at 197 to 37-3 at 51 | 2453-508 | L. N. Bowker & D. M. Chambers, *The Risk, Public Liability, & Economics of Tailings Storage Facility Failures* (July 21, 2015) (excerpts) |
| 22 | 37-3 at 66-99 | 2523-556 | D. M. Chamber & B. Higman*, Long Term Risks of Tailings Dam Failure* (Oct. 2011) |
| 23 | 37-3 at 100-104 | 2557-561 | D. M. Chambers, *Long-term Risk of Tailings Dam Failure*, 13 ALASKA PARK SCIENCE 55 (2014) |
| 24 | 37-4 at 70 to 37-6 at 75 | 2651-831 | J. N. Gray & I. R. Cunningham-Dunlop, *NI 43-101 Technical Report and Updated Resource Estimate for the Palmer Exploration Project, Porcupine Mining District, Southeast Alaska, USA* (2015) (excerpts) |
| 25 | 37-6 at 141 to 37-8 at 7 | 2897-3053 | Independent Expert Engineering Investigation and Review Panel, Report on Mount Polley Tailings Storage Facility Breach (Jan. 30, 2015) (excerpts) |
| 26 | 37-8 at 8-36 | 3054-82 | S. R. Jennings *et al.*, *Acid mine Drainage and Effects on Fish Health and Ecology; A Review* (2008) |
| 27 | 37-8 at 63 to 38-1 at 75 | 3109-336 | J. R. Kuipers *et al.*, *Comparison of Predicted and Actual Water Quality at Hardrock Mines: The reliability of predictions in environmental impact statements* (2006) (excerpts) |

PLAINTIFFS' PRINCIPAL BRIEF
*Chilkat Indian Village of Klukwan et al. v. BLM et al.*,
Case No. 3:17-cv-00253-TMB                                                    iii

Case 3:17-cv-00253-TMB    Document 43    Filed 06/01/18    Page 50 of 52

| 28 | 38-2 at 66-70 | 3426-30 | P. Moskowitz, *Mount Polley mine spill: a hazard of Canada's industry-friendly attitude?*, THE GUARDIAN (Aug. 13, 2014) |
| 29 | 38-2 at 75-94 | 3435-54 | J. Ordóñez, *Where Eagles Gather: The Story of the Alaska Chilkat Bald Eagle Preserve, Haines, Alaska* (2015) (excerpts) |
| 30 | 38-4 at 108-111 | 3655-58 | BLM, Constantine Mine 2017 Plan Modification, Environmental Assessment, DOI-BLM-AK-A010-2017-0025-EA, Case File: AA-094088, Decision Record (Sept. 21, 2017) |
| 31 | 38-4 at 112-115 | 3659-62 | BLM, Constantine Mine 2017 Plan Modification, Environmental Assessment, DOI-BLM-AK-A010-2017-0025-EA, Case File: AA-094088, Finding of No Significant Impact (Sep. 21, 2017) |
| 32 | 38-4 at 116-146 | 3663-93 | BLM, Constantine Mine 2017 Plan Modification, Environmental Assessment, DOI-BLM-AK-A010-2017-0025-EA, Case File: AA-094088 (Aug. 31, 2017) |
| 33 | 38-3 at 8-35 | 3462-89 | M. H. H. Price, *Sub-lethal metal toxicity concerns for Unuk watershed salmonids from Seabridge Gold's proposed KSM mine* (Mar. 8, 2014) |
| 34 | | | Declaration of Kimberley Strong |
| 35 | | | Declaration of Meredith Trainor |
| 36 | | | Declaration of Steven Eric Holle |
| 37 | | | Declaration of William Patric |
| 38 | | | Declaration of Tony Strong |
| 39 | | | Declaration of Joanne Elsie Spud |
| 40 | | | Declaration of Joe Ordóñez |
| 41 | | | Declaration of Nicholas Szatkowski |
| 42 | | | Declaration of Ben Kirkpatrick |
| 43 | | | Indigenous and Northern Affairs Canada, FAQ about Mineral Exploration in the North (2014) |

PLAINTIFFS' PRINCIPAL BRIEF
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No. 3:17-cv-00253-TMB                                                                 iv

Case 3:17-cv-00253-TMB    Document 43    Filed 06/01/18    Page 51 of 52

| 44 | Indian and Northern Affairs Canada, Stages of Mineral Exploration & Development in the Northwest Territories (undated) |
| 45 | Lynn Canal Conservation (LCC), Comments on the Constantine North, Inc. Palmer Exploration Project Exploration Plan of Operations, May 22, 2015 (Jan. 8, 2016) |
| 46 | LCC, Comments on the BLM Draft Environmental Assessment for the Palmer Exploration Project Plan of Operations (May 26, 2016) |
| 47 | Rivers Without Borders, Comments Re: 6822 (AKAO2O) Constantine Metal Resources Ltd's new mining Plan of Operations for continued exploration, doi-blm-ak-a020-2016-0006 (Jan. 8, 2016) |
| 48 | C. D. Taylor *et al.*, *Volcanic-Associated Massive Sulfide Deposits*, *in* PRELIMINARY COMPILATION OF DESCRIPTIVE GEOENVIRONMENTAL MINERAL DEPOSIT MODELS (E.A. du Bray ed., 1995) |
| 49 | University of Arizona, Superfund Research Program, Copper Mining and Processing: Life Cycle of a Mine (undated) |
| 50 | U. S. Geological Survey, *Mining and Water Quality* (accessed May 26, 2017) |
| 51 | C. A. Woody, *Copper-Effects on Freshwater Food Chains and Salmon: A Review* (Sept. 21, 2007) |

PLAINTIFFS' PRINCIPAL BRIEF
*Chilkat Indian Village of Klukwan et al. v. BLM et al.,*
Case No. 3:17-cv-00253-TMB                                    v

Case 3:17-cv-00253-TMB     Document 43     Filed 06/01/18     Page 52 of 52