IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

CHILKAT INDIAN VILLAGE OF
KLUKWAN, SOUTHEAST ALASKA
CONSERVATION COUNCIL, LYNN
CANAL CONSERVATION, and RIVERS
WITHOUT BORDERS.

                Plaintiffs,

      v.

BUREAU OF LAND MANAGEMENT,
BRIAN STEED, KAREN MOURITSEN, and
DENNIS TEITZEL, in their official
capacities,

                Defendants,

      v.

ALYU MINING CO., INC., HAINES
MINING & EXPLORATION, INC., AND
CONSTANTINE NORTH, LLC,

                Intervenor-Defendants,

Case No. 3:17-cv-00253-TMB

ORDER ON MOTION FOR
SUMMARY JUDGMENT (DKT. 43) AND
CROSS MOTION FOR SUMMARY
JUDGMENT (DKT. 58)

## I.   INTRODUCTION

This matter comes before the Court on Plaintiffs' Motion for Summary Judgment ("Motion").[1] Plaintiffs Chilkat Indian Village of Klukwan, Lynn Canal Conservation, Rivers Without Borders, and Southeast Alaska Conservation Council brought this action against Defendants the United States Bureau of Land Management ("BLM"), and three BLM officials—Dennis Teitzel, Brian Steed, and Karen Mouritsen—alleging a violation of the National

---

[1] Dkt. 43.

1

Environmental Policy Act, 42 U.S.C. §§ 4331 *et seq.*, ("NEPA") in connection with the approval of two mining exploration projects. The Motion is opposed by Defendants, whose opposition is treated as a cross-motion for summary judgment under the local rules,[2] and by Intervenor-Defendants Alyu Mining Co., Inc., Constantine North, LLC, and Haines Mining & Exploration, Inc. (collectively, "Intervenors").[3] The Motion has been fully briefed.[4]

For the following reasons, Plaintiffs' Motion for Summary Judgment is **DENIED** and Defendants' Cross Motion for Summary Judgment is **GRANTED**.

## II.    BACKGROUND

Plaintiffs challenge two BLM determinations authorizing mining exploration activities on public lands near Klukwan, Alaska.[5] Plaintiffs contend that BLM violated NEPA because the environmental review for both determinations did not consider the impacts of potential future mining development.[6] Plaintiffs sued BLM and three BLM officials on December 4, 2017.[7] Shortly thereafter, three mining companies with an interest in the suit—Alyu Mining Co., Inc.

---

[2] Dkt. 58. Under the local rules in effect at the time of the filing, for cases involving administrative appeals, "Defendant's principle brief in opposition . . . will be deemed a cross-motion for summary judgment." D. Ak. L.R. 16.3(c)(2) (as of Dec. 2011). Accordingly, the Court treats the response in opposition filed at Dkt. 58 as a Cross Motion for Summary Judgment.

[3] Dkt. 57.

[4] Dkt. 43 (Motion); Dkts. 57, 58 (responses); Dkt. 59 (reply). Plaintiffs filed a notice at Dkt. 54 and a corrected principle brief at docket 54-1, which provided updated citations to documents in the administrative record that were filed with the Court the same day as Plaintiff's Motion. *See* Dkt. 42. Accordingly, the Court cites to Plaintiff's updated brief at docket 54-1 in support of the Motion at docket 43.

[5] Dkt. 54-1 at 8.

[6] *Id.* at 10.

[7] Dkt. 1.

("Alyu"), Haines Mining & Exploration, Inc. ("Haines"), and Constantine North, LLC ("Constantine")—intervened as defendants.[8]

### A. The Palmer Project Area

The subject of this action are certain federally-managed public lands located in the Chilkat River watershed, 34 miles northeast of Haines, Alaska and near Klukwan, Alaska.[9] Pursuant to federal law, these lands are currently open to mining,[10] and are managed by the BLM Glenallen Field Office.[11] The land in question (the "Palmer Project Area") is located at the confluence of the Chilkat, Klehani, and Tsirku Rivers,[12] and is a contiguous block spanning approximately 6,765 acres and containing 340 federal unpatented lode mining claims "on the eastern margin of the Saint Elias mountain range."[13]

The Palmer Project Area is located within an area of unique environmental and cultural significance. This area serves as habitat for a wide range of aquatic, land, and avian species. The Chilkat and Klehani Rivers provide habitat for all five species of Pacific salmon, steelhead, and

---

[8] Dkt. 9 (Motion to Intervene); Dkt. 40 (Order granting motion to intervene).

[9] Dkt. 54-1 at 8; Dkt. 58 at 5.

[10] Dkt. 54-1 at 8.

[11] Dkt. 36-8 at 13. In addition to management under BLM regulations, the Palmer Project Area is governed by the BLM Ring of Fire Resource Management Plan ("RMP") and state regulatory schemes, including the Haines Borough Comprehensive Plan and the Haines State Forest Management Plan. Dkt. 35-9 at 23–24. None of these management schemes are directly implicated by the claims at issue.

[12] Dkt. 36-8 at 95.

[13] *Id*. at 13, 16. According to Constantine, 63 state mineral claims also cover an area of approximately 9,200 acres. *See* Dkt. 35-9 at 19. The international boundary with British Columbia, Canada serves as the western boundary of the Palmer Project Area. Dkt. 36-8 at 13. The specific boundaries of the Palmer Project Area are defined in the administrative record, including maps of the project area. *See, e.g., id*. at 13–15.

cutthroat trout, and numerous other fish species.[14] The region is home to Alexander Archipelago wolves, brown and black bears, mountain goats, and other land mammals.[15] And, the Palmer Project Area and surrounding land provides habitat for numerous avian species, and is located near the Alaska Chilkat Bald Eagle Preserve.[16] The Palmer Project Area also lies in the traditional territory of the Chilkat Tlingit people, a Native Alaskan tribe, and residents of the Village continue to rely on subsistence harvests to maintain their cultural heritage.[17]

B.  *Statutory and Regulatory Framework*

1.  Federal Mining Law

Federal law governing mining operations on public lands, such as the Palmer Project Area, is controlled by two statutes. Mining operations on public lands administered by the BLM are regulated under the Mining Act of 1872, 30 U.S.C. §§ 22–54 ("Mining Act") and its implementing regulations, found at 43 C.F.R. subpart 3809.[18] BLM's authority over public land is also subject to the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq.* ("FLPMA"), which governs the administration of public lands by the federal government.

BLM regulations under these two statutes govern mining activities on BLM-managed lands. Under the Mining Act, "all valuable mineral deposits in lands belonging to the United States" are open to exploration by the public for mineral deposits, unless specifically withdrawn

---

[14] Dkt. 36-8 at 101–08.

[15] *Id.* at 129–34.

[16] *Id.* at 101, 134–36.

[17] *See, e.g.*, Dkt. 35-12 at 99–101; Dkt. 38-4 at 80.

[18] 43 C.F.R. § 3809.5 defines "Operations" as including "all functions, work facilities, and activities on public lands in connection with prospecting, exploration, discovery and assessment work, development, extraction, and processing of mineral deposits locable under mining laws."

or exempted.[19] Upon discovery of an economically valuable mineral deposit and compliance with statutory and regulatory requirements, an individual may "locate" the deposit, which "gives an individual the right of exclusive possession of the land for mining purposes."[20] That individual may subsequently seek to "patent" the claim, "thereby purchasing from the Federal Government the land and minerals and obtaining title to them;" however, "an unpatented mining claim remains a fully recognized possessory interest."[21]

Under 43 C.F.R. §§ 3809.11, any operations that go beyond "casual use" of public lands cannot commence without BLM approval.[22] Specifically, where a mining operation will disturb more than five acres of land, BLM must approve a mining plan of operations ("MPO") before operations can begin.[23] An MPO is filed "with the local BLM field office with jurisdiction over the lands involved," and BLM regulations stipulate the minimum information sufficient for a complete MPO and "to determine that the plan of operations prevents unnecessary or undue

---

[19] 30 U.S.C. § 22. *See also Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 854–55 (2017) (quoting the same, and discussing authority of executive branch agencies to withdraw land from mining under federal law, both historically and under provisions of FLPMA found at 43 U.S.C. § 1701(a)(4)).

[20] *United States v. Locke*, 471 U.S. 84, 86 (1985) (citing 30 U.S.C. §§ 22, 26, 28) (describing the obligations and rights associated with locating a deposit under the Mining Act both before and after FLMPA was enacted in 1976). *See also* 43 U.S.C. § 1744 (FLPMA procedures for recording of unpatented mining claims).

[21] *Id*. (citing *Best v. Humboldt Place Mining Co.*, 371 U.S. 334, 335 (1963)). *See also Swanson v. Babbitt*, 3 F.3d 1348, 1350 (9th Cir. 1993). Statutory procedures for patenting of claims is found at 30 U.S.C. § 29.

[22] "Casual use" is defined in 43 C.F.R. § 3809.5 as "activities ordinarily resulting in no or negligible disturbance of the public lands or resources," such as the use of hand tools, hand panning, metal detectors, etc.

[23] 43 C.F.R. § 3809.11. For activities disturbing less than five acres of land, parties are still required to provide BLM with notice under 43 C.F.R. § 3809.21. The requirements for this notice are found at 43 C.F.R. § 3809.301. BLM regulations forbid segmenting a project "for the purpose of avoiding filing a [MPO]." 43 C.F.R. § § 3809.21(b).

5

degradation."[24] Based on specific criteria detailed in BLM regulations, 43 C.F.R. § 3809, the BLM field office will approve, disapprove, or withhold approval of the MPO.[25] As part of this review, BLM conducts an analysis of the environmental impacts of the MPO under NEPA.[26] Approval is required before any operations can begin,[27] and where new operations will occur, the operator is required to either submit a new MPO or apply for a modification.[28]

FLMPA did not "amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act," but was enacted to formalize the federal government's approach to managing publics land and natural resources.[29] FLPMA mandates that, in managing public lands, the BLM "take any action necessary to prevent unnecessary or undue degradation of the lands."[30] FLPMA also formalized the process by which Congress or the executive branch can formally withdraw federal public lands from mining operations.[31] While Congress and the Secretary of the

---

[24] 43 C.F.R § 3809.401. This minimum information includes, but is not limited to, operator information, a description of the operations, maps of the project area, preliminary project design, a reclamation plan for the conclusion of operations, and information concerning the water quality, rock characterization, wildlife, and other environmental factors. *See* 43 C.F.R. § 3809.401(b).

[25] 43 C.F.R. § 3809.411. BLM has authority to disapprove a plan only in specific circumstances; otherwise, an MPO that meets the criteria outlined in BLM regulations must be approved. *Id.*

[26] *Id*.

[27] 43 C.F.R. § 3809.412.

[28] 43 C.F.R. § 3809.431 (describing when a modification to an MPO is required).

[29] 43 U.S.C. § 1732(b).

[30] *Id*. BLM regulations at 43 C.F.R. §§ 3809.5, 3809.11(a), and 3809.411(d) define "unnecessary or undue regulation." Similarly, 43 C.F.R. § 3809.415 addresses methods of ensuring that an operation prevents unnecessary or undue degradation.

[31] 43 U.S.C. § 1714; 43 C.F.R. § 2300 *et seq. See also Zinke*, 877 F.3d at 854–57. The specific process for withdrawal depends on the size of the land tract to be withdrawn, the duration, and the initiating entity. Congress retains the sole authority to withdraw land parcels larger than 5,000 acres from mining permanently. 43 U.S.C. § 1714(c),(j). The Secretary of the Interior can

6

Interior (the "Secretary") retain sole authority to enact a withdrawal, BLM has the ability to enter a petition for a withdrawal, which, if accepted, initiates a review process to determine if withdrawal is appropriate.[32]

## 2. National Environmental Policy Act (NEPA)

NEPA "'provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.'"[33] NEPA "has twin aims."[34] "First, it 'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.'"[35] NEPA also "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision[-]making process."[36] "NEPA does not contain substantive environmental standards. Rather, it 'establishes action-forcing procedures that require agencies to take a hard look at environmental consequences."[37]

---

withdraw tracts smaller than 5,000 acres either temporarily or permanently; for parcels larger than 5,000 acres, the Secretary can make withdrawals lasting no longer than 20 years. 43 U.S.C. § 1714(c). The procedures in FLPMA's implementing regulations apply only to withdrawals made by the Secretary.

[32] 43 U.S.C. § 1714(c)(1), (d); 43 C.F.R. §§ 2310.1–2310.5. This process requires approval outside of BLM as well as public notice and comment to determine if withdrawal is appropriate.

[33] *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 997 (9th Cir. 2013) (quoting *Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059, 1070 (9th Cir.2002)).

[34] *Baltimore Gas and Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)).

[35] *Baltimore Gas*, 462 U.S. at 97 (quoting *Vt. Yankee*, 435 U.S. at 553).

[36] *Baltimore Gas*, 462 U.S. at 97 (citing *Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 143 (1981)). *See also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 781 (9th Cir. 2006) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1153–54 (9th Cir. 2006).

[37] *Kern v. BLM*, 284 F.3d 1062, 1066 (2002) (citing *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (internal punctuation omitted)).

7

Under 42 U.S.C § 4332(c), federal agencies must complete an environmental impact statement ("EIS") for "major federal actions significantly affecting the quality of the human environment." The Council on Environmental Quality ("CEQ") promulgated NEPA's implementing regulations, which are binding on administrative agencies.[38] "Federal regulations permit an agency that is planning a major federal action to conduct a less exhaustive Environmental Assessment ("EA") to determine whether the proposed action will 'significantly affect' the environment and thus whether an EIS is required."[39] "If the EA reveals that the proposed action will significantly affect the environment, then the agency must prepare an EIS. If the EA reveals no significant effect, the agency may issue a Finding of No Significant Impact ("FONSI").[40] Thus, "[b]y focusing agency and public attention on the environmental effects of proposed agency action, 'NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct.'"[41]

NEPA review is required component of BLM's review of any MPO.[42] For all agency actions, NEPA review—whether in the form of an EA or EIS—must be completed "'before any

---

[38] *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979); 40 C.F.R. §§ 1505.1–1508.28.

[39] *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 892 (9th Cir. 2002) (citing 40 C.F.R. §§ 1501.4(b), 1508.9 (2001)).

[40] *Kern*, 284 F.3d at 1067 (citing 40 C.F.R. §§ 1501.4, 1508.9).

[41] *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 487 (9th Cir. 2011) (quoting *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 371 (1989)).

[42] 43 C.F.R. § 3809.411(d).

irreversible and irretrievable commitment of resources.'"[43] Judicial review of agency compliance with NEPA is under the Administrative Procedure Act ("APA").[44]

### C. The Palmer Project Exploration Plan

Intervenor Constantine is the leaseholder of 340 unpatented mining claims in the Palmer Project Area, and has been engaged in exploration activities in this area since 1998.[45] Prior to 2016, Constantine's activities in the Palmer Project Area did not require BLM approval.[46] In 2015, Constantine obtained BLM authorization to conduct activities involving 4.70 acres of surface disturbance and approximately 1.2 miles of road; however, this activity did not trigger any review under NEPA due to its limited size and scope.[47]

On May 22, 2015, Constantine submitted an Exploration Plan of Operations (the "Exploration Plan" or "Exploration Plan MPO") to BLM seeking to expand exploration activities in the Palmer Project Area.[48] Constantine's Exploration Plan was proposed under 43 C.F.R.

---

[43] *Dombeck*, 304 F.3d at 892 (quoting *Metcalf*, 214 F.3d at 1143). *See also* 40 C.F.R. § 1502.5 (mandating that an EIS be prepared "early enough so that it can serve practically as an important contribution to the decisionmaking process"); *Andrus v. Sierra Club*, 442 U.S. 347, 351–52 n.3 (1979) (requiring a NEPA analysis be "prepared at the feasibility analysis (go-no go) stage" (citing 40 C.F.R. § 1502.5)).

[44] *See Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993 (9th Cir. 2004) (citing 5 U.S.C. § 706(2)(A)).

[45] Constantine previously operated under the name Rubicon Metals, Inc. and has been operating as Constantine since 2006. *See* Dkt. 54-1 at 19.

[46] Dkt. 36-8 at 19.

[47] Dkt 57 at 10–11. *See also* Dkt. 35-9 at 33–35. These activities did not require an MPO or NEPA review because the scale of the operations—which fell under the definition of "notice-level operations" under 43 C.F.R. § 3809.10—was not large enough to trigger either requirement.

[48] Dkt. 35-9 at 3. The Exploration Plan was submitted to comply with BLM regulations at 43 C.F.R. 3809.401, 3809.420, and 3809.11. It was amended on August 27, 2015. *Id.*

9

§ 3809.11, which applies to operations with a total surface disturbance greater than five acres, and sought authorization to expand surface disturbance to approximately 40 acres, including an additional 37.06 acres of disturbance beyond what was previously authorized.[49]

On November 30, 2015, BLM published Constantine's proposed Exploration Plan MPO, gave notice of a review period, and began accepting public comments.[50] Plaintiffs, as well as other commenters, urged BLM to include the potential impacts of development activities—i.e., the potential future development of a larger scale mining operation—in their environmental review of the Exploration Plan.[51] BLM issued a draft EA on April 26, 2015, which limited the review to only those impacts from the Exploration Plan activities, and a 30-day comment period began.[52] Commenters, including Plaintiffs, again requested that BLM expand the scope of the review and complete a full EIS addressing cumulative and future impacts from mining development; however, BLM again did not do so.[53]

On August 18, 2016, BLM issued a decision approving the Exploration Plan together with a FONSI determination.[54] BLM declined to expand the scope of the review because "[t]he

---

[49] Dkt. 35-9 at 1, 14–16. Proposed activities included helicopter-supported mineral exploration drilling, 1.35 km of linear exploration road construction, and 2.65 km of switchback exploration road construction, providing road access to new drill sites. Dkt. 35-9 at 14, 26–27.

[50] Dkt. 35-11 at 145–47. The BLM scoping notice for the Exploration Plan MPO was issued pursuant to 40 C.F.R. § 1501.7. *See also* Dkt. 36-8 at 26 (describing timeline for issuance of scoping notice and public comment period).

[51] *See, e.g.*, Dkt. 35-12 at 99–101, Dkt. 36-2 at 87, 88, 101.

[52] Dkt. 42-11 (draft EA); Dkt. 36-8 at 27 (describing public comment period for Draft EA).

[53] *See, e.g.*, Dkt. 36-7 at 5–6, 7–11, 22–26.

[54] Dkt. 36-9 at 1 (FONSI); Dkt. 36-9 at 5 (Decision Record).

proponent is still in the exploration phase; therefore, it is not a reasonably foreseeable future action to consider mining in this analysis."[55] Shortly thereafter, Constantine commenced operations.[56]

### D.  The Palmer Project Road Extension

On January 3, 2017, Constantine submitted an application for a modification of the Exploration Plan to BLM, seeking approval for an 800-foot extension of the previously approved road in order to access adjoining state lands with mineral deposits (the "Road Extension").[57] BLM gave public notice and opened public comment;[58] Plaintiffs again commented requesting that BLM conduct a more in-depth environmental review covering direct, connected, and cumulative impacts from development of a future mine.[59] On September 17, 2017, BLM issued a decision approving the Road Extension and an accompanying FONSI, again declining to consider future development impacts.[60] BLM asserted, in essence, that consideration of development impacts would be premature and overly speculative.[61]

---

[55] Dkt. 36-9 at 8. BLM also stated that it lacked discretion to "prevent the claimant, or their operators, from exploring or developing their mineral resources" because "[d]evelopment of mineral resources within an active unpatented mining claim is a non-discretionary action on behalf of the BLM's decision process." *Id*.

[56] Dkt. 1 at 22.

[57] Dkt. 37-1 at 28–34.

[58] Dkt. 38-4 at 3, 110.

[59] Dkt. 37-2 at 70–78.

[60] Dkt. 38-4 at 108–111 (Decision record); 112–115 (FONSI).

[61] *Id*. at 127–28 (stating that "Constantine is in the early stage of the mine life cycle with operations currently focused on [exploration] . . . [e]xamination of environmental impacts, this early in the process, is limited by the available information, both about the potential for future mining and about the natural environment."). BLM also noted that the BLM NEPA handbook directs consideration of only those "reasonably foreseeable future actions . . . for which there are existing

## E. The Present Action

Plaintiffs filed suit shortly thereafter, challenging BLM's environmental review of both the Exploration Plan and Road Extension (collectively, the "Exploration Activities") as deficient under NEPA.[62] Plaintiffs—three environmental groups,[63] and one Alaska Native Tribal government—assert environmental, economic, and cultural interests in the determinations at issue. All three environmental organizational plaintiffs assert that their work focuses on promoting conservation and sustainable use of natural resources, particularly water quality, ecosystem health, and sustainable land use in the area at issue in this action, and express concern for ensuring that appropriate steps are taken to protect the natural resources in the Palmer Project Area and the larger Chilkat watershed.[64] The fourth Plaintiff, the Chilkat Indian Village of Klukwan (the "Village") is a federally recognized Native Alaskan tribal organization whose traditional land—and current

---

decisions, funding, formal proposals, or which are highly probable based on known opportunities or trends." *Id.* (quoting NEPA Handbook, BLM's Surface Management Handbook, H-3809-1).

[62] Dkt. 1.

[63] Dkt. 1 at 5. All three environmental organizations are based out of or work in Southeast Alaska. Plaintiff Southeast Alaska Conservation Council ("SEACC") is a "conservation organization that has been working on mining and clean water issues in Southeast Alaska for nearly four decades. *Id.* Plaintiff Lynn Canal Conservation ("LCC") is a "grassroots conservation organization based in Haines, Alaska, with around 200 members," *Id.* at 6., and Plaintiff Rivers Without Borders ("RWB") is an international conservation nonprofit with "supporters in Haines, Alaska." *Id.* at 6.

[64] *See, e.g., id.* at 5–6 ("Promoting clean water and strong water-quality standards is an essential component of SEACC's goal to protect Southeast Alaska's natural resources including its public lands, and SEACC members' use of those lands and waters."); *id.* at 6 ("LCC has a long-term commitment to the health of fish and wildlife populations and to regulations that promote clean water and stream protection for watersheds . . . ."); *id.* at 6 (asserting that RWB is a "nonprofit conservation organization raising awareness of the outstanding ecological, cultural, and economic values of the Alaska-British Columbia transboundary watersheds . . . and encouraging ecosystem-based planning and stewardship").

Case 3:17-cv-00253-TMB   Document 61   Filed 03/15/19   Page 12 of 53

location—is along the Chilkat River in the Palmer Project Area.[65] The Village asserts that "[t]he Chilkat watershed and its resources are culturally and economically crucial to the Village's way of life," and that members "continue to practice traditional subsistence fishing, hunting, mushroom-, and berry-gathering in the Chilkat watershed."[66]

Defendants BLM, and the named BLM employees, are the federal bureau and federal officials responsible for managing the federal public lands in question.[67] Intervenors Alyu Mining Co., Inc. and Haines Mining & Exploration, Inc. are the owners of unpatented federal mining claims leased to Intervenor Constantine.[68] Constantine is conducting the exploration activities whose review is at issue in the present action.[69]

Plaintiffs now move for summary judgment, which Defendants and Intervenors oppose.[70]

## III.    JURISDICTION

The Court must first address four threshold issues raised by Intervenors that go to whether Plaintiffs' case is properly before this Court: standing, ripeness, mootness, and exhaustion of administrative remedies. The Court discusses each in turn and concludes that Plaintiffs' claims should proceed to the merits.

---

[65] *Id*. at 5.

[66] *Id*.

[67] *Id*. at 8–9. 43 U.S.C. § 1731 establishes the BLM as part of the U.S. Department of the Interior. BLM's authority to regulate and manage mining activities on federal lands is pursuant to the Mining Act of 1872, 30 U.S.C. §§ 22–54, ("Mining Act") and the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq.* ("FLPMA").

[68] Dkt. 9.

[69] Dkt. 1 at 12.

[70] Dkts. 43 (Motion), 57 (Intervenors' Response in Opposition), 58 (Defendants' Response in Opposition).

13

*A. Standing*

Intervenors first assert that Plaintiffs lack prudential standing to maintain this action.[71] "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."[72] Standing involves "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."[73] For the reasons identified below, the Court finds that Plaintiffs have both Article III and prudential standing to maintain this action.[74]

1. Article III Standing

Article III standing "is the threshold question in every federal case, determining the power of the court to entertain the suit."[75] The "irreducible constitutional minimum of standing consists of three elements . . . [t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[76] Plaintiffs here assert standing as organizations on behalf of their members.[77] Where an organization brings suit on behalf of its members, the organization has

---

[71] Dkt. 57 at 14.

[72] *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

[73] *Id*.

[74] Intervenors challenge only Plaintiffs' prudential standing to maintain this suit, asserting that Plaintiffs cannot challenge the BLM actions at issue. *See* Dkt. 57 at 21–22. Plaintiffs' summary judgment briefing describes their asserted basis for Article III standing. Dkt. 54-1 at 23–24. Because standing is a jurisdictional prerequisite to bringing suit in federal court, the Court finds it appropriate to briefly address both.

[75] *Warth*, 422 U.S. at 498.

[76] *Spokeo v. Robins*, 136 S.Ct. 1540, 1547 (2013) (internal punctuation omitted) (citing *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560 (1992) and *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

[77] Dkt. 54-1 at 23.

14

standing "when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"[78]

Individual members would have standing in their own right under Article III where they would meet the requirements of injury in fact, standing, and redressability.[79] The Plaintiff environmental organizations demonstrate that their members have a cognizable interest in the Palmer Project Area and have suffered an injury in fact: Plaintiffs enumerate a range of interests in the land in question, including use of the land for "hunting, fishing, subsistence practices, and recreation" as well as "aesthetic, economic, cultural, recreational, subsistence, and other interests."[80] These assertions are supported by numerous declarations averring to these facts.[81]

In the context of environmental harms, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."[82] Thus, "[t]he 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that

---

[78] *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (quoting *Hunt v. Wash. State Apple Advertising Com'n,* 432 U.S. 333, 343 (1977)).

[79] *See Ecological Rights Found.*, 230 F.3d at 1147 (citing *Laidlaw*, 528 U.S. at 182–83 and *Lujan*, 504 U.S. at 560).

[80] Dkt. 54-1 at 23.

[81] *See, e.g.*, Dkts. 43-35, 43-36, 43-37, 43-38, 43-39, 43-40, 43-41, 43-42, 43-43.

[82] *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)).

15

that interest is impaired by a defendant's conduct."[83] Plaintiffs have demonstrated such an interest, and thus, have established injury in fact.

Having demonstrated this first requirement, the members of the Plaintiff organizations easily satisfy the remaining requirements to show individual standing for NEPA claims. Under Ninth Circuit law, "[o]nce a plaintiff has established an injury-in-fact under NEPA, the causation and redressability requirements are relaxed."[84] NEPA is a procedural right, and a plaintiff "'who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.'"[85] Thus, "to establish redressability plaintiffs asserting procedural standing need not demonstrate that the ultimate outcome following proper procedures will benefit them."[86] Rather, "because they are seeking to enforce a procedural right under NEPA to protect their concrete interests, they have standing to challenge the adequacy of [the NEPA review process] even though they cannot establish that a revised [EA or EIS] would result in a different [course of action]."[87] Thus, the Plaintiffs must only show—as they have here—that they are "seeking to enforce a procedural right under NEPA to protect their concrete interests."[88]

---

[83] *Ecological Rights Found*, 230 F.3d at 1147) (quoting *Lujan*, 504 U.S. at 560–61).

[84] *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001).

[85] *Id*. at 682 (quoting *Lujan*, 504 U.S. at 572 n.7). *See also Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir.2005) ("NEPA is a procedural statute, and thus it is not surprising that procedural injuries suffice for standing in the NEPA context.").

[86] *Cantrell*, 241 F.3d at 682.

[87] *Id*.

[88] *Id*.

16

Finally, the Plaintiff organizations' interest in this case falls under the standard for organizational standing and environmental harms articulated above.[89] As detailed above, the members of the Plaintiff organizations have demonstrated they would have standing as individuals. Plaintiffs have similarly shown that the issues at hand are germane to their organizational purposes, as Plaintiffs are organizations specifically focused on environmental and cultural causes in the area,[90] and neither Defendants nor Intervenors challenge this fact. Last, neither Defendants nor Intervenors contends that the participation of individual members is required, and nothing in the facts indicates any need for individual members to participate.

Thus, Plaintiffs meet the requirements for Article III standing.

2. <u>Zone of Interests Test</u>

Intervenors contend that Plaintiffs cannot maintain this suit because they lack "prudential standing" to bring their claims. According to Intervenors, the relief Plaintiffs seek would "require the BLM to effectively make discovery determinations under the Mining Act [of 1872] as part of the NEPA process for approving a mineral exploration [Plan of Operations]."[91] Intervenors argue that Plaintiffs' suit would force BLM "to make two mandatory assumptions . . . under the Mining Act;" and that, because that statute protects only economic rights, the suit cannot be sustained.[92]

---

[89] Dkt. 54-1 at 23 ("Plaintiffs have standing to bring this case because their members have standing in their own right, the interests at stake are germane to Plaintiffs' organizational purposes, and the lawsuit does not require the participation of individual members.")

[90] *See, e.g.*, Dkt. 1 at 5–6.

[91] Dkt. 57 at 21.

[92] *Id*. at 21–22.

Plaintiffs, in reply, assert their claims arise under NEPA and the APA, and argue that their action falls within the zone of interests for those statutes.[93]

"NEPA claims are reviewed under the APA."[94] The APA imposes "a prudential standing requirement in addition to the requirement, imposed by Article III of the Constitution, that a plaintiff have suffered a sufficient injury in fact."[95] The Supreme Court "has long held that a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated."[96] Thus, a court should "first discern the interests arguably to be protected by the statutory provision at issue" and "then inquire whether the plaintiff's interests affected by the agency action in question are among them."[97] The zone of

---

[93] Dkt. 59 at 24–25.

[94] *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1087 (9th Cir. 2003) (citing *Marsh*, 490 U.S. at 375–76).

[95] *Nat'l Credit Union v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 488 (1998) (internal punctuation omitted) (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 152 (1970)); *see also Laub*, 342 F.3d at 1087 ("In addition to constitutional standing requirements, Plaintiffs must also meet the APA's standing requirements that there be (1) a final agency action; and (2) that the plaintiff suffers an injury that falls within the 'zone of interests' of the violated statutory provision." (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 882–83 (1990))).

[96] *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing*, 397 U.S. at 153). *See also Nat'l Credit Union Admin.*, 522 U.S. at 488 ("For a plaintiff to have prudential standing under the APA, 'the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute ... in question.'") (quoting *Ass'n of Data Processing*, 397 U.S. at 153).

[97] *Nat'l Credit Union*, 522 U.S. at 492 (internal quotation marks and punctuation omitted).

18

interests test "'is not meant to be especially demanding,'" and "do[es] not require any 'indication of congressional purpose to benefit the would-be plaintiff.'"[98]

"Whether a plaintiff's interest is arguably protected by the statute within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which the plaintiff relies."[99] Stated another way, "'the plaintiff must establish that the injury he complains of . . . falls within the zone of interests sought to be protected *by the statutory provision whose violation forms the legal basis for his complaint*.'"[100]

The dispute here stems from Plaintiffs' contention that BLM's environmental review of both the Exploration Plan and Road Extension was insufficient under NEPA and the APA.[101] It is well settled that environmental organizations asserting rights and interests in the protection of natural resources and ensuring NEPA procedures are followed to that end—as Plaintiffs assert here—have prudential standing under NEPA.[102] While some of Plaintiffs' arguments as to *why*

---

[98] *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225 (quoting *Clarke v. Sec. Indus. Ass'n.*, 479 U.S. 388, 399–400 (1987).

[99] *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997) (internal punctuation omitted). *See also id.* at 175 (directing courts to look to "the substantive provisions" of the statutory language, "the alleged violations of which serve as the gravamen of the complaint."); *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005) (holding that the zone of interests test bars claims where "'the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress intended to permit the suit'" (quoting *Clarke,* 479 U.S. at 399).

[100] *Bennett*, 520 U.S. at 175 (emphasis original) (quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 883).

[101] Dkt. 1 at 23–24; Dkt 54-1 at 9–10.

[102] *Kraayenbrink*, 632 F.3d at 485–86 (stating that where organizational plaintiffs had "members that study, recreate, and enjoy aesthetic pursuits," that organization had "a direct interest in seeing that BLM adequately considers the environmental consequences of its planned action as required by NEPA and that the well-being of the affected land not be threatened"). *See also Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1113-14 (9th Cir. 2002), *abrogated on other grounds by*

19

additional review under NEPA is necessary involve provisions of the Mining Act, the gravamen of Plaintiffs' claims is the adequacy and scope of Defendant's NEPA review: Plaintiffs contend that "Defendants' decisions to approve the Exploration Plan and Road Extension without adequate analysis of potential impacts . . . [were] in violation of NEPA, 42 U.S.C. § 4332(2)(c), and the Administrative Procedure Act, 5 U.S.C. § 706(2)."[103]

Intervenors' argument—that Plaintiffs' action is barred because they lack prudential standing under the Mining Act—falls short. Plaintiffs have not invoked any right under the Mining Act, but assert—as an argument for additional NEPA review—that certain provisions of the Mining Act could impact the timing and scope of the environmental review required.[104] The result Plaintiffs seek is not a determination—or any declaration of rights—under the Mining Act, and Plaintiffs invoke no provision of the Mining Act as a basis for their claims.[105] Rather, their claims assert violations of BLM's statutory and regulatory mandate to conduct a thorough NEPA review

---

*Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) (holding that injury in an environmental litigation is met "by showing that group members have direct contact with the environmental subject matter threatened by the adverse decision" (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1398 (9th Cir. 1995))).

[103] Dkt. 1 at 23–24.

[104] *See* Dkt. 54-1 at 25.

[105] Contrary to Intervenors' contention, the Court is not persuaded that the NEPA review Plaintiffs seek would require a formal determination of rights under the Mining Act. Certainly, an EIS considering future developments would necessarily include the assumption that *some* discovery of valuable mineral deposits was made; however, Plaintiffs' contention is that "there is already sufficient available information for a reasonable assessment of development impacts from a mine at this site," even if "more detailed information might emerge later." Dkt. 54-1 at 25. Plaintiffs do not request that BLM "effectively make discovery determinations under the Mining Act as part of the NEPA process," dkt. 57 at 21, but rather request that the Court remedy BLM's alleged violation of NEPA. Dkt. 54-1 at 45 (requesting the Court "declare invalid" the NEPA reviews).

prior to approving certain activities on federally managed land.[106] Where "Plaintiffs' threatened interests fall within NEPA's interest in preventing harm to the environment . . . their alleged injuries fall in the zone of interests that NEPA aims to protect."[107] Plaintiffs, who seek to vindicate environmental harms, fall within the zone of interests of these statutes.[108]

Accordingly, the Court finds Plaintiffs have standing to pursue their case.

### B. Justiciability

#### 1. Ripeness

Intervenors also assert that Plaintiffs' claims are—at least in part—not yet ripe for judicial review because no "site-specific mining plan has been proposed" and thus "development of a Palmer Project [Area] mine is not reasonably foreseeable at this point."[109] Intervenors specifically

---

[106] In addition to the specific claims identified in the Complaint, *see* Dkt. 1, the administrative record demonstrates that the agency action at issue was pursuant to statutory directives mandating BLM consider the environmental impacts of mining under NEPA before approving certain plans. *See* Dkt. 35-11 at 145–48 (describing the forthcoming review process as under NEPA); *see also* Dkt. 43-3 at 1 (stating, in BLM Notice, that the Exploration Plan "must be analyzed in accordance with [NEPA] and other relevant Federal and State laws and regulations to determine potential environmental consequences."). BLM states in that same notice that the agency is required to protect land from "unnecessary or undue degradation" under FLPMA. *See id.* at 2.

[107] *See Kootenai Tribe*, 313 F.3d at 1113–14.

[108] *See id.* (stating "[w]e have previously held that protection of the environment falls within NEPA's zone of interests" and finding that plaintiffs fell within NEPA zone of interests where "plaintiffs assert[ed] that the environmental health of their lands and the land they use for aesthetic, recreational, or spiritual purposes will be threatened" by the agency action at issue). Moreover, Intervenors cite to no case—nor is this Court aware of any—to support the proposition that Plaintiffs' claims under NEPA and the APA are barred because they are "inextricably intertwined" with the Mining Act, as Intervenors contend. Dkt. 57 at 21. To the extent that the "inextricably intertwined" standard is applicable to the zone of interests test, this Court is only aware of cases where it has been applied to consider whether a plaintiff's interests are inextricably intertwined with those of third parties such that a plaintiff can assert the third parties' interest to establish prudential standing. *See, e.g.*, *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078 (9th Cir. 1987).

[109] Dkt. 57 at 30.

21

identify "Paragraph 2 of [Plaintiffs'] Prayer for Relief"—which Intervenors describe as a request that "exploration activities be enjoined until BLM complies with NEPA by describing the environmental impacts of mine development"—as not ripe.[110] Defendants did not raise this argument, and Plaintiffs offer no direct response to this contention in their reply.[111]

Ripeness serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."[112] In determining ripeness, courts look to "the fitness of the issue for judicial decision and the hardship to the parties of withholding consideration."[113] In the context of NEPA, however, because "the rights conferred by NEPA are procedural rather than substantive,"[114] a plaintiff "'with standing who is injured by a failure to comply with the NEPA procedures may complain of that failure at the time the failure takes place, for the claim can never get riper.'"[115]

---

[110] Dkt. 57 at 30. The paragraph Intervenors refer to is Plaintiffs' request that this Court grant injunctive relief "by halting exploration activities permitted by approval of the Exploration Plan and Road Extension in the Palmer Project Area until Defendants have completed an environmental review that considers the potential impacts of mine development." Dkt. 1 at 24–25.

[111] While Plaintiffs do not directly take up the issue of ripeness, Plaintiffs do address the contention that BLM lacks sufficient information to engage in meaningful environmental review of a future mine in the Palmer Project Area. *See* Dkt. 59 at 22–23 ("It is reasonably possible to assess the potential environmental impacts of mine development in the Chilkat River watershed now.")

[112] *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998). *See also Kraayenbrink*, 632 F.3d at 486 (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 148–49 (1967).

[113] *Id*. (citing *California v. U.S. Dep't of Agric.*, 575 F.3d 999, 1011 (9th Cir. 2009)).

[114] *Kern*, 284 F.3d at 1071.

[115] *Kraayenbrink*, 632 F.3d at 486 (quoting *Ohio Forestry*, 523 U.S. at 727). *See also Kern*, 284 F.3d at 1071 (citing *Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947, 953 (7th Cir. 2000) and

The instant action involves just such a challenge: Plaintiffs contend that BLM's NEPA review of both the Exploration Plan and the Road Extension was inadequate because the agency failed to consider the impacts of potential future mining in the Palmer Project Area.[116] BLM completed the EA for both the Exploration Plan and the Road Extension, and issued a FONSI for both; it is undisputed that both of these determinations constituted a final agency action within the meaning of the APA.[117] Plaintiffs now challenge the adequacy of those reviews, and contend that the scope of those reviews was too narrow and a full EIS should have issued for one or both. Ninth Circuit law does not support Intervenor's contention that a site-specific plan is necessary for the issue of NEPA review to become ripe; rather, the procedural violation Plaintiffs' allege—which relates to the already-completed EAs—is now ripe.

To the extent that Intervenors argue that review of potential future mining operations is not ripe because those activities are not "reasonably foreseeable,"[118] this argument goes to the merits of the claims at issue. Intervenors contend that Plaintiffs' claims are not yet ripe because potential future mining operations are not yet foreseeable such that Plaintiff can raise them. Plaintiffs contend the opposite: their central assertion is that potential future mining operations *are* foreseeable, such that the already-completed environmental reviews should have considered those potential impacts as part of the analysis.[119] The scenario that Intervenors contend would be ripe—

---

joining the Seventh Circuit in holding that plaintiffs could challenge an agency's failure to prepare an EA or EIS under NEPA even before a specific project was identified).

[116] *See* Dkt. 54-1 at 24–25.

[117] Dkt. 43-13; Dkt. 43-30. *See also Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 976 (9th Cir 2003) (discussing criteria for final agency action).

[118] Dkt. 57 at 30.

[119] Dkt. 54-1.

the stage at which a specific mining plan has been proposed[120]—is precisely the scenario Plaintiffs

argue would be too late for any meaningful environmental review.[121] The Court will thus address

arguments relating to the foreseeability of future mining activities and the timeliness of NEPA

review of future mining plans as a merits argument.

2. Mootness

Intervenors further contend that Plaintiffs' claims are moot "with respect to the already

constructed 2.5 mile exploration road and the 800' road extension" and "to the extent it requests

injunctive relief from completed exploration activities."[122] Intervenors argue—despite conceding

that the Court could grant "NEPA process relief"—that any "process relief, such as requiring the

removal of the road, under the facts of this case would be unreasonable" because Plaintiffs did not

complain "that the road development or [exploration] adversely impacted the environment" but

rather raised concerns regarding "the potential environmental impacts of potential mine

development."[123] Neither Plaintiffs nor Defendants addressed this issue in their briefing.

In general, "'[a] case becomes moot whenever it loses its character as a present, live

controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions

of law." [124] In the context of NEPA, this analysis focuses on "where there can be any effective

---

[120] Dkt. 57 at 31–32 (arguing that case will become ripe when BLM receives "an application by Constantine for the environmental permits (and accompanying NEPA review) to develop a mine").

[121] *See, e.g.*, dkt. 54-1 at 25 ("By postponing its analysis of development impacts, BLM has likely compromised its ability to make a fully informed decision . . . rending its hard look too late.").

[122] Dkt. 57 at 29–30.

[123] *Id*. at 29.

[124] *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1157 (9th Cir. 2006), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) (quoting *Cantrell*, 241 F.3d at 678 (internal quotations and alterations omitted)).

24

relief" afforded to the plaintiffs if a violation is found.[125] Thus, "completion of activity is not the hallmark of mootness. Rather, a case is moot only where no effective relief for the alleged violation can be given."[126] Indeed, the Ninth Circuit has "repeatedly emphasized" that "if the completion of the action challenged under NEPA is sufficient to render the case nonjusticiable, entities 'could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine. Such a result is not acceptable.'"[127]

Intervenors' argument thus falls short, and the Court "decline[s] to hold the dispute moot simply because the violation (if any) has already occurred."[128] What Plaintiffs seek, ultimately, is an order requiring BLM complete a broader environmental review—including an analysis of the potential future impacts from development—prior to any continued exploration activities.[129] While some of that activity—for example, the Road Extension—is completed, Plaintiffs' objection that exploration should not have been approved without a full EIS remains a live concern.[130] Absent an assertion that *all* activities in the Palmer Project Area have concluded, and will not continue, the controversy is not mooted and remains properly before the Court. Intervenors fail to

---

[125] *Cantrell*, 241 F.3d at 678.

[126] *Neighbors of Cuddy Mountain*, 303 F.3d 1059 at 1065 (citing *Cantrell*, 241 F.3d at 678).

[127] *Or. Nat. Res. Council v. BLM*, 470 F.3d 818, 821 (9th Cir. 2006) (quoting *Cantrell*, 241 F.3d at 678).

[128] *Neighbors of Cuddy Mountain*, 303 F.3d at 1065–66.

[129] Dkt. 54-1 at 10, 45–46.

[130] Indeed, Intervenors assert that Plaintiffs' claims are mooted because they "did not contend . . . that the road development or [exploration] drilling adversely impacted the environment" but rather the "concerns were directed at the potential environmental impacts of potential mine development." Dkt. 57 at 29–30. This assertion in fact demonstrates why Plaintiffs' claims are not mooted: their contention—that a more comprehensive review should be completed prior to any development—remains an active issue for this Court to address.

demonstrate that no effective relief is available, as is required to establish mootness.[131] Accordingly, Plaintiffs' claims are not moot.

## C. Exhaustion of Administrative Remedies

Finally, Intervenors argue that Plaintiffs' suit is barred because of a failure to exhaust administrative remedies. Intervenors contend that Plaintiffs "failed to assert that the environmental impacts of mine development had to be considered during the [Exploration Plan] approval process because 'BLM's ability to protect area lands, including by withdrawal, would be substantially constrained or lost'"[132] after discovery. Intervenors' argument appears to focus on whether Plaintiffs' claims are barred because they failed to raise the issue of withdrawal of the Palmer Project Area land during the administrative process.[133] Plaintiffs, in reply, argue that they substantially raised the objections now before the Court during the administrative process, and that

---

[131] *See, e.g.*, *Or. Nat. Res. Council v. BLM*, 470 F.3d at 821 (holding that ongoing project work did not moot NEPA violation where plaintiffs requested declaratory and injunctive relief, and opportunities for agency to take the requisite "hard look" at environmental impacts "has present consequences" that agency could remedy or mitigate); *but see In Defense of Animals v. U.S. Dep't of Interior*, 648 F.3d 1012, 1013 (holding interlocutory appeal of a motion for preliminary injunction was mooted where the action had taken place, but noting that the entire action "remains pending before the district court" and was not per se mooted).

[132] Dkt. 57 at 22 (quoting Dkt. 1 at 3, 23–24).

[133] Intervenor's briefing on this point is not clear, and may have been intended to cut more broadly. However, Intervenors only specifically contend that Plaintiffs failed to raise withdrawal of the tract, but do not address the other objections to the NEPA review that were raised during the administrative process. *See, e.g., id.* at 23 (stating that Plaintiffs argue "that the mineral [Exploration Plan] should have considered/analyzed the alternative of withdrawing the Palmer [Project] area from mining" before a discovery, and that "BLM did not have an opportunity to address or respond to this claim during the administrative process . . . because [Plaintiffs] never raised it"); *id.* (stating that "Plaintiffs failed to exhaust its administrative remedies with respect to this issue"); *id.* at 24 (arguing that "[Plaintiff's] claim (that the BLM violated NEPA by failing to analyze the potential environmental impacts from potential future development of the Palmer [P]roject while there was still time to withdraw the Project area from mining) must be dismissed because [Plaintiffs] did not raise this specific issue during the administrative process") (internal punctuation omitted).

NEPA does not require a claimant use "precise legal formulations" during the administrative process to preserve their claims.[134]

Under 5 U.S.C. § 704, judicial review is available only for final agency actions.[135] "The APA requires that plaintiffs exhaust administrative remedies before bringing suit in federal court."[136] The "rationale underlying the exhaustion requirement is to avoid premature claims and to ensure that the agency possessed of the most expertise in an area be given first shot at resolving a claimant's difficulties."[137]

Exhaustion "applies to claims under NEPA,"[138] however, under Ninth Circuit law, when applied to NEPA, "the exhaustion requirement should be interpreted broadly."[139] "[T]here is no

---

[134] Dkt. 59 at 25.

[135] Although not specifically raised by Intervenors, because "[e]xhaustion is a jurisdictional requirement," the Court briefly addresses whether Plaintiffs were required to challenge the Exploration Plan and Road Extension via the BLM appeals process to exhaust their administrative remedies. *See Eason Land Co., LLC v. Sec'y of the U.S. Dep't of the Interior*, No. 2:14-cv-000951-US, 2015 WL 1538501 (D. Oregon April 7, 2015) (holding plaintiffs' claims foreclosed for failure to exhaust where they had failed to pursue an administrative appeal). "An agency decision is not final if (1) the agency has adopted a rule requiring an administrative appeal before judicial review; and (2) the initial decision would be inoperative pending appeal." *Montana Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1138 (D. Mont. 2004) (citing *Darby v. Cisneros,* 509 U.S. 137, 152, (1993)). Where, as here, the available administrative appeals process "do not . . . automatically stay a decision pending appeal," Plaintiffs are not required to pursue such an appeal to exhaust administrative remedies. *See Fry*, 310 F. Supp. 2d at 1138.

[136] *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006) (citing 5 U.S.C. § 704); *see also Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1065 (9th Cir. 2010) ("As a general rule, [courts] will not consider issues not presented before an administrative proceeding at the appropriate time." (quoting *Marathon Oil Co. v. United States*, 807 F.2d 759, 767–68 (9th Cir. 1986))).

[137] *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir .2002).

[138] *Hankins*, 456 F.3d at 965.

[139] *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1065.

bright-line standard" for meeting the issue exhaustion requirement.[140] Plaintiffs need only ensure that they "'provided sufficient notice to the agency to afford it the opportunity to rectify the violations that the plaintiffs alleged.'"[141] Thus, to satisfy the exhaustion requirement, "'[p]ersons challenging an agency's compliance with NEPA must structure their participation [during the administrative process] so that it . . . alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration.'"[142] "[P]laintiffs need not state their claims in precise legal terms, and need only raise an issue 'with sufficient clarity to allow the decision maker to understand and rule on the issue raised.'"[143]

A brief summary of Plaintiffs' comments demonstrates they satisfied this requirement. Collectively, their comments made clear to BLM their position that a full EIS should be completed prior to approval of the Exploration Plan, Road Extension, or any other activity in the Palmer Project Area that could lead to development of a mine in the future. The Chilkat Indian Village Tribal Government objected "to the narrow scope of analysis in the EA because BLM unreasonably limited project analysis" to the Exploration Plan, arguing "[t]his limitation prevents

---

[140] *Id.* (quoting *Hankins,* 456 F.3d at 968).

[141] *Id.* (quoting *Dombeck*, 304 F.3d at 899 (internal punctation omitted)). *See also Hankins*, 456 F.3d at 965; *Idaho Sporting*, 305 F.3d at 965.

[142] *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 764 (2004) (quoting *Vt. Yankee*, 435 U.S. at 553); *Hankins*, 456 F.3d at 965; *Idaho Sporting*, 305 F.3d at 965 ("Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met and we must consider exhaustion arguments on a case-by-case basis." (citing *Native Ecosystems*, 304 F.3d at 900)).

[143] *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1065 (quoting *Hankins,* 456 F.3d at 968); *see also Or. Nat. Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1151, 1158 (D. Oregon 2011) (stating that Ninth Circuit law takes an "expansive approach" and that "alerting the agency 'in general terms' to a particular issue will be sufficient to exhaustion if the agency is given the opportunity to 'bring its expertise to bear to solve [the] claim'" (quoting *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010))).

28

BLM from fully considering actions that are connected."[144] The letter requested that "BLM reject the [Exploration Plan], request more detail from Constantine, and then take a hard look at the significant effects this entire exploration project may have on the human environment in a comprehensive EIS."[145]

The other Plaintiffs also submitted similar comments. Plaintiff Rivers Without Borders ("RWB") commented that "[w]hile the currently proposed actions are not in themselves a reason for significantly raised environmental concern, the ultimate goal of a large scale mine in this watershed is of great concern."[146] As RWB bluntly stated: "Since mining is the ultimate goal of the activity being analyzed here, cumulative impacts from incremental decisions in that direction must be considered in advance," commenting that the "additional development" proposed in the Exploration Plan "warrants a full NEPA EIS analysis."[147] Similarly, Plaintiff Lynn Canal Conservation provided lengthy comments to BLM on the EA for the Exploration Plan, and concluded by stating their position that, "[g]iven this new information confirming Constantine's intent to conduct underground exploration, we recommend BLM reject [the Exploration Plan] and prepare a comprehensive [EIS] to take a hard look at significant effects of the entire Palmer

---

[144] Dkt. 36-7 at 6.

[145] *Id.* at 8. The letter also called the EA's cumulative impact analysis "perfunctory" and "useless," and requested "that BLM require a complete Environmental Impact Statement before further road and exploration expansion is granted . . . to expand exploration activities." *Id.* at 11.

[146] *Id.* at 57. RWB specifically called for deficiencies in the EA to be addressed "[p]rior to a proposal being submitted" for a large scale mine. *Id.* Comments submitted on behalf of RWB by Sustainable Growth Solutions argued that the "temporal scope" of the EA was "misleading" and "should extend beyond 2019," arguing that a full EIS on the entire scope of the mining activities—both now and in the future—should be submitted. *Id.* at 23.

[147] *Id.* at 58.

29

Exploration."[148] And, finally, Plaintiff Southeast Alaska Conservation Counsel ("SEACC") commented that the EA was too narrow in scope, and that "NEPA requires BLM to take a hard look at the cumulative effects of this cumulative action now, before resources are committed or the die otherwise cast."[149]

These comments make clear that BLM was on notice of Plaintiffs' position that a full EIS—and, specifically, an EIS that included an assessment of the potential future impacts of development—should have been completed prior to the approval of the Exploration Plan or the Road Extension.[150] While Plaintiffs may not have specifically raised the precise legal issue of withdrawal, they were not required to do so. "The rationale underlying the exhaustion requirement is to avoid premature claims and to ensure that the agency possessed of the most expertise in an area be given first shot at resolving a claimant's difficulties."[151] Plaintiffs' comments raised the

---

[148] *Id*. at 75–76.

[149] *Id*. at 63. SEACC also specifically took issue with BLM's cumulative impact analysis, arguing that not only was it too limited, that BLM relied on "conclusory general effect statements . . . without disclosing the underlying data" that "fail to satisfy the hard look required by NEPA." *Id*.

[150] Nor were Plaintiffs alone in this position. For example, nonparty Alaska Clean Water Advocacy ("ACWA") argued that "[t]his current EA, as with past permit applications by the operator, attempts to piecemeal the project to preclude the need for a full [EIS]." *Id*. at 5. That same letter argued that "[t]he proposed exploration activities are being undertaken only for the purpose of setting the stage for future development; they have no independent utility," and that given Constantine's investment "full-project development is reasonably foreseeable." *Id*. Moreover, ACWA contended, "[i]f exploration continues to be allowed with only limited environmental review at each step, BLM will eventually face significant pressure to approve final development plans," a result that would "frustrate NEPA's goal of conducting a full environmental review before making decisions affecting the environment." *Id*. Thus, ACWA requested that BLM "consider exploration and likely future development activities together in assessing the potential for significant impacts and the need for an EIS." *Id.*

[151] *Idaho Sporting*, 305 F.3d at 965 (citing *Saulsbury Orchards & Almond Processing, Inc. v. Yeutter,* 917 F.2d 1190, 1195 (9th Cir.1990)).

basic objections that their Complaint now lodges, and BLM had ample opportunity to address those objections.

Accordingly, Plaintiffs properly exhausted their administrative remedies and the claims are properly before the Court.

## IV.    LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate where, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party,[152] "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[153] In the context of judicial review of agency actions, "the Supreme Court has expressed a general rule that courts reviewing an agency decision are limited to the administrative record."[154] Thus, "review of a final agency determination" is typically "limited to the administrative record" and "does not require fact finding" by the Court absent certain narrow exceptions.[155]

---

[152] *Scott v. Harris*, 550 U.S. 372, 378 (2007).

[153] Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Jensinger v. Nev. F. Credit Union*, 24 F.3d 1127, 1130-31 (9th Cir. 1994).

[154] *The Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005) (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985)).

[155] *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). *See also Powell*, 395 F.3d at 1030 (describing the "limited circumstances" in which courts may consider evidence outside the administrative record and explaining that "[w]ere the federal courts routinely or liberally to admit new evidence when reviewing agency decisions, it would be obvious that the federal courts would be proceeding in effect, de novo rather than with the proper deference to agency processes, expertise, and decision-making").

*B.  Judicial Review of Agency Actions Under NEPA*

NEPA, 42 U.S.C. §§ 4321–4370, mandates federal agencies comply with specific procedures prior to any major federal action to ensure consideration of environmental factors in the decision process. The purpose of NEPA is "(1) to ensure the agency will have detailed information on significant environmental impacts when it makes its decisions; and (2) to guarantee that this information will be available to a larger audience."[156] Ultimately, "NEPA exists to ensure a process, not a result." [157]

"NEPA requires federal agencies to prepare an [EIS] for "major federal actions significantly affecting the quality of the human environment."[158] "An agency must prepare an EIS if 'substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor.'"[159] "To decide whether an EIS is required . . . an agency may first prepare an [EA], which is a 'concise public document' that must 'briefly provide sufficient evidence and analysis for determining whether to prepare an EIS.'"[160] If no EIS is required, the agency may issue a Finding of No Significant Impact, or "FONSI," thus approving the action without further environmental review.[161]

---

[156] *Inland Empire Pub. Lands v. U.S. Forest Serv.,* 88 F.3d 754, 758 (9th Cir. 1996).

[157] *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1136 (9th Cir. 1997).

[158] *Bonneville*, 117 F.3d at 1535–36 (quoting 42 U.S.C. § 4332(2)(C)).

[159] *Id.* at 1136 (quoting *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992) (internal punctuation omitted)).

[160] *In Def. of Animals; Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) ("*Dreamcatcher*") (quoting 40 C.F.R. § 1508.9(a)(1) and citing *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir.1998)).

[161] *Dreamcatcher*, 751 F.3d at 1068 (citing 40 C.F.R. § 1508.13).

While NEPA itself provides no basis for private enforcement, final action under NEPA is subject to judicial review under § 706(2) of the APA.[162] A final agency action under the APA may be set aside by a court only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[163] "An agency's decision is arbitrary and capricious if it fails to consider important aspects of the issue before it, if it supports its decisions with explanations contrary to the evidence, or if its decision is either inherently implausible or contrary to governing law."[164] "This standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'"[165] "In making this assessment, [the reviewing court] must not 'substitute [its] judgment for that of the agency.'"[166] "Courts apply a 'rule of reason' standard in reviewing the adequacy of a NEPA document."[167] For

---

[162] *Kraayenbrink*, 632 F.3d at 481; *Pit River Tribe*, 469 F.3d at 778 (citing 5 U.S.C. § 706(2)(A)). *See also Ecology Ctr., Inc. v. Austin*, 430 F.3d 1057, 1062 (9th Cir. 2005) ("Our review of agency actions challenged under . . . NEPA is governed by the judicial review provisions of the Administrative Procedure Act.").

[163] 5 U.S.C. § 706(2)(A); *Kraayenbrink*, 632 F.3d at 481 ("In reviewing claims brought under the APA, we will only set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (quoting 5 U.S.C. § 706(2)(A))). *See also Dep't of Transp.*, 541 U.S. at 763 (citing 5 U.S.C. § 706(2)(A)); *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 361 F.3d 1108, 1118 (9th Cir.2004), *as amended and superseded on denial of reh'g en banc*, 402 .F.3d 846, 868 (9th Cir. 2005); *Kern*, 284 F.3d at 1070 ("An agency's decision not to prepare an EIS once that agency has prepared an EA is reviewed for abuse of discretion, and will be set aside only if it is 'arbitrary and capricious.'" (citing *Marsh,* 490 U.S. at 376–77)).

[164] *Dreamcatcher*, 751 F.3d at 1061 (citing *Powell*, 395 F.3d at 1026).

[165] *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)).

[166] *Dreamcatcher*, 751 F.3d at 1068 (quoting *Okanogan Highlands All. v. Williams,* 236 F.3d 468, 473 (9th Cir.2000)).

[167] *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 992–93 (quoting *Churchill Cty. v. Norton,* 276 F.3d 1060, 1071 (9th Cir.2001), *amended on denial of reh'g*, 282 F.3d 1055 (9th Cir. 2002)).

a reviewing court, "the task is to ensure that the agency has taken a 'hard look' at the potential environmental consequences of the proposed action."[168] "Through the NEPA process, federal agencies must carefully consider detailed information concerning significant environmental impacts, but they are not require[d] to do the impractical." [169]

## V.  ANALYSIS

The facts of this matter are not in dispute; rather, the parties disagree on the sole issue of whether NEPA requires consideration of future impacts from potential mine development as part of the environmental review for exploration activities. Plaintiffs contend that BLM violated NEPA by approving an inadequate EA and FONSI determination for both the Exploration Plan and Road Extension and refusing to consider the potential impacts of future mining development prior to issuing those determinations.[170] Defendants disagree with Plaintiffs' contention that review of potential future mining development impacts must occur prior to exploration, asserting that BLM can—and would—conduct a thorough, meaningful environmental review of potential mining development if, and when, such a project is actually proposed.[171] Intervenors argue the same, and assert that NEPA does not require BLM to analyze future development impacts when authorizing exploration.[172]

---

[168] *Id*. at 992–93 (quoting *Churchill Cty.,* 276 F.3d at 1072).

[169] *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 992–93 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) and *Inland Empire*, 88 F.3d at 764 (internal punctuation and quotation marks omitted)).

[170] Dkt. 54-1 at 21-22.

[171] Dkt. 58 at 25–26, 27.

[172] Dkt. 57 at 18–19.

"Because this case does not present any issues of genuine material fact," resolution on summary judgment "is appropriate."[173] Based on the parties' arguments, and the administrative record before the Court, the Court finds that neither NEPA requirements nor Ninth Circuit law mandate that BLM review potential future impacts from mine development prior to approving exploration activities, and therefore **DENIES** Plaintiff's Motion for Summary Judgment at docket 43 and **GRANTS** Defendant's Cross Motion for Summary Judgment at docket 58. The Court addresses each argument in turn below.

### A. Connected and Cumulative Impacts Under NEPA

Plaintiffs contend that potential future mining development qualifies as both a "connected action" and a "cumulative impact" of the exploration activities under NEPA regulations such that those development impacts should have been considered as part of the environmental review process for the Exploration Activities.[174] In response, Defendants argue that any future mine development is still "hypothetical," and that NEPA does not require its consideration as either a connected action or as part of the cumulative impacts assessment for either of the exploration EAs.[175] Although these two analyses overlap in part, as the concepts are substantively linked, the terms are two separate, defined terms under NEPA's implementing regulations. Accordingly, the Court addresses each in turn under the above standard of review.[176]

---

[173] *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d at 1472.

[174] Dkt. 54-1 at 26–28 (arguing that any potential mine development is a "connected action" under BLM regulations, 40 C.F.R. § 1508.25(a)(1)(ii)); *Id.* at 28–31 (arguing that any potential mine development should be considered as part of the "cumulative impacts" analysis required by 40 C.F.R. § 1508.8).

[175] Dkt. 58 at 12–13.

[176] *See* 40 C.F.R. § 1508.25(a) (defining "connected actions"); 40 C.F.R. § 1508.27; 40 C.F.R. § 1508.7 (defining "cumulative impacts").

35

1.  Connected Action under 40 C.F.R. § 1508.25

Plaintiffs' first argument is that potential future mine development is a "connected action" under 40 C.F.R. § 1508.25(a)(1)(ii) such that it must be considered as part of the environmental review for the Exploration Activities.[177] "CEQ regulations implementing NEPA require that an agency consider connected actions . . . within a single EA or EIS."[178] NEPA regulations require actions be considered together if the two actions "[c]annot or will not proceed unless other actions are taken previously or simultaneously."[179] The Ninth Circuit "appl[ies] an 'independent utility' test to determine whether multiple actions are so connected as to mandate consideration in a single EIS."[180] "The crux of the test is whether 'each of two projects would have taken place without the other and thus had independent utility.'"[181] "When one of the projects might reasonably have been completed without the existence of the other, the two projects have independent utility and are not 'connected' for NEPA's purposes."[182]

Here, Plaintiffs contend that potential future mine development must be considered a connected action with the Exploration Activities because "the [Exploration Plan] and Road Extension decision lack utility independent of potential future development of the Palmer Project

---

[177] Dkt. 54-1 at 27.

[178] *Klamath-Siskiyou*, 387 F.3d at 998-99 (citing *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1118 (9th Cir. 2000), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011)) (internal quotation marks omitted)).

[179] 40 C.F.R. § 1508.25(a) (defining "connected actions).

[180] *Hankins*, 456 F.3d at 969.

[181] *Id*. (quoting *Wetlands Action Network*, 222 F.3d at 1118 (internal quotation marks omitted)).

[182] *Hankins*, 456 F.3d at 969 (citing *Dombeck*, 304 F.3d at 894).

36

[Area] deposit."[183] Plaintiffs contend that "[t]he possibility of development is the rationale and impetus for exploration," and that "[w]ithout the possibility of development, exploration would be an irrational waste of time."[184] In response, Defendants argue the opposite: that "it would not be unwise or irrational for Constantine to explore for minerals, and, based on the results of the exploration, ultimately decide not to pursue full scale mine development."[185]

While Plaintiffs' argument has logical merit—certainly, the activities in question are closely related in practical purpose and utility—Ninth Circuit law supports Defendants' contention that the potential future mining activities are not a connected action as defined by NEPA regulations. First, applying the "independent utility" test supports Defendants' position. Actions are "connected actions" under this test where they are "inextricably intertwined" such that neither would exist but for the other.[186] Here, as Defendants correctly point out, mineral exploration can—and does—often proceed without mine development.[187] District courts in the Ninth Circuit have found that exploration activities have independent utility separate from the ultimate goal of

---

[183] Dkt. 54-1 at 28.

[184] *Id*.

[185] Dkt 58 at 16–17.

[186] *Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1068 (9th Cir. 1995) (describing "connected actions" as actions that are akin to "links in the same bit of chain," contrasted with those that are "separate segments of chain," and thus not "connected actions" under NEPA regulations (citing *Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 400 (9th Cir. 1989)).

[187] Certainly, the converse is not always true: typically, some exploration *must* occur before a mine can be developed, as part of the standard "life cycle" of a mine. Yet the issue here concerns whether the present action challenged—the EA for the Exploration Plan and the EA for the Road Extension—have independent utility. No mine development is yet proposed; thus, it is beyond the Court's review to discuss the scope of a possible future EA or EIS for that future mining activity would need to include the impacts from past Exploration Activities.

development—namely, information gathering.[188] While it is clear that the Exploration Activities will only provide a return on investment for Constantine if mining eventually occurs—i.e., that the two projects "would benefit from the other's presence,"[189] the utility of the exploration is to gather information about the Palmer Project Area. Plaintiffs concede that "[e]xploration is not always successful—in some situations exploration may fail to reveal a profitable mineral deposit, and so development will not follow."[190] Given this fact, the Court finds it cannot arrive at the conclusion that the Exploration Activities are "inextricably intertwined" with potential future mine development such that NEPA regulations mandate their consideration at the time of the NEPA review for the Exploration Activities.

Furthermore, the events that Plaintiffs argue should be considered together in a single EA or EIS are not in development concurrently, a fact that distinguishes the matter now before the Court from the cases cited by Plaintiffs. To support their position that future mine development is a "connected action" that must be considered simultaneously with any environmental review of

---

[188] *Concerned Citizens and Retired Miners Coal. v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 912–13 (D. Ariz. 2017); *Greater Yellowstone Coal. v. Reese*, 392 F. Supp. 2d 1234, 1240 (D. Idaho 2005) ("While the information from the exploratory project may be used in the [proposal to expand mine development ] the exploratory project has a stand-alone purpose—gathering information to allow mining in the South Manning Creek area. The Court cannot find that Greater Yellowstone has raised serious questions on this issue."). In fact, in looking to the independent utility of exploration, courts have rested in part on the fact that "an agency cannot inform the public about the full impacts of a project until it has the data necessary to assess that impact," and that data from the exploration efforts might, in fact, inform a later EIS for futher project development. *See Concerned Citizens*, 279 F. Supp. 3d at 914 (further noting that "the [exploration] will provide data that is highly relevant to the [EIS for the mine expansion], as well as generate valuable data in an area of significant mining activity.").

[189] *See Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 580 (9th Cir. 1998) (quoting *Nw. Res. Info. Ctr.*, 56 F.3d at 1068).

[190] Dkt. 54-1 at 27 (stating "[d]evelopment thus remains a possible, though not certain, outcome.").

38

the Exploration Activities, Plaintiffs mainly rely on *Save the Yaak Committee v. Block*[191] and *Thomas v. Peterson*.[192] In *Save the Yaak*, the Forest Service was held to have violated NEPA when it issued separate EAs for sections of logging road—rather than a comprehensive EIS—because "the Forest Service awarded timber contracts, segmented the road construction, set completion dates for each segment, and tied the completion of the reconstruction to the timber sales."[193] In that case, "[e]ach segment of the road was to be reconstructed pursuant to a particular timber contract." [194] Thus, the Ninth Circuit held that the "road construction, timber harvest, and feeder roads are all 'connected actions'" and should have been considered together to determine whether to prepare an EIS.[195] Similarly, in *Thomas v. Peterson*, the Ninth Circuit held that an EA for construction of a timber road should have also considered the effects of the timber sales "that the road was designed to facilitate" where plans for timber sales were underway and acknowledged in the logging road EA, and in fact, analyzed under separate environmental review documents shortly thereafter. [196] Here, no such definite plans exist regarding potential future mining.

Moreover, where the separate actions at issue are phases, or stages, of a single, larger effort, the Ninth Circuit has held that NEPA analysis must encompass all phases only where "[t]he dependency is such that it would be irrational, or at least unwise, to undertake the first phase if

---

[191] 840 F.2d 714 (9th Cir. 1988).

[192] 753 F.2d 754 (9th Cir. 1985), *abrogated in part on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 141 (2010).

[193] 840 F.2d at 720.

[194] *Id.*

[195] *Id.*

[196] 753 F.2d at 757–59. In fact, in *Thomas*, the challenged EA for the logging road included a cost-benefit analysis of the timber harvest. *Id.*

39

subsequent phases were not also undertaken."[197] Such is not the case here. While Plaintiffs correctly assert that the purpose of exploration is to determine whether development is plausible,[198] this does not mean that exploration is "irrational" without also developing a mine. Rather, exploration is a necessary, rational step to determine whether such future activity will occur. "NEPA does not require the government to do the impractical," and where details, planning decisions, and precise information about future phases, or activities, are unavailable, NEPA does not require that an agency consider those activities together.[199]

Accordingly, the Court finds that future development activities are not a "connected action" under 40 U.S.C. § 1508.25(a) such that BLM was required to consider these activities as part of the scope of the EAs issued for the Exploration Plan or Road Extension.

2. Cumulative Action and Cumulative Impact Analysis

The Court next turns to Plaintiffs' contention that future development activities must be considered as part of the cumulative impacts of the Exploration Plan and/or Road Expansion project EAs.[200] Under Ninth Circuit authority, both an EA and EIS must include a cumulative

---

[197] *Trout Unlimited v. Morton*, 509 F.2d 1276, 1285 (9th Cir. 1974).

[198] Dkt. 54-1 at 27–28.

[199] *Wetlands Action Network*, 222 F.3d at 1119. *See also Hankins*, 456 F.3d at 969–70.

[200] NEPA regulations also separately define "cumulative actions" as "actions, which viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2). This regulation—which looks to "the obligation to wrap several cumulative action proposals into one EIS for decision making purposes"—is "separate and distinct" from the cumulative impact analysis required by 40 C.F.R. § 1508.7. *See Dombeck*, 304 F.3d at 896 n. 2. Plaintiffs do not otherwise challenge the adequacy of BLM's cumulative impact analysis, or the impacts identified that would directly result from the Exploration Plan or Road Extension activities. Rather, Plaintiffs challenge only whether additional activities should have been included in the scope of that analysis.

impact analysis.[201] NEPA regulations define cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."[202] "This regulatory definition incudes impacts resulting from 'individually minor but collectively significant actions taking place over a period of time.'"[203] Thus, "[e]ven if a single, comprehensive EIS is not required, the agency must still adequately analyze the cumulative effects of the projects within each [NEPA document]."[204]

When reviewing an agency's cumulative impact analysis, "the reviewing court needs to explore the specific parameters of this analysis; the fact that such a section exists is not enough."[205] However, "[t]he scope and nature of the direct, indirect, and cumulative impacts analysis is a matter committed to the sound discretion of the agency."[206] Where an agency's cumulative impact

---

[201] *Kern*, 284 F.3d at 1076.

[202] 40 C.F.R. § 1508.7.

[203] *Churchill Cty.*, 276 F.3d at 1076 (quoting 40 C.F.R. § 1508.7).

[204] *Earth Island,* 351 F.3d at 1306.

[205] *Id.* at 1311. *See also Kern*, 284 F.3d at 1076 (holding that this review should include "'some quantified or detailed information; general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.'") (quoting *Neighbors of Cuddy Mountain*, 137 F.3d at 1379–80 (internal punctuation omitted)). Specifically, "[t]he analysis 'must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects.'" *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993–94 (quoting *Ocean Advocates*, 361 F.3d at 1128).

[206] *Rock Creek All. v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1173 (D. Mont. 2010), *aff'd in part sub nom. Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439 (9th Cir. 2011) (citing *Kleppe v. Sierra Club,* 427 U.S. 390, 413–14, (1976)).

analysis is "fully informed and well considered," courts "should defer to that finding."[207] This includes the agency's "determination of what are 'reasonably foreseeable future actions.'"[208]

Here, the question of whether potential future development of a mine in the Palmer Project Area should be considered part of the "cumulative impacts" of the Exploration Activities turns on whether mining development is a "reasonably foreseeable future action."[209] The Ninth Circuit "defines 'reasonably foreseeable' in this context to include only 'proposed actions.'"[210] The Ninth Circuit has explained this rule as follows:

> This rule makes sense: The agency is required to analyze the cumulative effects of projects that it is already proposing. For any project that is not yet proposed, and is more remote in time, however, a cumulative effects analysis would be both speculative and premature. By contrast, any future project, once proposed, becomes more concrete and less speculative, and thus, would be subject to NEPA's cumulative effects analysis. Further, at the time it was proposed, if it is a major federal action, its NEPA assessment would be obligated to include all past projects in the cumulative effects analysis.[211]

---

[207] *Ocean Advocates*, 361 F.3d at 1128.

[208] *Kern*, 284 F.3d at 1075 (quoting *Blue Mountains*, 161 F.3d at 1211). *See also Rock Creek All.*, 703 F.Supp.2d at 1173 ("If the nature and scope of the analysis is challenged, the reviewing court may only examine whether the agency has taken a hard look at the environmental consequences." (quoting *Inland Empire*, 88 F.3d at 763) (internal quotations omitted)). However, courts "need not forgive a clear error in judgment." *Kern*, 284 F.3d at 1075 (quoting *Blue Mountain*, 161 F.3d at 1211 (internal quotation marks omitted)).

[209] *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006) ("Projects that are 'reasonably foreseeable' should be included in the cumulative effects analysis." (citing 40 C.F.R. § 1508.7)).

[210] *Powell*, 395 F.3d at 1023 (quoting *Or. Nat. Res. Council v., Marsh*, 832 F.2d 1489, 1498 (9th Cir. 1987), *rev'd on other grounds*, 490 U.S. 360 (1989)).

[211] *Powell*, 395 F.3d at 1023.

Thus, where plans remain "speculative and have not been reduced to specific proposals," cumulative impacts analysis is not required.[212] The Ninth Circuit has held that "general statements regarding a desire for increased mining," with "no information as to the scope or location of any future projects" does not "require a cumulative impacts analysis."[213]

*City of Davis v. Coleman*,[214] which Plaintiffs cite for the proposition that "[a] future action need not be certain to be reasonably foreseeable," is inapposite.[215] *Coleman* involved a single, existing proposal—construction of a freeway interchange—and an assessment of the cumulative impacts stemming from that proposed action.[216] Here, Plaintiffs do not challenge the impacts included in the EAs for the currently proposed activities in the Exploration Plan and Road Extension; rather, they assert that the cumulative impact analysis should forecast impacts stemming from potential future actions—beyond what is currently proposed in the two MPOs— by the agency and third parties.[217]

---

[212] *Jones*, 741 F.3d at 999 (holding that review of future activities was not required where "there is no reliable study or projection of future mining"). *See also Envtl. Prot. Info. Ctr.*, 451 F.3d at 1014 (upholding a U.S. Forest Service EA that "noted" a specific proposal "but specifically excluded it from its analysis" because the agency lacked sufficiently specific information to allow for "meaningful consideration").

[213] *Jones*, 741 F.3d at 1001.

[214] 521 F.2d 661 (9th Cir. 1975).

[215] Dkt. 54-1 at 29.

[216] *See* 521 F.2d at 674–75. Specifically, at issue were the impacts from future development— increased population, traffic, pollution, industrial development, and services—that would likely result from the construction of "a large interchange on a major interstate highway in an agricultural area where no connecting road currently exists." *Id.* at 675.

[217] Moreover, none of the potential future development at issue in *Coleman* would itself have required any NEPA review to go forward. By contrast, here, any mine development in the future in the Palmer Project Area will require an MPO and additional NEPA review before implementation. *See* 40 C.F.R. § 1508.7; 43 C.F.R. § 3809.401.

Plaintiffs also look to *Northern Plains Resource Council, Inc. v. Surface Transportation Board*[218] for the proposition that "anticipated development of a specified area is reasonably foreseeable."[219] Yet *Northern Plains* is also distinguishable from the present facts. In that case, the Ninth Circuit found the Surface Transportation Board (the "Board") acted arbitrary and capricious when, in conducting NEPA review for one of three coal-transport railway applications, the Board failed consider the cumulative impacts associated with (1) all three applications for a coal-transport railway, which were filed together; and (2) the cumulative impacts associated with a recently-completed programmatic EIS assessing 20-years of coalbed methane development in certain areas of the state.[220] There, however, the Board had substantial information regarding the scope of those activities and their likelihood,[221] and the Ninth Circuit held that given that the Board had "a time frame and a reasonably foreseeable development plan," the Board had "not sufficiently explained

---

[218] 668 F.3d 1067 (9th Cir. 2011).

[219] Dkt. 54-1 at 29. Plaintiffs also rely on *Thomas v. Peterson*, 753 F.2d 754 (1985) for the related proposition that "[a] future action need not be certain to be reasonably foreseeable," and that foreseeability "can be inferred from circumstantial facts"). That case, however, involved a challenge to an EA for a timber road where preparation of a Forest Management Plan and accompanying EIS was occurring concurrently with the litigation, and had been in development at the time the challenged EA was completed. *See id.* at 757–58. The Ninth Circuit noted that "the record contains substantial evidence that the timber sales were in fact at an advanced stage of planning by the time that the decision to build the road was made," and noted that "[t]he Forest Service issued EA's for, and approved, two of the timber sales nine and sixteen months after it issued the road EA." *Id.* at 760. Here, no such facts indicate that active planning for development is ongoing such that BLM must consider it concurrently with the exploration activities.

[220] 668 F.3d 1067, 1077 (9th Cir. 2011).

[221] *Northern Plains*, 668 F.3d at 1079 (stating "[t]he route for the railroad is known, including the terrain and counties in which it would operate. Likewise, the Methane EIS has described in some detail the likely scope of CMB development in the future. Although the Methane EIS is a programmatic document, it is specific to the number of wells, field compressors, roads, and pipelines for each of the three counties that [the proposed railroad] would cross.").

44

why it cannot or should not incorporate this available data concerning likely future development into its environmental impact analysis." [222]

No such information is available here. Plaintiffs point to no such specific data—nor is the Court aware of any—providing BLM with specific, quantifiable information about the parameters of future mine development. Indeed, Plaintiffs largely rely on the contention that general knowledge about the Palmer Project Area is sufficient, and assert that the cumulative impacts of a future mine would be qualitatively the same, and "additive to those of the [Exploration Plan] and Road Extension[.]"[223] Such general assertions cannot meet the definition of "reasonably foreseeable" as articulated by the Ninth Circuit, nor can this Court find that BLM's decision to limit the scope of their cumulative impacts analysis to only the currently proposed activities was arbitrary and capricious such that this Court should set it aside.[224]

---

[222] *Northern Plains*, 668 F.3d at 1079. The Ninth Circuit went on to note that where "actual numbers, broken down by county, about development over the next 20 years" existed, "an adequate cumulative impact analysis necessarily requires that such information be included." *Id. See also Mont Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074, 1090–1093 (2017) (finding that the agency was required to incorporate readily available data and impacts from already proposed actions into their cumulative impact analysis).

[223] Dkt. 54-1 at 31. Plaintiffs explain that "like exploration activities, development would generate water quality impacts in and downstream of the [Palmer Project Area]"; that "like exploration activities, development infrastructure would cause disturbance and habitat displacement"; and point to several other general impacts, such as noise, that would continue to result were development to occur. *Id.* The Court acknowledges that Plaintiffs' position makes practical sense, and that expansion of these ongoing exploration operations—many of which involve the same activities that development and extraction would—will necessarily cause the same disturbances, but on a larger scale. However, existing case law does not require an agency consider these possibilities as part of the cumulative impact analysis absent a proposal, or a showing of a more definite plan for future activities such that a meaningful analysis of those impacts could occur.

[224] *See Envtl. Prot. Info. Ctr.*, 451 F.3d at 2015 ("In sum, because the parameters of the [project] were unknown at the time of the EA, it was not arbitrary and capricious for the [agency] to omit the project from its cumulative analysis.").

Accordingly, the Court finds that BLM did not violate NEPA in declining to consider potential future mine development impacts in its cumulative impact analysis for the Exploration Plan and Road Impact EAs.

### B. *Timeliness Under NEPA*

Plaintiffs also argue that NEPA timeliness requirements mandate BLM consider the impacts of potential mining development as part of the Exploration Plan and Road Extension EAs.[225] Specifically, Plaintiffs argue that BLM's failure to consider these development impacts as part of any environmental review for the Exploration Plan and Road Extension, violates NEPA timeliness requirements because the exploration activity "may lead to the establishment of private rights" that would limit the options available to BLM and "compromis[e] its ability to make a fully informed decision . . . rendering its hard look too late."[226]

Plaintiffs advance two specific arguments to support this broad proposition. First, Plaintiffs argue that 42 U.S.C. § 4332(2)(C)(v)—NEPA's requirement that a hard look by the agency occur "before . . . an irreversible or irretrievable commitment of resources prejudices the agency's choices"—dictates that review of possible development be included agency's decision to approve exploration.[227] Plaintiffs also argue, more generally, that NEPA "requires an agency to take a hard look at impacts 'as soon as it can reasonably be done;'" and that "thorough discussion of future impacts in the life cycle of a mine is possible even where the outcomes of exploration remain uncertain."[228]

---

[225] Dkt. 54-1 at 32.

[226] *Id.* at 25; *see also id.* at 34–37.

[227] *Id.* at 33.

[228] *Id.* at 38 (citing *Kern*, 284 F.3d at 1072).

1.  <u>Irreversible or Irretrievable Commitment of Resources</u>

Plaintiffs first argue that NEPA's requirement that impacts be analyzed before an "irreversible or irretrievable commitment of resources prejudices the agency's choices" requires that potential future impacts of mine development be assessed as part of environmental review for the Exploration Activities. In response, Defendants assert that the decision to withdraw land is a separate analysis from any NEPA analysis or the approval of any MPO, and that no statute or regulation "limits the Secretary [of the Interior's] authority to withdraw the public lands at issue because BLM approved the exploration MPOs."[229] In addition, Defendants argue that "[a]pproving the proposed exploration MPOs at issue here does not diminish BLM's decision-making authority with respect to any future mining operations that Constantine may one day propose," and that "BLM retains full authority to reject or require modification of any future proposed MPO that causes unnecessary or undue degradation" under BLM regulations.[230]

"The purpose of an EIS is to apprise decisionmakers of the disruptive environmental effects that may flow from their decisions at a time when they 'retain a maximum range of options.'"[231] Under Ninth Circuit law, this means that "[t]he agency must complete an EA before the 'go-no go' stage of a project, which is to say before 'making an irreversible and irretrievable commitment of resources.'"[232] According to Plaintiffs, "by deciding to approve exploration, BLM

---

[229] Dkt. 58 at 30.

[230] *Id.* at 28.

[231] *Conner v. Buford*, 848 F.2d 1441, 1446 (9th Cir. 1988) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983) (internal punctuation omitted)). *See also Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979) (environmental review "shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary").

[232] *Ctr. for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1006 (9th Cir. 2011) (quoting *Daley*, 214 F.3d at 1142–43) (internal citations and punctuation omitted); *Conner*, 848 F.2d at 1446) (holding that "an EIS must be prepared before any irreversible and irretrievable

47

authorizes activities that may lead to discovery of a valuable mineral deposit" and thus "constrain BLM's authority to fully protect the area."[233] Plaintiffs contend that "the agency's discretion to protect the Palmer Project [A]rea by a land withdrawal [under 43 U.S.C. §§ 1702(j), 1714(a)] narrows at the point of discovery."[234] Thus, "BLM's decisions at issue in this case approving exploration activities could be the last chance before [Constantine] would reach the point of discovery."[235]

Plaintiffs are correct that discovery of an economically viable deposit would vest property rights in Constantine, or any other party who should make such a discovery. However, unlike the cases Plaintiffs rely on for the proposition that this is an irrevocable decision by the agency—all of which involved some affirmative act on the part of the agency[236]—the vesting of rights under the Mining Act occurs independent of any action by BLM. Indeed, as Plaintiffs recognize, "[t]his

---

commitment of resources" occurs (quoting *Envtl. Def. Fund v. Andrus*, 596 F.2d 848, 852–53 (9th Cir. 1979))).

[233] Dkt. 54-1 at 34.

[234] *Id*. at 35.

[235] *Id*. at 37.

[236] *See, e.g., Pit River Tribe*, 469 F.3d at 775–76 (challenging issuance of geothermal development leases which affirmatively granted the leaseholders "the exclusive right to drill for, extract, produce, remove, utilize, sell, and dispose of all geothermal resources in the lands described"); *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1226 (9th Cir. 1988) (contesting EA preparation for issuance of oil and gas leases on federal land); *Conner*, 848 F.2d at 1462 (involving issuance of oil and gas leases on national forest land). *Cf. Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1063–64 (9th Cir. 1998) (EIS not required where the agency retained the ultimate right to decide quantities of timber harvesting because agency had not irretrievably committed resources).

vesting of rights occurs by operation of law, triggered by private third-party actions, requiring no additional agency decision."[237]

In advancing this scenario to support their argument, what Plaintiffs have unearthed is not a mandate of NEPA, but the uncomfortable interplay between the Mining Act—which has long stood to encourage the exploration, discovery, and development of economically profitable natural resources on public lands—with NEPA's goal of ensuring consideration of environmental factors prior to any federal agency action. Certainly, the two acts do not seem to harmonize well, and in some ways, the Mining Act appears at first to run contrary to the spirit of meaningful environmental review under NEPA.

Sifting through the interplay of the regulatory schemes that Plaintiffs discuss, and returning to the overarching aim of NEPA, informs this Court's decision: NEPA is designed to inform the decision-making process of federal agencies, not to ensure any particular result. The environmental review procedure at issue here is BLM's review of two MPOs submitted by Constantine: one for the Exploration Plan, and one for the Road Extension. Neither discovery of an economically profitable mineral deposit, nor withdrawal of the Palmer Project Area from mining under FLPMA, is at issue here, or under review by the agency.

Nor could either of those events—even if they were under review—mandate a certain level of environmental review occur before BLM's approval of the two MPOs. The possibility of discovery is not an action within the agency's control. Absent some discretionary decision by the agency that represents a "commitment" of resources by affirmative act, NEPA's timeliness

---

[237] Dkt. 54-1 at 36 (citing to *United States v. Shumway*, 199 F.3d 1093, 1100 (9th Cir. 1999)). *See also* Dkt. 54-1 at 9 (noting that vesting of rights under Mining Act occurs "by operation of law").

requirements cannot be said to have been violated.[238] The event that Plaintiffs assert could result in an "irrevocable and irretrievable" commitment of resources (thus, they argue, mandating agency environmental review *now*) depends on the actions of a private, third-party, and is not within BLM's control. NEPA's regulations cannot bind BLM to act based on the possibility of an event that is not only outside of their control, but occurs due to the operation of law and is contingent on the actions of third parties, without any action at all by BLM.

Similarly, the withdrawal process is distinct and independent from BLM's NEPA review of the two MPOs. While Plaintiffs are correct that discovery would constrain the ability of BLM to wholly withdraw the Palmer Project Area under 43 U.S.C. §§ 1702(j),[239] that process—if it were to occur at all—is entirely separate from NEPA. NEPA review does not mandate—or even trigger—any process by which BLM would have to investigate the option of land withdrawal. The issue of withdrawal would constitute a separate agency action, governed by FLPMA, with independent statutory and regulatory standards to justify the withdrawal and a distinct procedure that BLM and the Secretary must follow.[240]

As Defendants correctly note, the "development of mineral resources within an active unpatented mining claim was a non-discretionary action on behalf of BLM's decision process."[241]

---

[238] *See Pit River Tribe*, 469 F.3d at 780 (noting that NEPA would not apply to a modified provision of the Geothermal Steam Act going forward, because "[b]y changing 'may' to 'shall,' the statute eliminated the Bureau's discretion in extending geothermal leases, provided that certain conditions are met by the lessees. NEPA's EIS requirements apply only to discretionary federal decisions.").

[239] *See* Dkt. 54-1 at 34–35.

[240] *See, e.g.*, *Zinke*, 877 F.3d at 855–58 (describing withdrawal authority and process).

[241] Dkt. 54-1 at 21 (quoting Dkt. 36-9). *Cf. South Dakota v. Andrus*, 614 F.2d 1190, 1193–94 (8th Cir. 1980) (holding that nondiscretionary approval of a mineral patent under the Mining Act a ministerial action, and thus not within the ambit of NEPA).

BLM regulations "establish specific and limited circumstances under which the agency may disapprove a proposed MPO or MPO modification."[242] Thus, any withdrawal determination is entirely distinct from the agency actions at issue here—the approval of the Exploration Plan and Road Extension—and, thus, the former cannot be said to drive the timeline of any NEPA review of the latter.

  2.  Timing of Cumulative Impacts Analysis Generally

Plaintiffs further—and more generally—argue that Ninth Circuit law "requires an agency to take the hard look at impacts 'as soon as it can reasonably be done,'" and that, for the present case, this mandates review of potential mining impacts as part of the review for the two MPOs[243] While Plaintiffs concede that BLM does not have precise information available now, and would necessarily have to conduct more in-depth review later if an actual mining proposal is submitted, Plaintiffs nonetheless argue that the information available is sufficient for *some* review of potential impacts from development.[244] Thus, Plaintiffs contend, "a reasonably thorough analysis of development impacts is possible," and that "BLM was required to undertake that analysis."[245] Defendants contend, in response, that appropriate time for analysis of potential mining impacts is "when (and if) actually proposed."[246]

Under Ninth Circuit law, while "it is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now," this rule does not

---

[242] Dkt. 58 at 30.

[243] Dkt. 54-1 at 38 (citing *Kern*, 284 F.3d at 1072).

[244] *Id*. at 39–40.

[245] *Id*. at 40.

[246] Dkt. 58 at 28.

Case 3:17-cv-00253-TMB   Document 61   Filed 03/15/19   Page 51 of 53

"require the government to do the impractical if not enough information is available to permit meaningful consideration."[247] The cases Plaintiffs rely on for the proposition that review of future mining development must occur prior to approval of any Exploration are readily distinguishable from the present circumstances, and involve situations where the review at issue was for projects that were actually proposed,[248] or where substantially more information was available to the agency about future activities.[249] Defendants correctly assert that any future mining development activities would require an MPO and would be subject to NEPA review, including an analysis of past, present, and future operations.[250] Ninth Circuit law does not require this review to occur now, and in fact, provides BLM the authority to defer that analysis until such a project is actually proposed.[251] Nothing here indicates that BLM's decision to do so was arbitrary and capricious such that this Court should disturb that determination.

---

[247] *Envtl. Prot. Info. Ctr.*, 451 F.3d at 1014 (internal citations and punctuation omitted).

[248] *See Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dep't of the Interior*, 608 F.3d 592, 600–01 (9th Cir. 2010) (approving an amendment expanding operations where a three-phase drilling exploration effort had already been approved); *Thomas*, 753 F.3d at 756–57, 760–61 (requiring consideration of a timber road and the timber harvesting for which the road was built together, where EAs for timber sales followed nine and sixteen months after the issuance of the road EA, and EA for at least one sale was in preparation concurrently with road EA).

[249] *See Northern Plains*, 668 F.3d at 1079 (agency required to consider the effects of coalbed methane where an extensive EIS projecting likely development over 20 years was already available and could be incorporated into environmental review).

[250] 40 C.F.R. § 1508.7; 43 C.F.R. § 3809.401.

[251] *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (noting that NEPA's timeliness requirements for a multi-step project are "tempered by the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences" (citing *Kleppe*, 427 U.S. at 402)). *See also Wetlands Action Network*, 222 F.3d at 1119 (authorizing consideration of the phases of a multi-phased project separately where consideration together would be impractical due to incomplete planning for later phases).

Accordingly, the Court finds that NEPA timeliness requirements do not mandate that BLM consider the future effects of development when approving the EAs for the Exploration Plan and Road Extension.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment at docket 43 is **DENIED** and Defendants' Cross Motion for Summary at docket 58 is **GRANTED**.

Dated at Anchorage, Alaska, this 15th day of March, 2019.

*/s/Timothy M. Burgess*

TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

Case 3:17-cv-00253-TMB   Document 61   Filed 03/15/19   Page 53 of 53